# EXHIBIT 3

## IN THE MATTER OF:

*Robert Gene Wells v.*
*Tommy Ford, et al*

---

*Deposition of Ron McAndrew*
*March 28, 2022*

---



(850) 737-9071
info@precisionreportingandvideo.com

BAY COUNTY
4408 Delwood Lane, Suite 20
Panama City, Florida 32408

WALTON COUNTY
12889 Emerald Coast Pkwy, Suite 107A
Miramar Beach, Florida 32550

*Original File Ron McAndrew 03-28-2022_S.txt*
*Min-U-Script® with Word Index*

# EXHIBIT 3

1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                  PANAMA CITY DIVISION

 3   ROBERT GENE WELLS,

 4           Plaintiff,

 5   v.                        CASE NO.:  5:21-cv-00019

 6   TOMMY FORD, in his official capacity as
     SHERIFF of BAY COUNTY, and RICK ANGLIN,
 7   In his supervisor capacity

 8           Defendants.

 9
     _____/
10

11   DEPOSITION OF:     RON McANDREW

12   ON BEHALF OF:      Attorney for Defendants

13   DATE:              March 28, 2022

14   TIME:              8:57 a.m. to 12:57 p.m. CT

15   PLACE:             All Parties Remote Via Zoom

16   REPORTED BY:       Stephanie R. Zeitvogel, FPR-C
                        Stenographic Reporter
17                      Notary Public
                        State of Florida at large
18

19

20

21

22

23

24

25
```

# EXHIBIT 3

2

```
1    APPEARANCES:

2    ADAM J. ELLIS, ESQ.
           - and -
3    JOHN BAILEY, ESQ.
     Marie Mattox, P.A.
4    203 North Gadsden Street
     Tallahassee, Florida 32301-7637
5    850-383-4800 Fax: 850-383-4801
     adam@mattoxlaw.com
6
               Attorneys for Plaintiff
7

8
     JENNIFER HAWKINS, ESQ.
9    Warner Law Firm, P. A.
     501 West 11th Street, Suite A
10   Panama City, Florida  32401
     850-784-7772
11   pleadings@warnerlaw.us

12             Attorney for Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 3

3

1                 INDEX TO PROCEEDINGS AND EXHIBITS

2                                          PAGE    LINE

3   RON McANDREW                             4      5

4   Direct Examination by Ms. Hawkins        4      8

5   Cross-Examination by Mr. Ellis          127     2

6   Redirect Examination by Ms. Hawkins     128     21

7   Recross-Examination by Mr. Ellis        131     5

8   Further Redirect Examination by         131     23
    Ms. Hawkins
9
    Exhibit 47 Roster Card D,               135     10
10              WEL1-000090 - 91

11  Further Recross-Examination by Mr. Ellis 136    19

12  Exhibit 48 Post Order, WEL1000077 - 87  137     10

13  Exhibit 49 Incident Report,             137     11
                WEL1-000831 - 832
14
    Exhibit 50 Full Investigative Report,   137     12
15              WEL1-000765 - 000816

16  Certificate of Oath                     138     1

17  Certificate of Reporter                 139     1

18  Errata sheet                            140     1

19  Read and Sign Letter                    141     1

20

21

22

23

24

25

# EXHIBIT 3

4

1          COURT REPORTER:  Do you swear or affirm that

2       the testimony you are about to give will be the

3       truth, the whole truth, and nothing but the truth?

4          THE WITNESS:  I swear.

5                    RON McANDREW,

6  the witness herein, being first duly sworn, was examined

7  and testified as follows:

8                 DIRECT EXAMINATION

9  BY MS. HAWKINS:

10     Q    Good morning, Mr. McAndrew.  We are here on

11  Robert Wells v. Tommy Ford as Sheriff of Bay County and

12  Rick Anglin, and I am Jennifer Hawkins representing them

13  both for the Warner Law Firm.

14          I believe that we've done a deposition

15  previously where I've taken your deposition, and so sort

16  of the same things apply.  I'm going to try not to speak

17  over you and allow you to finish answering your

18  question, and if you can, try to allow me to finish

19  asking the question before you start answering so we can

20  get a complete record, okay?

21     A    Yes, ma'am.

22     Q    All right.  Do you agree with me that an

23  expert should review the record and be accurate in the

24  information that he or she renders an opinion on?

25     A    I do.

# EXHIBIT 3

1       Q      Are you aware of a recent ruling by

2   Judge Hinkle on a case that I believe you gave an expert

3   opinion on was Lucas v. Tommy Ford as sheriff of Bay

4   County and Rick Anglin?

5       A      I am.

6       Q      Okay.  And are you aware of Judge Hinkle's

7   ruling last Thursday on that case?

8       A      No.

9       Q      Okay.  Are you aware that in his ruling that

10  he stated that you made findings based on the Bay County

11  Jail being in a mandatory evacuation zone when factually

12  it was not?

13      A      That has been brought to my attention by

14  Attorney Mattox.

15      Q      Okay.  And clearly you were not factually

16  correct in giving that opinion and basing your

17  information on that, were you?

18      A      I was not.  There's a correction in process.

19      Q      And in fact, Judge Hinkle expressed his

20  disappointment that an expert or someone such as

21  yourself who purports to be an expert would not make

22  sure that he had the facts correct before rendering an

23  opinion?

24      A      Yes.  Of course, I agree with that.  And at

25  the same time, I also would say that mistakes are made

# EXHIBIT 3

6

1   and mistakes if found should be corrected, and that's of

2   course what's happening.

3       Q    Okay.  And now, you were made aware of the

4   fact that the Bay County Jail was not in evacuation in a

5   deposition that you gave on that case, but you did not

6   correct your error at that time, did you?

7       A    I was not aware of the error at that time, so

8   I of course did not correct it.

9       Q    So having been told in that deposition that

10  the jail was not in a mandatory evacuation zone did not

11  prompt you to confirm that you had correct information

12  such that you could correct it prior to the Judge ruling

13  on it?

14      A    I'm sorry.  Can you shorten that question just

15  a bit?  I'm not getting the gist.

16      Q    Sure.  Well, being told in that deposition

17  that the Bay County Jail was not in a mandatory

18  evacuation zone did not prompt you to go further, look

19  into it to see if you were incorrect such that you could

20  amend your opinion?

21      A    As I previously said, had I known at the time,

22  of course I would have, but I did not know there was an

23  error in my statement at the time, but that is in the

24  process of being corrected.

25      Q    So it's your position that at that deposition

# EXHIBIT 3

7

1   that you gave on that Lucas case, you were never told

2   that the Bay County Jail was not in an evacuation zone

3   by me?

4       A    I don't remember if you made reference to that

5   during that particular deposition or not.  I didn't

6   prepare myself to address that deposition today.

7       Q    Fair enough.  Tell me about your schooling.

8       A    I have an AA degree from Miami Dade College in

9   criminal justice administration.  I'm a certified public

10  manager through the Center for Public Management,

11  Florida State University.  That's not a bachelor's

12  degree.  It's a two-year pass/fail program under

13  Governor Lawton Chiles' Sterling program, and I have

14  that certification.

15          I have completed 12 career development

16  courses, all 40 or 80-hour courses taught in community

17  colleges around the State of Florida, a design

18  sanctioned by the Florida Department of Law Enforcement,

19  pass and fail in all cases.  I have attended and

20  completed countless seminars and special training events

21  all related to corrections.

22      Q    Okay.  Please tell me about your work history.

23      A    How far back should we go?  I'm an old man.

24      Q    Your history in corrections and/or anything

25  that would relate to you rendering an opinion on a jail

# EXHIBIT 3

8

1   case --

2      A    (Phone ringing.)  Let me shut this off.  I'm

3   sorry.

4          I was in the United States Air Force for four

5   and a half years.  I was -- I served in France and the

6   Belgian Congo.  I worked for a French firm for 18 years

7   in France, the Mediterranean, the Middle East, the Far

8   East, and Southeast Asia.  In 1979, I lost that job as

9   our business in Southeast Asia had gone from very good

10  to almost zero.

11         I came back to the United States at that time,

12  went to Miami, could not find a job.  The opportunity to

13  be hired as a recruit correctional officer came up, and

14  I accepted.  I came up through all of the gut level

15  positions of officer, sergeant, lieutenant, captain,

16  investigator, inspector, major, while going from one

17  institution to another around the State of Florida.  I

18  skipped over colonel, and I was appointed as a deputy

19  warden in 1988.

20         In 1992, I was appointed as a warden to open a

21  new prison in Gulf County, Wewahitchka.  In 1996, I was

22  appointed as the warden of Florida State Prison in

23  Stark.  In 1998, I was appointed as the warden of

24  Central Florida Reception in Orlando.

25         In 2001, I was allowed to purchase four years

# EXHIBIT 3

9

1   of my military time, and they gave me credit for 27

2   years, and I retired for five days, at which time I was

3   called by the mayor of Orange County and asked if I

4   would take over the Orange County Jail on an emergency

5   basis.  I did so contingent upon the county doing a

6   national search for a new director.  That took about a

7   year.

8          At that time, I went back into retirement.  I

9   got into politics.  I was elected as the city councilman

10  where I lived.  I then ran for the mayor's position and

11  lost my bid.

12         In 2005, I was called by a law firm in Panama

13  City and asked if I would do some expert work.  Since

14  that time, I have been retained on 594 separate

15  verifiable cases.  I have testified as an expert in

16  state and federal courts throughout the United States

17  and the High Court of Dublin.

18         I have been in this business now for almost 17

19  years as a prison and jail consultant.

20  Q    How many times previously have you had to go

21  back and correct and change your errors in your report

22  after a ruling by a judge such as the one that occurred

23  on Thursday?

24         MR. ELLIS:  Form.

25         THE WITNESS:  I don't have a figure for that,

# EXHIBIT 3

1       but I can tell you that it has happened.  I don't

2       know how many times, but it's not many.  I live in

3       a world where people do make mistakes.  Sometimes

4       they're given the wrong information or they fail to

5       see something.  But if they are a true

6       professional, they're willing to admit the mistake,

7       back up, and correct it.

8   BY MS. HAWKINS:

9       Q    What is it that you did for the French firm?

10  You said you worked for a French firm for 18 years.

11  What was that doing, what were you doing?

12      A    I started out as a salesman covering the

13  Mediterranean from Italy across Southern France to

14  Spain, Morocco.  I was then promoted to the vice

15  president and general manager of the Far East and

16  Southeast Asia operations after spending a year in

17  Lebanon.

18           And I then lived and worked in Japan, Korea,

19  Hong Kong, Vietnam, Thailand, Guam, and finally I worked

20  in an office for that company in Honolulu.

21      Q    What sort of products or services did that

22  company deal with?

23      A    Luxury products that you find in duty-free

24  shops, hundred dollar neckties, French perfumes.  We had

25  all of the top lines -- (unintelligible).

# EXHIBIT 3

11

1          COURT REPORTER:  Could you repeat those for me

2     a little bit slower?

3          THE WITNESS:  I'm sorry?

4          COURT REPORTER:  Those products, could you

5     repeat that a little bit slower.  I didn't get it.

6          THE WITNESS:  Sure.  Top line fragrances and

7     associated products.  Things like expensive

8     neckties, expensive cigarette lighters, that came

9     from the French companies of Patou, Garban

10    [phonetic], Dana, Long Ba [phonetic], SUP, Madame

11    Rochas, Werth.  And there may have been a couple of

12    others that escape my memory at this moment.

13  BY MS. HAWKINS:

14    Q    You said the first firm that contacted you

15  about doing work as an expert was a law firm in Panama

16  City.  Which law firm was that?

17    A    Wes Pittman.

18    Q    Do you have any documents or items with you

19  today in preparation of giving this deposition?

20    A    I do.  I have my report and the Florida Model

21  Jail Standards.

22    Q    And on the Florida, obviously, you know,

23  you've got your Florida -- are the Florida Model Jail

24  Standards something that you relied upon in formulating

25  your opinion?

# EXHIBIT 3

12

1      A      I did.

2      Q      Did you review anything in preparation for

3   this deposition today?

4      A      I reviewed my own report and the referenced

5   areas of Florida Model Jail Standards 2018.

6      Q      And I'm going to -- I've got the addendum

7   report just because it seems to be the most complete

8   obviously from your first report.  And so I'm not going

9   to ask you to go through every single document you

10  reviewed in formulating your opinions in your report

11  because you've got 124 items listed there.

12          But what I'm going to ask you to do, if you

13  could look at your report for me, could you confirm that

14  there's nothing else in addition to that that you

15  reviewed or looked at in formulating your opinion or in

16  giving your testimony today that you're aware of?

17     A      As of this date, I have not reviewed anything

18  that's -- further that's listed in my addendum report.

19  I have asked for some materials that were not provided,

20  but I understand that there may be a Court ruling on

21  that or is going to be.

22     Q      And what item is that?

23     A      The jail's emergency plans.

24     Q      And how would the jail's -- having the jail's

25  emergency plans relate to the Wells case?

# EXHIBIT 3

13

1    A    Well, since I have been the author of
2  emergency plans for the Florida Department of
3  Corrections and the Orange County Jail, updated,
4  revised, I can say that emergency plans for any place of
5  incarceration are going to include a multitude of very
6  important things that you're required to do during an
7  emergency.  And it may not be specifically titled for
8  each instance, but there are many areas of importance
9  that I would want to review in terms of this particular
10  case.
11    Q    And what was the emergency in this case that
12  you would be looking at those emergency plans for?
13    A    I don't know because I haven't been able to
14  see the plans.
15    Q    Okay.  Well, is it your position that there
16  was some sort of an emergency that took place in this
17  case that -- such that plans would be relevant?
18    A    I can't know yes or no on that until I see the
19  plans.  And, of course, they're not being provided.
20    Q    So you can't identify if an emergency has
21  taken place without having plans to know if an emergency
22  took place?
23    A    If I had the plans, I'd be able to answer that
24  question accurately.
25    Q    So it's your position that you don't know if

# EXHIBIT 3

14

1    there was an emergency or not as it relates to the Wells

2    case?

3        A     That's not what I said.  I'm saying that the

4    emergency plans outlines requirements during an

5    emergency or a perceived emergency.  And once again, I

6    have not been able to see those plans, so I can't answer

7    that question accurately.

8        Q     So you're unable to tell me if there was an

9    emergency or a perceived emergency in the Wells case?

10       A     Of course in my report, I've outlined very

11   accurately the horrible brutal rape of the plaintiff,

12   and I'm familiar with the Prison Rape Elimination Act of

13   2003, and I know that there are possible emergencies

14   that would be outlined if I had the emergency plans, but

15   I don't.  So therefore, I can't accurately answer your

16   question, ma'am.

17       Q     Okay.  So it's your position that a rape may

18   be emergency, but you don't know if it's an emergency or

19   not without looking at the plans?

20       A     As I said previously, I thoroughly outlined

21   the horrible and brutal rape of the plaintiff and how he

22   was subsequently treated, and there may, there may not

23   be a reference to an incident like that in the emergency

24   plans.  But once again, without having those plans to

25   further review, it's impossible to answer that question

# EXHIBIT 3

15

1  accurately.

2      Q    Do you anticipate modifying your opinion or

3  formulating any new opinion in this case?

4      A    No, ma'am, unless of course new evidence or

5  material comes forward.

6      Q    Have you ever been disallowed by any Court

7  from testifying as an expert witness?

8      A    Twice, in Fort Pierce and Fort Myers.  In each

9  case, I had not personally interviewed the inmate on

10  resentencing cases, and my testimony was not allowed.

11  That's out of 156 times that I have testified as an

12  expert in state and federal courts across the country,

13  all over the state, the New York State Court of Claims

14  and the High Court of Dublin.

15      Q    What are the names of those cases?

16      A    They're in my case file history, which I would

17  assume has been provided to you by this time.

18      Q    I don't believe that I've got your case file

19  history, but I may have it.  If I don't have that, is

20  that something that you could get to me, you could get

21  me those names of those two cases later?

22      A    I believe Mr. Bailey could e-mail it to you

23  instantly.

24      Q    Okay.  Thank you.  And are those two

25  identified on there specifically as the ones that you

# EXHIBIT 3

1  were not allowed to testify in or is it just it's

2  somewhere in the list of 150 something cases you just

3  told me about?

4      A    It's somewhere in the mix of 594 cases.

5      Q    Okay.  Well, I'd like to know the names of

6  those two because obviously if there are 500 and you

7  were only allowed -- you know, disallowed in two, I'm

8  going to need the names of them.

9           Do you not remember the names of the two where

10  you weren't allowed to testify?

11      A    It was 15 or 16 years ago, so my memory in

12  terms of something like that far back -- I've been asked

13  the same question a number of times, and I've always

14  named the two different places and the reasons why my

15  testimony was not valid.

16           But they were resentencing cases, Miller

17  Graham cases, and of course since that time, I have

18  refused to take a case unless I have personally

19  interviewed the subject.

20      Q    Did you interview the plaintiff in this case?

21      A    I did not.

22      Q    Are you currently being compensated for your

23  testimony?

24      A    I am.

25      Q    If this case proceeds to trial, do you

# EXHIBIT 3

17

1   anticipate being compensated for your testimony?

2        A    I do.  This is my business.

3        Q    Could you please tell me about your fee

4   arrangement and how you're being compensated for your

5   testimony?

6        A    My fee schedule should have been provided to

7   you likewise.  I can look it up.  But for a deposition,

8   as an example, it's $350 an hour with a minimum of

9   $1,400, and reasonable prep time according to the

10  federal rule, and I charge the representative attorney

11  $250 an hour for consultation, record review,

12  interviews.  And then I charge, of course, for the time

13  that it takes me to do a report, same rate.

14       Q    And about how much do you think that you've

15  charged so far in reviewing the documents and preparing

16  your expert report?

17       A    Approximately 5,000.

18       Q    And what is your rate if this goes to trial?

19       A    What I just told you.

20       Q    Okay.  Well, you told me the deposition rate

21  and then you told me an attorney consultation rate.  Is

22  it 350 an hour for trial as well?

23       A    Well, the deposition rate is also the trial

24  rate.

25       Q    Okay.  All right.  And how much time did you

# EXHIBIT 3

18

1    spend preparing for this deposition?

2        A    Counting this morning, probably about five

3    hours.

4        Q    And what did you review in preparing for this

5    deposition?

6        A    I reviewed my report, the Florida Model Jail

7    Standards, and consultation with staff of Ms. Mattox and

8    also a consultation with Ms. Mattox.

9        Q    And who was the staff that you consulted with

10   in preparation for this deposition?

11       A    John Bailey provided me with some material

12   that I requested.

13       Q    Okay.  And what is that material that you

14   reviewed?

15       A    The link for this Zoom conference or Zoom

16   deposition.

17       Q    And so you're billing prep time to get the

18   Zoom link?

19       A    No, no, for something as small as that, I

20   don't log that.

21       Q    Okay.  Well, you just said that you consulted

22   with staff in preparation for this deposition, and so

23   are you billing for the consultation then with John

24   Bailey?

25       A    Should he work with me in providing me

# EXHIBIT 3

19

1   materials that I've given him a list of, yes, I would

2   certainly charge for that time.

3        Q    Okay.  And what materials did he give to you

4   in preparation for today?

5        A    Oh, gosh.  Well over a hundred items that I've

6   been provided in this particular case, so I can't

7   remember which ones that Mr. Bailey gave me and which

8   ones Ms. Mattox gave me, but they were all with the

9   approval of Ms. Mattox and provided to me by her staff.

10  And there may have been other people in her office that

11  provided me with things, but I can't remember all the

12  names.

13       Q    And were those items that were provided and

14  that are listed on your expert report or separate items?

15       A    No, what's listed on my report.

16       Q    All right.  And so then when I asked you about

17  your preparation for deposition today and what you did,

18  you said that you spent five hours preparing and that

19  you consulted with Ms. Mattox and Ms. Mattox's staff

20  including John Bailey, and that he provided you

21  information that you requested, such that that's

22  included in your preparation time.  Is that an accurate

23  summary of what you told me?

24       A    Well, the small amount of time that I was with

25  Mr. Bailey, I'm not billing for that because I was just

# EXHIBIT 3

20

1    asking for material.  I asked if the emergency plans had

2    ever been provided yet and if there was any new

3    documentation that I had not been provided, and he said

4    not to his knowledge, that he would consult with

5    Ms. Mattox.

6          I consulted with Ms. Mattox last evening, and

7    I often call her office and I speak to other members of

8    her staff, but I don't remember who I talked to or when.

9      Q    And how long did you spend consulting with

10   Ms. Mattox?

11     A    Oh, less than an hour.

12     Q    Okay.  So if you did about an hour consulting

13   with Ms. Mattox and her staff, then is it your testimony

14   that you spent approximately four hours reviewing your

15   own report and the Florida Model Jail Standards?

16     A    Approximately, yes.

17     Q    And that's at $250 an hour?

18     A    That's correct.

19     Q    And your report is 12 pages long?

20     A    It is.

21     Q    So how many hours would you say you spent

22   reviewing that report of those four?

23     A    More than two hours to include the Florida

24   Model Jail Standards.

25     Q    Okay.  Now, you just said more than two hours

# EXHIBIT 3

21

1    to include the Florida Model Jail Standards, but you had

2    told me that you spent about four hours total reviewing

3    both your report and the Florida Model Jail Standards.

4    So let's separate those two since those are the two

5    things that you reviewed and you spent four hours total

6    on.

7              How many hours did you spend reviewing your

8    own report that's only 12 pages long and the 12th page

9    only has your fee schedule on it?

10        A    Keep in mind I used the word approximately.

11   And approximately means that I would have to go back and

12   get all of my notes and material and add up that time.

13   And it was approximately four hours total.  And just how

14   much time in all different areas I can't tell you off

15   the top of my head.

16        Q    Okay.  So you can't tell me approximately how

17   much was spent on the Florida Model Jail Standards and

18   approximately how much was spent on your 12-page report?

19        A    It was certainly more than two hours for

20   reviewing the report and reviewing the standards.

21        Q    All right.  So now, did you only prepare for

22   about approximately two hours or was it four hours?

23                 (Phone ringing.)

24              THE WITNESS:  I apologize.  I should have left

25        that -- I'm sorry.  Could you repeat that question,

# EXHIBIT 3

22

1       please?

2   BY MS. HAWKINS:

3       Q     You changed it, and I just want to make sure

4   I'm clear.  Did you spend approximately four hours

5   reviewing your report and the Florida Model Jail

6   Standards or did you spend approximately two hours

7   reviewing them?

8       A     I spent approximately four hours reviewing the

9   standards, my report, conversations with Mr. Bailey and

10  with Ms. Mattox.  It was definitely more than two hours

11  in reviewing my report and the standards, and it was

12  approximately an hour with Ms. Mattox.  Brings it to

13  well over three hours, so we're approaching four hours

14  there, thus the word approximately.

15      Q     Okay.

16      A     I can't give you any more information relative

17  to the time spent at this time.

18      Q     Okay.  Well, originally you had told me you

19  spent five hours preparing, and you just changed the

20  numbers a couple of times, and so I just don't want to

21  have any mistakes here when I know how many hours you

22  spent preparing.  So we have --

23      A     Well, when you say -- you're forgetting

24  something, that this was scheduled for March the 14th.

25  I prepared myself prior to March 14th.  Here we are

# EXHIBIT 3

23

1    several weeks later.  And of course testing my memory, I

2    go back and do a thorough review once again.  So if I

3    was actually billing for all of the hours that I

4    reviewed, it would certainly be more than five hours.

5         Q    Okay.  And how much are you billing for the

6    preparation for the March 14th depo when this was

7    originally scheduled?

8         A    I think it was two or two and a half hours.

9    I'd have to pull out the invoice and take a look at it.

10        Q    Okay.  And you sent that invoice to

11   Ms. Mattox?

12        A    I sent it to you, and you have paid me.

13        Q    Okay.  So is it your testimony then you spent

14   an extra -- what would be an extra two and a half hours

15   if we counted your original prep time or an extra four

16   and/or almost five hours if we count your prep time for

17   this deposition because the deposition was canceled by

18   Ms. Mattox previously?

19        A    I don't know who canceled it.  I don't

20   remember the circumstances.  But I know that I was

21   prepared, and that I reviewed the material prior to the

22   14th, and again yesterday and today.  Certainly well

23   over five hours should I bill for all of that time,

24   which I am not.

25        Q    With regards to the opinions that you arrived

# EXHIBIT 3

24

1    at, can you describe for me the steps that you took in

2    arriving at your opinions?

3          A    Of course.  I looked at the case as a whole.

4    I started from the very beginning when the plaintiff was

5    first arrested or first arriving at the Bay County Jail.

6    And I went down the list from there, researching and

7    using my own background and my own experience, my own

8    knowledge in terms of first of all looking at the case

9    and seeing if I would take it.

10              And I don't automatically take a case.  I turn

11   down at least half of the things that come my way.  And

12   then I flip back.  Once I have a really good

13   understanding of the case and if I think it's something

14   that I can work on, I go back to the representing

15   attorney, I ask for an agreement, and then I go back to

16   the work again and I address from the top to the bottom

17   one issue after another.

18         Q    Have you provided any legal opinions in your

19   report?

20         A    I'm not an attorney.

21         Q    Okay.  Have you provided any legal opinions?

22         A    No, ma'am.  I'm not an attorney.  I cannot

23   provide legal opinions.

24         Q    All right.  What facts did you assume as true

25   when you formulated your opinion?

# EXHIBIT 3

25

1      A     I put the facts down as I see them based upon

2  my experience and my knowledge.  It's up to The Court to

3  decide if it's true or false.

4      Q     Did you make a credibility determination of

5  any witnesses in formulating your opinion?

6      A     I'm sorry, I didn't get that.

7      Q     Did you make a credibility determination of

8  any witness in formulating your opinion?

9      A     If Dr. Hough's opinion counts, yes, I -- I

10  refuted certain things of his report outlined in my

11  addendum.

12      Q     All right.  Are working at jail and working in

13  the prison the same?

14      A     Basically.  They're both places of

15  incarceration.  They both have people locked up against

16  their will.  They both have legal obligations in terms

17  of care and custody.  They both have rules and

18  regulations.  They operate very much as the same.  They

19  have unarmed and armed personnel.  They have an

20  obligation to provide medical, nutrition, security,

21  safety, and care.

22      Q     Can you tell me how they're different?

23      A     A jail is normally smaller, although some

24  jails such as the jail where I worked in Orlando was as

25  large or larger than most prisons.  I had 4,500 inmates

# EXHIBIT 3

26

1    and 1,775 staff members.  So the Bay County Jail would

2    be considerably smaller because of its geographical

3    presence.  What more can I say?

4        Q    What's different about the inmate population

5    between a jail and a prison?

6        A    In a prison, everybody has been convicted if

7    they're an inmate.  In a jail, some have been convicted

8    and some have not.  Some are simply awaiting trial and

9    are presumed innocent until found guilty.

10       Q    Do you have any experience investigating

11   sexual battery cases?

12       A    Yes, I was an investigator for six years with

13   the Florida Department of Corrections.

14       Q    Okay.  And which -- you have a long history.

15   Which six years, can you tell me approximately?

16       A    1982 to 1987.

17       Q    Okay.

18       A    Or '81 to -- '81 to '87.

19       Q    Okay.  Thanks.  I don't have your CV pulled up

20   in front of me.  I know you probably have all that

21   information on it.

22            And then after 1987, you said that you started

23   actually working in the correctional setting not as an

24   investigator in 1988; is that correct?

25       A    I didn't get that question, I'm sorry.

# EXHIBIT 3

27

1     Q    I'm sorry.  1988 is then when you started

2  working in corrections not like as an investigator; is

3  that right?

4     A    No, I started out in 1979 as a basic recruit

5  correctional officer uncertified.  And that same year, I

6  completed the academy and was certified.

7     Q    Okay.  And I'm seeing it on your CV.  I'm

8  sorry.  1988 is when you became the assistant warden,

9  and that's why I had that year in my head there.

10          All right.  So we've got in 1981 -- and still

11  I'm seeing investigator inspector from 1982 to 1987 in

12  Tomoka Correctional Institution.  Am I saying that

13  right?

14     A    Yes.  I might be off by a year or two in terms

15  of the years I was an investigator because I forgot that

16  I did go to Martin Correctional for one year.

17     Q    Okay.  And I'm seeing correctional major in

18  Martin Correctional right after that from '87 to '88.

19     A    Yeah.

20     Q    So you were in Stuart, Florida and Daytona

21  Beach, then you were an investigator?

22     A    In Daytona Beach, I was an investigator.

23     Q    Okay.  Were you at Stuart and Martin or just

24  at the Daytona Beach facility?

25     A    I was at both in different positions.

# EXHIBIT 3

28

1      Q      Were you -- I'm sorry.  Let me clear my

2   question.

3             I meant were you an investigator at both

4   facilities or just the Daytona Beach facility?

5      A      No, ma'am, I was not an investigator at

6   Martin.  The investigator worked under my supervision.

7      Q      Okay.  All right.  Then so during that period,

8   then you investigated sexual battery cases, correct?

9      A      I did.

10      Q      Okay.  Tell me about that experience

11   investigating sexual battery cases.

12      A      There was multiple investigations involving

13   sexual battery.  I investigated everything you can

14   possibly imagine, murder, battery, sexual battery,

15   escape, attempted escape, arson.  Same crimes you find

16   on the street basically, theft, theft by force.

17      Q      All right.  And is that common in correctional

18   institutions that you see crimes committed the same --

19   you just said the same crimes you see on the street

20   basically?

21      A      In those days, it was more prevalent than it

22   is today, I believe.  I believe that corrections has

23   taken a better turn over the past years.  And thanks to

24   the Prison Rape Elimination Act of 2003 and a lot of

25   other corrections made in the proper corrections, there

# EXHIBIT 3

29

1   is less, although there is certainly still all crimes.

2   I believe that the rate at least according to the annual

3   reports of the Florida Department of Corrections, it

4   appears that serious crimes have taken somewhat of a

5   decline.

6       Q   When were you trained?  When did you receive

7   your training to do investigative work?

8       A   At Miami Dade College in Homestead, Florida,

9   and also at Daytona Beach Community College in Daytona

10   Beach.

11       Q   Okay.  And the Miami Dade was 1979 to 1984?

12       A   Well, I -- I didn't get my AA degree when I

13   was in Homestead, so when I arrived in Daytona Beach, I

14   went to the Daytona Beach Community College, completed

15   the courses I needed for graduation, transferred them

16   back to Miami Dade Community College and I was awarded

17   my AA degree.

18       Q   And do you have any certified law enforcement

19   training where you can put criminal cases on people or

20   charges?

21       A   I do not.  As an investigator with the

22   Department of Corrections, I did make arrests and I did

23   file complaints with the State Attorney's Office and the

24   Seventh Judicial Circuit of Daytona Beach and testified

25   accordingly.

# EXHIBIT 3

30

1      Q    Okay.  All right.  So you had arrest powers

2  and the authority to do criminal charges and arrest an

3  individual through your correctional training?

4      A    I didn't need arrest powers.  I already had

5  the person locked up.  They were in prison.  So once a

6  crime was committed and I had solid evidence, I would

7  take my report, my investigative report to the State

8  Attorney's Office, and the State Attorney's Office would

9  then make the decision on whether it would be prosecuted

10  or not.  And all cases that I took to the State

11  Attorney's Office, there was prosecution.

12      Q    And about how many sexual battery cases did

13  you take to the State Attorney's Office?

14      A    I don't remember.  Not very many because we

15  had the power of discipline where we could take as much

16  as several years of gain time in those days with an

17  inmate, and it was very much like sentencing them to

18  another two or three or four years in prison, and also

19  90 days of disciplinary confinement, and then transfer

20  authority to a prison that dealt with more severe

21  criminals, more dangerous criminals.

22      Q    All right.  Tell me about how many sexual

23  batteries occurred in the Orange County Jail while you

24  were the interim director.

25      A    I don't remember.  I don't remember if we had

# EXHIBIT 3

31

1   a case like that.  The Orange County Jail was very well

2   run.  The previous administration left me a very clean

3   slate.  There was a great deal of training of staff.

4   They adhered to rules and regulations very strongly.  So

5   we had less violence at the Orange County Jail than we

6   did in state prisons.

7        Q    Okay.  So is it your position if I did a

8   public records request of the Orange County Jail from

9   the time you were there, there wouldn't have been any

10  rapes?

11       A    I can't say that.  I just don't remember if

12  there was one or not.

13       Q    All right.  While you were the warden, Florida

14  Department of Corrections in Orlando, that's Central

15  Florida Reception Center?

16       A    Yes, I had over 3,000 inmates at five

17  different locations -- four different locations, sorry.

18       Q    All right.  And approximately how many rapes

19  occurred in those different prisons from 1998 to 2001?

20       A    Goodness, I have no idea.

21       Q    Okay.  Would you agree that there were at

22  least several?

23       A    Possibly.  And of course I was not the

24  investigator there, I was the warden.  But serious

25  things like that would have been brought to my

# EXHIBIT 3

1   attention, but we're going back more than 20 years.  And

2   I simply cannot remember if we had any sexual battery

3   cases at Central Florida Reception Center.

4       Q    And I'm certainly not expecting you to give me

5   a specific number after all this time either.  I'm just

6   curious if it happened.  And so those were brought to

7   your attention then when there would be a sexual battery

8   in the prison where you were the warden?

9       A    It would have been.  I just don't remember if

10  any were bought to my attention or not.

11      Q    But would there have been time -- since you

12  said you weren't the investigator, would there have been

13  times when they weren't brought to your attention?

14      A    I'm sorry.  I didn't get that.

15      Q    Would there have been times possibly where

16  they weren't brought to your attention because someone

17  else handled it?

18          MR. ELLIS:  Form.

19          THE WITNESS:  If I was away on vacation and

20      one of the assistant wardens was filling in for me,

21      it's possible that something like that could have

22      happened.  I just don't remember.

23  BY MS. HAWKINS:

24      Q    Okay.  And what about in Starke, Florida?  You

25  worked at a prison there as warden from 1996 to 1998.

# EXHIBIT 3

33

1    Approximately how many sexual batteries occurred in that

2    prison while you were there?

3         A    None.  Every inmate at Florida State Prison is

4    locked up in a single cell and does not have the

5    opportunity to be with other inmates.  You have death

6    row where they're locked up 24/7, and all other cells

7    are single cells throughout the prison.  And these are

8    inmates that have been sent there from the rest of the

9    state because they were not manageable.

10        Q    Okay.  All right.  Well, tell me about Gulf CI

11   from 1992 to 1996.  How many sexual batteries or rapes

12   occurred in that prison?

13        A    I don't remember.  Sorry.

14        Q    Were there -- did some occur?

15        A    Possibly, but I just -- I simply don't

16   remember.

17        Q    Okay.  You have described this as a horrible,

18   brutal rape.  Can you describe for me what is a horrible

19   and brutal rape?

20        A    Any rape is horrible and brutal.  Some more

21   than others.  This is the second case that I have worked

22   where an inmate was raped with a broom handle.  And in

23   each case, it was horribly disgusting and hurtful to the

24   victim.

25        Q    So -- okay.  So it's your position that any

# EXHIBIT 3

34

1    rape is horrible and brutal, but some more than others?

2         A    Of course.

3         Q    Okay.  Is this one the first category or is

4    this some-more-than-others category?

5         A    Are we talking about the plaintiff in this

6    case right now?

7         Q    The plaintiff, yes, yes.  I'm sorry.  This

8    case, the Wells case.

9         A    I believe that in this case, it was certainly

10   more brutal than the average prison rape or jail rape.

11        Q    How long -- what was the duration?  How long

12   was he being raped for?

13        A    I don't know or I don't remember if that

14   information was in the investigation or not.

15        Q    How many people were restraining him while he

16   was being raped?

17        A    Two.

18        Q    How did they restrain him?

19        A    He was handicapped, had to walk with a walker.

20   Didn't take a whole lot to restrain a person like that.

21        Q    So two people.  So how did -- do you know the

22   names of the individuals who raped him?

23        A    McCoy and Bell.

24        Q    Okay.  All right.  How long was McCoy raping

25   Mr. Wells for?

# EXHIBIT 3

35

1      A      I think I just answered that.  I don't know if

2   that information was provided or not.  It may have been

3   provided.  I just don't remember.

4      Q      Okay.  And what did McCoy do in raping

5   Mr. Wells?

6      A      He observed and assisted Bell.

7      Q      All right.  And so then when I asked you how

8   many people were restraining him and you said two, and

9   then you gave me those two names, how was McCoy

10  restraining Mr. Wells?

11     A      By his mere presence and being with Bell --

12     Q      Okay.  So by physically being present?

13     A      -- made him a participant.

14     Q      I'm sorry.  I didn't realize you were still

15  talking.  Go ahead and finish your question.  I didn't

16  mean to interrupt you -- or your answer.

17     A      His mere presence in association with Bell

18  made him a participant.

19     Q      Well, I asked you who was restraining him, not

20  who was a participant.  So is it still your position

21  that there were two people restraining Mr. Wells?

22     A      Well, restraining doesn't mean that you can

23  physically hold somebody.  Your mere presence, the

24  threat of your presence can be restraining.  If someone

25  is standing in front of you and not allowing you to

# EXHIBIT 3

36

1    pass, they are restraining you --

2          Q    Is it your position --

3          A    -- from your own personal freedom.

4          Q    Is it your position then that Mr. McCoy and/or

5    Bell were in front of Mr. Wells such that he could not

6    pass?

7          A    I cannot remember off the top of my head the

8    position of each of these men that -- McCoy and Bell in

9    terms of the plaintiff.  I'd have to go back and do some

10   review on that.  I cannot remember their exact

11   positions.

12         Q    Do you know if Mr. McCoy was behind Mr. Wells

13   such that Mr. Wells never even knew Mr. McCoy was there?

14         A    As I just said, I cannot remember their exact

15   positions, but I do remember the content that was

16   provided by the plaintiff, by others, that both Bell and

17   McCoy were definitely a part of this problem.

18         Q    Okay.  Well, you gave the testimony that he

19   was taking part in restraining him, and then you told me

20   that his mere presence could be restraining him and you

21   gave the example that he was in front.  If he was in

22   front of Mr. Wells, that would be restraint.  Would you

23   agree --

24         A    He could have been in back of him.  If it was

25   the -- if it was the entrance to a shower, and it was,

# EXHIBIT 3

37

1   he could have been in back of him preventing him from

2   leaving the shower, he could have been in front of him

3   preventing him from going in another direction.  That's

4   all just a series of where and how.

5        Q    But would you agree with me that there's a

6   video of where and how --

7        A    Yes.

8        Q    -- of this?

9        Okay.  So we certainly don't have to speculate

10  where Mr. McCoy was in relation to Wells if he was

11  preventing him from entering or if he was preventing him

12  from leaving, do we?

13       A    Well, a few minutes ago, I mentioned I could

14  not remember off the top of my head exactly where McCoy

15  was standing, but I do remember in reviewing all the

16  material, the video included, that he was certainly a

17  part of the crime.

18       Q    So are you correcting your previously given

19  testimony that he was restraining him because you simply

20  don't know?

21            MR. ELLIS:  Form.

22            THE WITNESS:  No, I'm not changing my

23       testimony at all.

24  BY MS. HAWKINS:

25       Q    So it's still your position Mr. McCoy was

# EXHIBIT 3

38

1  restraining Mr. Wells?

2      A    Say that again, please, ma'am.

3      Q    It's still your position then that Mr. McCoy

4  was restraining Mr. wells?

5      A    Yes.

6      Q    But it's also your testimony you don't know

7  how he was restraining him?

8      A    I know that I just don't remember.  I'd have

9  to go back and do some research on that.

10      Q    But you didn't review the video in preparation

11  for your deposition today, did you?

12      A    No.

13      Q    Okay.  Did you review the video at all?

14      A    Yes, but it's been some time.

15      Q    You stated that this was more brutal than

16  other jail prison rapes, and part of that had to do with

17  a broom handle being used.  Is that accurate?

18      A    Without question.

19      Q    All right.  Now, tell me, who had the broom

20  handle?

21      A    Bell.

22      Q    And how long did the broom handle make contact

23  with Mr. Wells?

24      A    I'd have to go to the video and count the

25  seconds or minutes as it came about on the video.

# EXHIBIT 3

39

1      Q   Could it have been more than a minute?

2      A   I don't -- I don't know the time without going

3  back and reviewing that.  I cannot tell you the exact

4  time off the top of my head.

5      Q   Could it have been as short as two seconds?

6      MR. ELLIS:  Form.

7      THE WITNESS:  I don't -- as I just said, I

8     don't remember without reviewing the time.

9  BY MS. HAWKINS:

10     Q   How many times did Mr. Bell stick the broom

11  handle and/or attempt to stick the broom handle in

12  Mr. Wells's anus?

13     A   I don't remember.

14     Q   So you described this as a more brutal rape

15  than other prison jail rapes, but you -- can you

16  describe anything about this rape to me?

17     A   He was raped in the rectum by a broom handle

18  being handled by inmate Bell, and my correctional

19  experience tells me having seen many rapes in years past

20  that this and one other that I have been previously

21  investigating was horribly brutal.

22     Q   Tell me about his injuries from the brutal

23  rape.

24     A   I'd have to look at the medical papers again.

25  I don't remember exactly how serious his injuries were,

# EXHIBIT 3

40

1    but he was injured.

2           Q     He was injured?  Okay.

3           A     Yes.

4           Q     And what did you review that showed you he was

5    injured?

6           A     I'd have to look at the documents reviewed.

7    There's over a hundred of them, and I can't remember

8    which one, but there's one that describes his injury.

9           Q     Okay.  I'm going to need to know which

10   document that was.  I'm just going to take a note, and

11   when we take a break, maybe you could find that for me.

12          A     Okay.

13          Q     Okay.  So it's your testimony that he was

14   injured, but you don't remember the extent of his

15   injuries.  So do you remember if there was tearing?

16          A     I'm sorry.  I was taking a notation.

17          Q     Okay.  I'm sorry.  Do you remember if there

18   was tearing?

19          A     I'd have to go back and look.

20          Q     Do you know if Mr. Wells even reported

21   penetration?

22          A     I don't.

23          Q     Now, if he never reported penetration, would

24   that be still considered one of the more horrific and

25   brutal rapes that you had seen?

# EXHIBIT 3

41

1      A      Yes.

2      Q      Even if he wasn't penetrated by the broom

3  handle at all?

4      A      I have been taught at national many people

5  that are raped simply don't report it because of the

6  humiliation that's associated with rape.  So whether he

7  made a statement or not, I simply can't remember in

8  terms of the penetration part.  But a lot of people

9  don't report it because of the associated humiliation.

10     Q      Was there evidence of penetration?

11     A      I'd have to check.

12     Q      So as you're giving me this deposition today,

13  you don't know if there was penetration at all?

14     A      Yes, I do.  I just don't know to what degree,

15  and I'd have to go back and look at the document that

16  covered that.

17     Q      How do you know that there was penetration?

18     A      As you mentioned earlier, that when we have

19  the break, I'll find that document, and I'll be able to

20  answer that question more accurately at that time.

21     Q      Okay.  And is that the medical document that

22  you're thinking of?

23     A      I don't know if it's a medical document or the

24  investigation or what.  I just have to go back and take

25  a look.

# EXHIBIT 3

42

1    Q    Okay.  And that's the same document where you

2  were getting his injuries from, just to be clear?

3    A    Yes.

4    Q    Okay.  Would you agree with me that if there

5  was not penetration, that it would not fit the

6  definition of sexual battery?

7    A    Absolutely not.  It certainly would be rape

8  any time someone is forced to be in a sexual position

9  against their will.

10    Q    Okay.  So what sexual position was he forced

11  to be in?

12    A    I think you've asked the same question about

13  ten different ways, and I'll answer once again that as

14  you said during the break, that you'll give me an

15  opportunity to take a look at that document, and I'll be

16  able to accurately answer your question at that time.

17    Q    So when you're testifying he was forced to be

18  in a sexual position, you don't actually know if he was

19  forced to be in a sexual position?

20    A    I think that when we take the break and I get

21  that document, I can give you an exact accurate answer

22  to that question.

23    Q    All right.  Let's go back to the definition of

24  sexual battery then.  It's your position that a sexual

25  battery does not require penetration?

# EXHIBIT 3

43

1      A     That's a legal question that I would rather

2  counsel answer.

3      Q     All right.  Do you have any recollection from

4  your years as an investigator whether or not sexual

5  battery requires penetration?

6      A     In all of the investigations that I conducted,

7  as I remember, there was either penetration or attempted

8  penetration.

9      Q     Would you agree with me if there was only

10  attempted penetration, then it would only be an

11  attempted sexual battery?

12      A     That, once again, is definitely a legal

13  question that counsel would have to answer.

14      Q     Would you agree with me that as an

15  investigator who's putting criminal charges on

16  individuals, that you should know, an investigator

17  should know the elements of crimes?

18          MR. ELLIS:  Form.

19          THE WITNESS:  I don't make the criminal

20      charge.  I offer the information that I have

21      gathered, and the State Attorney's Office

22      determines the criminal charge.

23  BY MS. HAWKINS:

24      Q     Okay.  So when you were an investigator, you

25  simply put together a case file and then referred it to

# EXHIBIT 3

44

1    someone else; is that correct?

2         A    I referred it to the State Attorney's Office.

3         Q    So you had no real arrest authority or ability

4    to actually put charges on anyone.  The best you could

5    do was an investigation?

6              MR. ELLIS:  Form.

7              THE WITNESS:  I answered that already, but I

8         didn't have to arrest anyone.  I had them already

9         locked up.  But if I had someone like a murder case

10        that happened at Tomoka Correctional Institution,

11        I'll call the local sheriff, he'll send the deputy,

12        and the deputy worked with me.  I already had the

13        information and the evidence involving that case.

14        And then he made a formal arrest as a county deputy

15        sheriff, and we submitted dual reports to the State

16        Attorney's Office and it went to trial.

17   BY MS. HAWKINS:

18        Q    And you would agree with me that when you put

19   new charges on an individual, even if you've already got

20   them locked up, that it starts a new proceeding whereby

21   they formally have to go through the arrest process and

22   arraignment process, and they start the legal process on

23   that new charge, do they not?

24             MR. ELLIS:  Form.

25             THE WITNESS:  That sounds correct.

# EXHIBIT 3

45

1    BY MS. HAWKINS:

2         Q    All right.  So I know you said several times

3    that you didn't need to arrest anyone because they were

4    already locked up.  And I think we can agree they were

5    already locked up, but if you put new charges on

6    someone, they are in fact technically arrested on that

7    new charge, correct?

8              MR. ELLIS:  Form.

9              THE WITNESS:  That's a pretty hard question to

10            answer.  I can tell you that when I submit the --

11            submitted my investigations to a State Attorney's

12            Office, if it was a serious crime, and it normally

13            was, the State Attorney's Office would effect an

14            arrest themselves.  And instead of going to a

15            county jail as most folks would do, they would

16            remain at the state prison until the day of their

17            court, the trial.

18   BY MS. HAWKINS:

19        Q    Are you aware that the charges, the criminal

20   charges that were put on Bell and McCoy were reduced and

21   were not prosecuted as sexual battery charges?

22        A    Yes.

23        Q    All right.  And could that have been because

24   there was no penetration in this case?

25        A    I don't know why.  I just know that that's

# EXHIBIT 3

46

1    what happened.

2         Q    What time of day did this incident occur?

3         A    I don't remember.

4         Q    How did you determine which guards were on

5    duty to formulate your opinion on these various guards?

6         A    Once again, that information was extracted

7    from the material provided, and I don't remember

8    which -- the names of the guards that were on duty at

9    the time off the top of my head.

10        Q    Well, you would have been provided two shift

11   roster cards and -- from the folks -- let's see.  You've

12   got them on your list as 91 and 92, Assignment Roster

13   Card C and Assignment Roster Card D.  And you provided

14   opinions on a Mr. Beasley, a Mr. Olson.  There was

15   someone else in there that you had provided.  Hang on.

16             So how is it that you determined it was

17   Mr. Beasley on duty off of that particular card versus

18   another card?

19        A    As I remember, the card had the date and shift

20   on it.

21        Q    All right.  But would you agree with me that

22   if you don't know what time this occurred, you would not

23   know what shift was on duty?

24        A    I don't remember that.

25        Q    So you don't know how you picked the guys you

# EXHIBIT 3

47

1   picked?

2       A    Yes, of course I know how I picked it.   I

3   picked it based on the material I was provided, but I

4   don't remember that without going back and looking at

5   that material.

6       Q    So which document was it that you looked at

7   that gave you the time to know which shift was on duty?

8       A    Say that again, ma'am.

9       Q    Which document was it -- I'm sorry I didn't

10  hear what you said.  Which document was it that you

11  looked at that showed you which shift was on duty?

12      A    I think it was the roster.

13      Q    And -- and the roster told you the time of the

14  incident, so you knew that that was the shift on duty?

15      A    Yes.

16      Q    All right.  And so let's go through your list

17  of documents here.  All right.  So I've got 91,

18  Assignment Roster Card C, and 92, Assignment Roster Card

19  Two.  So it's your testimony it was one of those two

20  roster cards that gave you the information of the time

21  of the incident such you knew who was on duty?

22      A    I believe so, best of my knowledge.

23      Q    Well, you've given an opinion the Bay County

24  Jail was in violation of Florida Model Jail Standards by

25  having noncertified correction officers at times monitor

# EXHIBIT 3

48

1    the protected confinement door with the use of cameras.

2              Which Florida Model Jail Standard is that in

3    violation of specifically?

4         A    I thought I had that in my report.

5         Q    You did.  I'm just making sure that that's the

6    correct one.

7         A    I don't see it off the top of my head, but

8    it's in the report.

9         Q    So who was it that was monitoring the cameras

10   that was not certified such that this was a violation of

11   Florida Model Jail Standards?

12        A    Beasley was one.  Howard Beasley.

13        Q    And what was he doing?  What was his role?

14        A    He was a detention specialist, uncertified.

15        Q    Okay.  And what was he physically doing on

16   shift?  What was his job?

17        A    He was supervising the control room for that

18   particular area.

19        Q    Do you remember which pod this was in?

20        A    No.  Yes.  It was Pod 1, Dormitory C.

21        Q    Okay.  And so it's your position that Beasley

22   was in the control room watching the cameras, even

23   though he was a detention specialist?

24        A    That's correct.

25        Q    And you determined that he was the one in the

# EXHIBIT 3

49

```
1    control room by looking at the roster card?
2         A    Yes.
3         Q    Which gave you the time and the incident?
4         A    Yes.  And there's other documentation that
5    places him there as well.
6         Q    And what's the other documentation that places
7    him there?
8         A    I believe it's the incident report.
9         Q    All right.  And what was Heppenstall's role?
10        A    Well, Heppenstall was -- he was a detention
11   officer.
12        Q    Okay.  And what was he doing?  What was his
13   job?
14        A    As a detention officer.
15        Q    And where would he have been located?
16        A    I don't believe he gave an exact location on
17   that, Heppenstall.
18        Q    Is that -- I don't want to interrupt you if
19   you're still looking.  It looked like you were still
20   looking to finish the answer.  Is that your answer?
21        A    That is my answer.
22        Q    All right.  How many inmates were in C 1?
23        A    I don't know.
24        Q    Okay.  I believe you provided an opinion as to
25   the number of guards being inadequate; is that correct?
```

# EXHIBIT 3

50

1      A      I did.

2      Q      Okay.  All right.  And you gave that opinion

3  without knowing how many inmates were in C 1?

4      A      The number of inmates in a pod does not

5  determine whether you have one, two, or three officers.

6  It -- the number of officers are determined by staffing,

7  by the roster itself, because at any moment a pod can

8  change its population dramatically by new arrests, by

9  inmates being transferred from another jail, being

10  returned to the jail from state prisons to face new

11  court actions.  So that number can change dramatically

12  and instantly.

13      Q      So how many would be required for C 1?

14      A      That would -- you would have to go back to the

15  roster where it was approved by the Florida Model Jail

16  Standards and the model approved by the inspector from

17  the Florida Model Jail Standards 2018.

18      Q      Would you agree with me that the number of

19  inmates in C 1 could be reasonably ascertained by the

20  number of cells and/or beds they had?

21      A      You have to ask that question again.  I'm

22  sorry.

23      Q      Well, could you ascertain the number of

24  inmates that would be appropriate for C 1 based on the

25  number of cells and the beds that they had?

# EXHIBIT 3

51

1      A     No.  You can have empty cells.

2      Q     Okay.  So the population could be less than

3  what a normal capacity is by having empty cells and

4  empty beds?

5      A     It could be full or it could be a little less.

6      Q     Okay.  But you don't know what the capacity of

7  C 1 is based on the number of beds and/or cells with

8  beds that they had?

9      A     I don't remember if I reviewed the number of

10  inmates that were in Pod 1 or not.

11      Q     Okay.  And without knowing how many inmates

12  were in Pod 1 on the date in question, you provided an

13  opinion that they did not have enough correctional

14  officers on duty?

15      A     The number of inmates presently in the pod has

16  absolutely nothing to do with the requirement of

17  staffing.

18      Q     Okay.  And what is the required staffing for C

19  1?

20      A     That was as I just answered the question.

21  It's what was developed by the jail and approved by the

22  Florida Model Jail Standards inspector.

23      Q     Okay.  Well, I want to know the number.  Where

24  did you get the number?

25      A     What number of what?

# EXHIBIT 3

52

1    Q    The number of staffing, how many they needed
2    to staff it.  You said that it wasn't enough.  How many
3    more people did they need?  What is the staffing that
4    they needed?
5        A    They needed certified staffing as opposed to
6    noncertified.  They had the citizen sitting behind the
7    window supervising without the certification or
8    training.
9        Q    Okay.  And how many certified staff did they
10   need for C 1?
11       A    Whatever the staffing chart would call for.
12   But in this case, there was none.  There was a
13   noncertified person on duty.
14       Q    And what did the staffing chart call for?
15       A    Sorry?
16       Q    What did the staffing chart call for?
17       A    I just said a minute ago that that was
18   something you would have to reference to the staffing
19   chart itself.
20       Q    Well, I'm asking you.  You gave the opinion it
21   was inadequate.  And so if it's inadequate, I want to
22   know what would have been adequate.  How many do you
23   need for it to have been adequate?
24       A    It certainly had to be more than zero, and
25   they had zero, so that's inadequate.

# EXHIBIT 3

53

1      Q      Okay.  And so Heppenstall was not certified as

2   well?

3      A      No.  He was a detention officer.

4      Q      Okay.  All right.  So if there was one line

5   for an individual, the required staffing would have been

6   one; is that correct?

7      A      There would have to be at least one certified

8   person.

9      Q      Okay.  And because -- because you were saying

10  Beasley was not certified, you were saying that they did

11  not have enough staffing because they did not have one?

12     A      They had zero.

13     Q      Okay.

14     A      And zero is -- that's inadequate.

15     Q      Let's talk about the investigation in this

16  case, all right?  How did -- how did this come to the

17  attention of the Bay County Jail staff?

18     A      I don't follow that question.

19     Q      Well, how did they find out about the rape?

20     A      I believe it was the video and the fact that

21  the victim spoke out.

22     Q      So it's your belief the victim spoke out --

23  well, let me just ask you.  How did they know about the

24  video?

25     A      Well, they're in charge of the video.  And if

# EXHIBIT 3

54

1  someone makes a claim that something happened, the first

2  thing you do is go to the video to see if they can

3  confirm.

4      Q    Okay.  So it's your position that the victim

5  spoke out, and then they located the video to confirm if

6  it happened or didn't happen?

7      A    Yes, that's one.  There's possibly another

8  person that spoke up about this.  I'd have to go back

9  and look at it.

10     Q    Well, you gave an opinion on their

11  investigation, did you not?

12     A    I did.

13     Q    And what was your opinion of the

14  investigation?

15     A    It was not adequate.  It was unauthorized.  I

16  don't think it was done by a proper investigator.

17     Q    Okay.  So it's your position it was

18  unauthorized by not being done by a proper investigator?

19     A    That's one of the reasons, yes.

20     Q    Okay.  Who was the investigator who did the

21  investigation?

22     A    I don't remember the investigator's name right

23  now.

24     Q    How was he not certified to do this

25  investigation?  I assume you're trying to look at a

# EXHIBIT 3

1  document now; is that right?

2       A    I'm looking for the area in my report where I

3  made that reference so that I can --

4       Q    Okay.  All right.  I just didn't want to keep

5  asking you questions because it looked to me -- we're on

6  Zoom, so it's hard to kind of tell what people are doing

7  sometimes, so I'll let you keep looking if that's what

8  you're doing.

9       A    I'm sorry.

10       Q    That's okay.

11       A    Yes, that was Officer Sean Burkett's

12  investigation.

13       Q    Okay.  And what page are you on?

14       A    Page 10.

15       Q    Okay.

16       A    Third paragraph.

17       Q    And tell me, was Sean Burkett the investigator

18  assigned to this, this rape?

19       A    He was the one who investigated the rape.  I

20  believe it goes without question that he was assigned to

21  do this work.

22       Q    So he took witness statements?

23       A    I don't believe so.

24       Q    Okay.  Did anyone take witness statements?

25       A    I don't believe so.

# EXHIBIT 3

56

1      Q     Did he watch the video?

2      A     I don't remember if he did that or not.  I'd

3  have to go back and read more detailed information about

4  Mr. Burkett.

5      Q     Well, you have given an opinion that he

6  conducted an unlawful investigation, so I need to know

7  how it was unlawful.

8      A     This is a PREA crime, and PREA crimes require

9  trained investigators by the Florida Model Jail

10  Standards and by Florida statutes, by national law.  The

11  Department of Justice is the author of the Prison Rape

12  Elimination Act of 2003.

13      Q     So it's your position that Sean Burkett did

14  the complete, full investigation, and there was no

15  investigator beyond Sean Burkett that was assigned to

16  this?

17      A     The Prison Rape Elimination Act of 2003

18  outlines the requirements for investigations of PREA

19  crimes, and Mr. Burkett certainly did not meet those

20  qualifications.

21      Q     Okay.  And it's your position that it was

22  never forwarded to an investigator that met those

23  conditions?

24      A     If it was, it was after the fact.

25      Q     After the fact meaning what, after the

# EXHIBIT 3

1   incident?

2       A    After the filing of charges.

3       Q    After the filing of charges.

4            So is it your belief then that Sean Burkett's

5   the one who filed charges?

6       A    No, I believe it's the director of the jail.

7       Q    So it's your belief the director of the jail

8   filed charges.  Who was that?

9       A    Ultimately, yes.

10      Q    Well, who signed the affidavit?

11      A    I don't know.  I'd have to -- I don't --

12      Q    A sworn law enforcement officer would have to

13  sign the affidavit, correct?

14      A    Yes.

15      Q    And would it be safe to assume that would be

16  the person who investigated the case such that they

17  swore to the affidavit?

18      A    Say that question again, ma'am.

19      Q    Is it safe to assume that they would have been

20  the one to investigate the case if they were the one

21  that signed the affidavit?

22      A    Yes, but they were investigating after -- a

23  long time after the incident.  It was Burkett that was

24  the first and took the responsibility of investigating

25  prior to law enforcement getting involved.

# EXHIBIT 3

58

1     Q     Okay.  So tell me what happened then.  So you

2  say Burkett's the first one to investigate.  And what

3  does Burkett do?

4     A     I don't have his investigation at my hands,

5  but I can get it if you'd like.

6     Q     Well, it's your position that it went from

7  Burkett to a sworn law enforcement officer, correct?

8     A     Correct.

9     Q     And how did that happen?

10    A     I don't remember exactly how it transpired,

11  but it did.

12    Q     Would someone from the jail have to have given

13  it to the sworn law enforcement officer to investigate?

14    A     I would -- I would assume that that would be

15  the director of the jail.

16    Q     How is it your position that Burkett was the

17  actual investigator of this crime or this PREA?

18    A     Would you ask that question again, please,

19  ma'am?

20    Q     You've come to the conclusion that Burkett was

21  the investigator on this, such that the investigation

22  was unlawful.  How did you determine Burkett to be the

23  investigator of this PREA incident?

24    A     He was the first person to investigate and

25  file a paper.

# EXHIBIT 3

1    Q    And did you ever review a document whereby

2  Major Anglin appointed an investigator due to this being

3  PREA?

4    A    Yes.

5    Q    Okay.  And tell me about that document.

6    A    That was after Burkett's flawed efforts to

7  investigate this crime.

8    Q    And what was flawed about Burkett's effort?

9    A    That he was not qualified for starters.  And

10  most importantly, he was not qualified.

11    Q    Okay.  He was not qualified.

12        Okay.  So what else?

13    A    He made absolutely no notation of a location

14  in protective confinement for the month of June 2018 in

15  his investigation.

16    Q    Did you ever find a document assigning this to

17  Burkett as the actual investigator of this case?

18    A    No, ma'am.

19    Q    Are you aware of Burkett doing anything more

20  than trying to locate a video of this incident?

21    A    No.

22    Q    Are you aware that after the video was located

23  and the paperwork went to Major Anglin, that the case

24  was assigned an investigator?

25    A    Yes.

# EXHIBIT 3

1      Q      And who was the investigator it was assigned

2  to?

3      A      I don't remember his name, but he was -- he

4  was a certified law enforcement officer.

5      Q      Okay.  So would you agree then that that

6  certified law enforcement officer completed an

7  investigation of this case?

8      A      Yes.

9      Q      And would his investigation have been

10  unlawful?

11      A      No, but it would have been late.

12      Q      And how would it have been late?

13      A      Because the evidence by this time could have

14  been tampered with.

15      Q      And what evidence is that?

16      A      Oh, the evidence that this poor man who's been

17  attacked going into the protective confinement shower by

18  two inmates that were not in protective confinement, had

19  no business being there, was then reassigned to another

20  cell outside of protective confinement.  He's being

21  punished for getting assaulted by giving him a top bunk

22  when it's obvious that he's handicapped.  Getting on a

23  top bunk for someone like him is a very difficult and

24  dangerous thing to do.

25      Q      Okay.  So which dorm was he reassigned to?

# EXHIBIT 3

61

1      A     I don't know what dorm he was assigned to

2   after that, but it was outside of protective

3   confinement.

4      Q     So you think it was general population?

5      A     Yes.

6      Q     All right.  So you don't know which dorm he

7   was assigned to, but you have come to the conclusion he

8   was assigned to general population?

9      A     He was assigned to a non-protective

10  confinement area.  Exact dorm and the title of the dorm

11  I cannot tell you.

12     Q     How do you know it was non-protective

13  confinement if you don't know which dorm it is?

14     A     Because the material that I reviewed indicated

15  that he was taken out of protective confinement.

16     Q     Okay.  And which document was that that said

17  he was taken out of confinement and put in general

18  population?

19     A     I believe that's the second investigation.

20     Q     And it says he was put in general population?

21     A     It says he was removed from protective

22  confinement.

23     Q     Are you aware if the Bay County Jail has

24  multiple confinement pods?

25     A     Yes.

# EXHIBIT 3

62

1    Q    Okay.  And which are they?

2    A    Well, you have -- they have a classification

3  process that requires the jail to separate inmates.

4  Dangerous felons as an example cannot be housed with

5  misdemeanors.

6    Q    Right.

7    A    So it's --

8    Q    Well, I want to know the dorm.  I want to know

9  the dorm.  Can you tell me the dorm?

10    A    No, I can't.

11    Q    Okay.  And what is the C dorm for the Bay

12  County Jail?

13    A    C Dorm Pod 1 is protective confinement.

14    Q    And what's C 2?

15    A    I don't know.

16    Q    And what's C 3?

17    A    I have no idea.

18    Q    All right.  So if he was housed in C 3, he

19  could have been in protective confinement, he could have

20  been even in a more secure location.  You don't know?

21    A    I know that he was no longer in protective

22  confinement.

23    Q    Well, isn't it true you only know he was no

24  longer in C 1?  You don't know that he wasn't in

25  protective confinement; isn't that true?

# EXHIBIT 3

63

1        A     No, that's not true.  I do know that he was

2   removed from protective confinement.

3        Q     But you don't know what C 3 is though, do you?

4        A     No, but I know that he was removed from

5   protective confinement.

6        Q     Okay.  So you know he was removed from C 1 and

7   he was placed into C 3, correct?

8        A     I don't know which area he was assigned to off

9   the top of my head.

10       Q     All right.  Well, you have it in your report

11  that he was moved to C 3 cell, top -- 10, top bunk.

12       A     Yes, but I don't know the classification of

13  that particular pod.  I know it's not protective

14  confinement.

15       Q     So that could be a secure dorm, could it not?

16       A     Well, every dorm at the jail is secure.

17       Q     And that could be protective custody where

18  folks are, as they say, behind the door?

19       A     No.  His original cell was the protective

20  confinement area for the Bay County Jail.

21       Q     So is it your position then that the Bay

22  County Jail only has one confinement area?

23       A     They only have one generally.  There's another

24  that they can set up as protective confinement if they

25  have that many inmates that need protection.  At that

# EXHIBIT 3

64

1   time, there was only one pod for protective confinement.

2        Q    And where do they put in the Bay County Jail

3   individuals who need to be behind the door?

4        A    I don't follow that.

5        Q    Well, individuals sometimes need to be in a

6   cell by themselves, do they not?

7        A    They do.

8        Q    Okay.  And would you agree with me that C 1

9   was in fact an open dormitory?

10       A    Yes.

11       Q    Okay.  So is it safe to assume that there is a

12  location in the jail where you have individual cells

13  when inmates need to be placed behind the door?

14       A    Yes, if they're -- if they're dangerous

15  felons, have been arrested for dangerous -- very

16  dangerous crimes such as murder or rape, they have to

17  be -- they cannot be housed with misdemeanors.

18       Q    That wasn't my question.  My question was is

19  it fair to assume that the Bay County Jail has another

20  confinement dorm, a protective custody dorm whereby they

21  have individual cells for folks who need to be there for

22  maybe their own protection or because of discipline

23  issues?

24       A    Mr. Wells was in a protective confinement pod.

25  He was assigned there for protection.  He had a

# EXHIBIT 3

65

1   nonviolent very minor drug charge and was handicapped at

2   the same time.  He was in protective confinement.

3        Q    Okay.  So you believe C 3 was general

4   population?

5        A    Say that again, ma'am.

6        Q    It's your position C 3 is general population?

7        A    I don't know exactly what the title of it is.

8   I know it's not protective confinement.

9        Q    And you know it's not protective confinement

10  how?

11       A    Because protective confinement was where

12  Mr. Wells was initially housed.  That was the protective

13  confinement pod.

14       Q    And it's your position that the Bay County

15  Jail could not have more than one protective confinement

16  area where they could house individuals behind the door?

17       A    They could have, but they did not at that

18  time.

19       Q    And how do you know that?

20       A    From the investigation and general material

21  that I reviewed throughout the course of this case.

22       Q    Are you aware of Mr. Wells's history of

23  getting in the top bunk and being found by nurses in the

24  top bunk?

25       A    Yes.

# EXHIBIT 3

1    Q    So you reviewed those documents whereby they

2    were finding Mr. Wells in a top bunk that he himself had

3    gotten into the top bunk?

4    A    Yes.

5    Q    Are you aware of Mr. Wells's criminal history,

6    the prior charges, the prior violent felonies he had

7    such as robbery?

8    A    That's outside my area of expertise and I

9    leave that for other people to address.

10    Q    Would you not agree with me that when you

11    classify an individual, that you would want to know

12    their criminal history as well as the current charge

13    that they're there for?

14    A    Yes, if it was a part of the classification

15    process, it should be considered.

16    Q    Okay.  Is looking at prior criminal history

17    not part of the classification process?  Has it not been

18    ever since you've done this?

19    A    Yes, but it has absolutely nothing to do with

20    protective confinement if that's the necessity and the

21    classification fits.

22    Q    So it's not important to know if Mr. Wells had

23    violent felonies on his history as well when deciding

24    where he needed to be housed?

25    A    The list of charges, of course, is reviewed by

# EXHIBIT 3

67

1   classification, but the details of any alleged past

2   criminal history would not be a part of that.

3       Q   Okay.  Well, let's go back to the tampering.

4   You stated that the second investigation just came too

5   late and evidence could be tampered with.  And what

6   evidence is that?

7       A   Evidence of physical injury, evidence of the

8   end of a broom being tested for DNA, the -- a lot of

9   things, a lot of things that an investigator would do.

10      Q   All right.  Would you agree with me if there

11   was a video of the broom making contact with Mr. Wells

12   and you can see Mr. Wells and the broom, there would be

13   no need for DNA testing?

14      A   The details of the video are not that close.

15   It's too far away to make that exact determination.

16      Q   So it's your testimony then you can't tell if

17   there was penetration from the video?

18      A   That's correct.

19      Q   And instead of relying on the witness or

20   Mr. Wells's testimony of whether or not there was

21   penetration, you would get DNA testing to determine if

22   there was penetration?

23      A   That would be a supplement to support anything

24   else.  This is a serious crime that has been alleged,

25   and as an investigator, I would certainly have gathered

# EXHIBIT 3

68

1   every piece of evidence possible.  I would not have made

2   assumptions for The Court.  I would have gathered and

3   have given to The Court any and all possible evidence as

4   required.

5        Q    So how many brooms were in that pod?

6        A    I don't know.

7        Q    Well, how would you identify the specific

8   broom if there was more than one?

9        A    I would have gotten all the brooms if

10  necessary.

11       Q    And what would you have done with those

12  brooms?

13       A    I would have taken swabs from the end of each

14  broom.  I would have gotten fingerprints off of each

15  broom.  And for a crime this serious -- this is not

16  somebody that stole a loaf of bread from a grocery

17  store.

18       Q    So is it your position you would need

19  fingerprints off of a wooden broom handle when you can

20  see on video who handled the broom?

21       A    To confirm who handled the broom.  It's part

22  of evidence.

23       Q    And how would fingerprints further prove who

24  handled it other than a video watching the person handle

25  it?

# EXHIBIT 3

69

1          A      The Court makes those decisions.   The

2    investigator doesn't have that opportunity.   If he does,

3    he's not an investigator.   If he does, he's not

4    investigating a very serious crime.   You gather any and

5    all possible evidence, you present it to The Court, and

6    The Court makes the decision on whether it's evidence or

7    not.

8          Q    How many times in your career have you

9    successfully lifted fingerprints off of a wooden broom

10    handle?

11          A    Off of a wooden broom handle, I don't

12    remember.   I have gathered fingerprints before, but I

13    don't remember if I ever got them off of a broom handle

14    or not.

15          Q    Do you know if a wooden broom handle is even a

16    surface where you'd be able to lift prints?

17          A    Yes, of course, latent prints would be on a

18    broom handle wood or plastic.

19          Q    And how many -- how many other prints would

20    you pick up in addition to the individual who used it in

21    the video if every other inmate in that pod had used it

22    to sweep that day?

23               MR. ELLIS:   Form.

24               THE WITNESS:   Through the process of

25          elimination.

# EXHIBIT 3

1    BY MS. HAWKINS:

2         Q    Okay.  So you would rely on the video then,

3    correct?

4         A    As a -- as a supplement, of course.  You tie

5    one to the other.  You don't ignore one piece of

6    evidence because you think you solved the crime with

7    something else.

8         Q    So it's your position you would have lifted

9    prints off of the broom that was handled by every inmate

10   in that pod and submitted all of those prints to FDLE

11   for testing?

12        A    Absolutely.  And if they refused to do it,

13   then it would be on FDLE.  It would not be on me as the

14   investigator.

15        Q    And the last time you investigated crimes was

16   in a prison setting in the '80s, correct?

17        A    That's -- that's correct, but I have

18   supervised investigators that work under my wing for

19   most crimes you can possibly imagine, and I reviewed

20   their material before it was submitted.

21        Q    Okay.  Well, tell me about DNA evidence.  How

22   many crimes did you work when you investigated in the

23   '80s had DNA evidence?

24        A    None, because it wasn't available then.

25        Q    Okay.  So it's your position you would have

# EXHIBIT 3

1    had that broom tested for DNA evidence?

2          A    In 2018 I certainly would have.

3          Q    And, of course, if the surface of the broom

4    was covered by another object, would you agree with me

5    there would not have been any DNA on that broom

6    regardless of whether there was penetration?

7          A    I don't see what the question is in what you

8    said there.

9          Q    Would you agree with me if there was something

10   covering that broom, there would not be DNA evidence on

11   the broom regardless of whether or not there was

12   penetration?

13              MR. ELLIS:   Form.

14              THE WITNESS:   That's entirely possible, but at

15         the same time, you don't ignore any possible

16         evidence.   You make the effort.

17   BY MS. HAWKINS:

18         Q    Okay.

19         A    You don't make -- you don't make courtroom

20   decisions as an investigator.   You do what's required of

21   you, you put it on paper, you put it in paper bags,

22   plastic bags, whatever is required, and you submit it to

23   The Court through the state attorney.   They make the

24   decision.

25         Q    How many times did you testify in court as an

# EXHIBIT 3

72

1    investigator?

2         A    In the Seventh Judicial Circuit, I think it

3    was 11 or 12 times.

4         Q    And that was for crimes that were committed in

5    the prison where you were working?

6         A    That's right.

7         Q    And do you know if Mr. Wells was originally

8    cooperative when investigators asked him about this

9    and/or any jail personnel asked him about the incident?

10        A    I'm not following your question, ma'am.

11        Q    Do you know if Mr. Wells was originally

12   cooperative?  Did he cooperate?  When someone asked him

13   about what happened, was he cooperative or did he say he

14   didn't want to talk to them or deny it or things to that

15   effect?

16        A    I believe his cooperation was not open in the

17   very beginning.  He was surrounded by two men accused of

18   extremely violent crimes, murder and rape, and he had

19   his own protection to worry about at that time.

20        Q    Do you know where they might have asked him

21   about the incident such that he was concerned about

22   these other individuals?

23        A    No, I'd have to go back and look at the exact

24   location.

25        Q    Would you agree that if Mr. Wells was not

# EXHIBIT 3

1   immediately forthcoming with what took place, that that

2   could have delayed the investigation?

3       A    Possibly.  It could have delayed that part of

4   the investigation, but it certainly should not have

5   delayed the investigation in any way, shape, or form.

6       Q    Well, what if Mr. Wells did not give an

7   accurate time of when this occurred?

8       A    The video would correct that and give the

9   exact time.

10      Q    And how is it your position that they would

11  find the video without being told that it occurred or

12  when it occurred?

13      A    Any time there's an allegation of criminal

14  activity, the first thing you do, as I mentioned

15  earlier, is go to see if there's video that will give

16  you a picture of what may or may not have happened.

17      Q    Would you not agree with me that you need to

18  know the time to find the correct video?

19      A    Say that again, ma'am.

20      Q    Would you not agree with me you need to know

21  the time of when it might have happened to be able to go

22  find the video?

23      A    The video, you take the whole video, and you

24  scroll down through it until you come to whatever you're

25  looking for.  You may not have the time.  That's part of

# EXHIBIT 3

74

1    the investigation.  That's why you work hard in the

2    investigation.

3        Q    Sure.  And how many hours worth of video do

4    you think you'd need to look at when you don't have the

5    time to have found this incident?

6        A    Whatever is necessary.

7        Q    And would you not agree with me that if you

8    don't have the time, that there could be a lot of video

9    you would need to review?

10       A    Well, there's only one video for that

11   particular crime.  So if an investigator, if he's doing

12   his job properly, can usually narrow down the time by

13   interviewing other people in the pod separately.  Going

14   through the video itself, if you don't have the

15   information, you sit there in front of a monitor and you

16   scroll through that video until you find what you're

17   looking for.

18       Q    And from --

19       A    And you eliminate.

20       Q    From start to finish from when the broom was

21   picked up by Mr. Bell to when it was returned, how long

22   is that incident in its entirety?

23       A    I don't remember.  You asked that question

24   earlier, and I don't remember the exact time, how much

25   time.

# EXHIBIT 3

1     Q    I think I asked a slightly different one.  I

2  asked the actual length of the broom making contact with

3  Mr. Wells and so that was the question I asked, how long

4  that took.  I wanted to know if you knew how long from

5  start to finish from when he picked up the boom to when

6  he returned the broom?

7     A    No, I don't know that time, no.

8     Q    Okay.  Would you agree with me that if you

9  don't have the time of the incident and you just start

10  in the morning when the inmates wake up and you go to

11  when they go to bed at night, you could be looking at

12  more than 12 hours' worth of video to find this

13  incident?

14          MR. ELLIS:  Form.

15          THE WITNESS:  That's a very long question.

16     Can you narrow it down for me, ma'am, please?

17  BY MS. HAWKINS:

18     Q    Well, would you agree with me that you could

19  have an entire day's worth from when inmates wake up,

20  you know, and I don't know the time they wake up,

21  5:00 a.m., 6:00 a.m., to whenever they go to bed,

22  10:00 p.m., 11:00 p.m., that you would have that length

23  of video to watch to try to find this happening?

24          MR. ELLIS:  Form.

25          THE WITNESS:  Yes, but when you're -- when

# EXHIBIT 3

76

1        you're -- I'm sorry.  When you're investigating

2        something like that and you have the video, you

3        have control of the video.  You can speed it up,

4        slow it down, pick one single frame.  You have an

5        opportunity to take eight hours of video and put it

6        into one hour.  You're not going to have to sit

7        there and let it go slowly through motion.  You can

8        put your finger on the button, speed it up, slow it

9        down.  I've done it many times, and it works like a

10       charm.

11   BY MS. HAWKINS:

12       Q    How many days between when Mr. Wells -- you

13   said Mr. Wells reported this.  How many days between

14   when Mr. Wells reported this to the investigation by the

15   actual investigator who did the complaint affidavit?

16       A    I'm sorry, ma'am.  I'm not understanding the

17   question.

18       Q    You said that the investigation, it was just

19   too late, there was too much of a delay.  And I want to

20   know how much time passed, since you formulated that

21   opinion, between when Mr. Wells reported this and when

22   the investigator that you say is qualified took over the

23   investigation?

24       A    As best as I can remember, it was a day.

25       Q    When did Mr. Wells first report this

# EXHIBIT 3

77

1    happening?

2         A    I would have to go back and check the exact

3    time, but as I mentioned just now, I think it was a day.

4         Q    Would you agree that no one reported it the

5    day that it happened?

6         A    Yes.

7         Q    What is your evidence that they moved him out

8    of C 1 into C 3 to punish him versus to protect him from

9    possible perpetrators?

10        A    Because they took him from protection to

11   non-protection.

12        Q    But you don't know if C 3 is a behind-the-door

13   pod or not?

14        A    I know that it's not protection.

15        Q    Okay.  So it's your position --

16        A    Not was, but was not.  Was not.

17        Q    It's your position that if he was in a

18   behind-the-door setting, that that's not protection?

19        A    He's going to have to come out from behind

20   that door for a number of things.  Showers, bathrooms,

21   go to the control room to ask for a inmate request form,

22   for a multitude of reasons that you have to leave your

23   cell if you have a cell like that.

24        Q    Would you agree with me that he was no longer

25   with the potential or alleged perpetrators when he was

# EXHIBIT 3

1   moved out of C 1?

2        A    Say that again, ma'am.  I'm sorry.

3        Q    He was no longer with the alleged perpetrators

4   once he was moved out of C 1?

5        A    That's correct.

6        Q    Would you agree with me that it's -- the first

7   move that you want to make to protect an individual is

8   to separate them from alleged perpetrators?

9        A    Once you are having an issue with a predator

10  or predators, you have to assume that they are gang

11  members, that they have other contacts, that they know a

12  multitude of people in the jail that have been arrested.

13  They can get word passed around if they want.  It's

14  the -- those that were accused of this crime, in my

15  opinion, they should have been moved to single cells and

16  locked up.  They're in a protective custody area of all

17  places.

18       Q    And do you know -- once their identities were

19  ascertained and verified through the investigation, do

20  you know if they were moved?

21       A    Possibly.  I -- I'm not sure.

22       Q    Well, now, you've given an opinion that you

23  think they should have been moved, and you didn't review

24  the records to see if they actually were moved?

25       A    I think they were moved, but not immediately.

# EXHIBIT 3

79

1     Q     Would you agree with me that you need to
2  ascertain who the perpetrators are and through an
3  investigation, and that it's the safest course of action
4  to remove the known victim to safety while you ascertain
5  who the perpetrators are?

6     A     Well, for a full day, of course, they left the
7  situation untouched, and the decision at that particular
8  time in my opinion would have been as soon as the video
9  had been viewed is that Bell and McCoy should have been
10  placed in administrative confinement.

11     Q     Well, you just said that they left the
12  situation untouched for a full day, but earlier you
13  agreed with me that no one reported it for a full day,
14  that it was the following day before anyone reported
15  this, correct?

16     A     The victim was still under the eyesight of the
17  perpetrator.  Of course, to try and report it while
18  they're right there next to you would be a very scary
19  thing to try and do.  We're dealing with guys that just
20  killed somebody and the other one raped somebody.
21  They're facing many, many years probably in state prison
22  and have very little to lose.

23          So if you have this little misdemeanor kind of
24  crime that you've been accused of, and you're probably
25  going to be leaving jail very soon, you don't want to

# EXHIBIT 3

1    threaten predators like Bell and McCoy.  It would be too

2    dangerous.  And of course, I can understand why it's not

3    reported until the following day.  Just seeing these

4    guys would be a threat to someone like Mr. Wells.

5        Q    Is it your position Mr. Wells was only there

6    on a misdemeanor crime?

7        A    No, he was there on a drug charge.

8        Q    Did he have any other felonies he was there

9    on?

10       A    If he was, I don't remember any additional

11   felonies.

12       Q    Well, for whatever the reason it wasn't

13   reported, would you agree with me that it not being

14   reported until the following day would delay the jail's

15   ability to take any action such as reviewing the video

16   to identify the alleged perpetrators?

17       A    I just explained that these two very violent

18   men were still within eyesight of the victim.  That

19   would be a very scary thing to do, to try and report

20   something while they can still get their hands on him.

21       Q    Sure.  No, you've explained that.  But what

22   you haven't explained is how they were supposed to

23   identify the perpetrators prior to this being reported.

24       A    Well, I think I mentioned the video and --

25       Q    Okay.  Well, you still haven't explained how

# EXHIBIT 3

81

1   they're supposed to know about the video without the

2   crime being reported.

3        A    Automatically know about the video.  If

4   somebody reports the possibility of criminal activity,

5   it's the first thing you do.  That's why they have video

6   in these places these days.

7        Q    Well, certainly.  But you agreed with me,

8   though, that it wasn't reported until the following day

9   so they certainly couldn't have even known that there

10  was video until the following day.

11       A    Sure, they could have.

12       Q    And how was that without it being reported?

13       A    Because it's right there in the computer.  You

14  just bring it up and scroll through it.

15       Q    So is it your position they should scroll

16  through an entire day's worth of video every single day

17  at the end of the day to see what happens?

18       A    If something has been alleged, absolutely.

19       Q    But I think you're failing to see,

20  Mr. McAndrew, it hadn't been alleged yet, and so I think

21  we can agree to disagree here at this point that we're

22  not talking about the same thing.

23            But you would agree with me that until

24  something has been alleged, you don't know to look at

25  the video, correct?

# EXHIBIT 3

82

1          MR. ELLIS:  Form.

2          THE WITNESS:  That's correct.

3     BY MS. HAWKINS:

4          Q    Okay.  All right.  Are you aware if Mr. Wells

5     actually slept in the top bunk versus the top bunk

6     simply being a data entry?

7          A    I do believe he was in the top bunk at one

8     time, probably for self-protection.  That's something

9     I'm not absolutely sure of, but it would -- it would be

10    an investigative assumption that if he went to a top

11    bunk, it would be to get as far away as possible from

12    someone that could hurt you.

13         Q    Okay.  So you're assuming every time he was in

14    a top bunk, that was to get away from people who were

15    hurting him?

16         A    No, I don't know about other times, but I do

17    know about this time.

18         Q    Okay.

19         A    And this time, it would certainly be a proper

20    investigative assumption.

21         Q    Okay.  And I know that there's a form that

22    says he was assigned a top bunk.  My question to you is,

23    though, do you know if he actually slept in the top bunk

24    or if he was just on paper assigned the top bunk?  Did

25    you do anything to confirm that?

# EXHIBIT 3

83

1      A    No.

2      Q    Did you ever talk to Mr. Wells to see, hey, it

3 looks like you were assigned a top bunk.  Did you -- did

4 they force you to sleep in a top bunk or did you sleep

5 in a bottom bunk?

6      A    No.

7      Q    Do you know the process for assigning bunks at

8 the Bay County Jail?

9      A    I know that they have a classification process

10 that they're supposed to follow.  It's outlined very

11 clearly in the Florida Model Jail Standards 2018.  And

12 it's through that classification process that people are

13 assigned to every cell they go to throughout that entire

14 jail.  They don't just bring people in and say this is

15 where you're going.

16      Q    Okay.  Is something on getting -- is something

17 on getting a top or a bottom bunk also in the Florida

18 Model Jail Standards?

19      A    Before they're assigned to any cell, that NCIC

20 and SCIC reviews are done.  After that, the most recent

21 charges are reviewed, and they have a classification

22 system that tells them what their custody should be and

23 what their likelihood of dangerousness is, and assigned

24 accordingly to various areas of the jail.

25      Q    Well, I was asking about the bunk.  Is there

# EXHIBIT 3

84

1    something in the classification about the bunk in the

2    Florida Model Jail Standards?

3        A    I can't remember if there's something in the

4    standards for -- that addresses a particular bunk.

5        Q    What, to your knowledge, were the acts of

6    violence that inmate McCoy and Bell had committed

7    against other inmates?

8        A    Other inmates I did not inquire.  I was not

9    advised of any other actions against other inmates.  I

10   saw no evidence of that in the material that I reviewed.

11       Q    How do you define a dangerous felon?

12       A    By the charges in terms of classification.  I

13   have to make a professional assumption that some inmates

14   are going to be more dangerous than others simply based

15   on the pending charges.

16       Q    Well, the circumstances -- let me ask.  You

17   made a note that Dell -- Bell was a dangerous felon

18   because he had a sexual charge.  Do you know if that was

19   a sexual charge involving an adult or a minor?

20       A    I can't remember if it was an adult or a

21   minor, just that he was being charged with a rape

22   charge.

23       Q    And are individuals with charges of sexual

24   acts on minors often in protective custody in prisons

25   and/or jails?

# EXHIBIT 3

85

1      A    It would depend upon the media or whether he

2  had just been arrested.  It would depend upon a lot of

3  things in terms of the classification process.  They

4  have a process by which they narrow these things down.

5      Q    But you agree with me that there's sort of a

6  hierarchy both in jail settings and prison settings of

7  inmates based on their charges, and that those who

8  perpetrate crimes on small children are considered some

9  of the lowest of the low in the inmate population?

10            MR. ELLIS:  Form.

11            THE WITNESS:  Well, years ago, that was very

12        true what you're saying, but there are so many men

13        that are in prison in the State of Florida and

14        throughout the country these days that are there

15        for sexual battery on both adults and children that

16        it's become pretty much a moot issue in terms of

17        inmate protection in the prison system.

18  BY MS. HAWKINS:

19      Q    So you do not believe that an inmate who has

20  been perpetrating sexual acts on a child would possibly

21  need extra protection in a jail, prison setting?

22      A    That would depend upon the classification

23  process once again, like I said, looking at the whole

24  picture.

25      Q    So it's possible then the Bay County Jail

# EXHIBIT 3

1    going through the classification process in reviewing

2    Bell's charges of having perpetrated sexual acts on a

3    child recognized he needed extra protection from the

4    general population?

5              MR. ELLIS:  Form.

6              THE WITNESS:  That would be again part of the

7         classification process, and he could or could not

8         be considered for any kind of special housing.

9    BY MS. HAWKINS:

10        Q     And did you review any of the classification

11   documents as it pertained to Bell?

12        A     They were not provided.

13        Q     And what about classification on Mr. McCoy, do

14   you know any of the circumstances involving his charges?

15        A     He was charged with murder.

16        Q     And do you know anything about that murder, if

17   it was a high profile murder that had hit the news and

18   the media and was high profile?

19        A     Well, once again, I'd be stepping outside my

20   area of expertise if I go beyond the title of the

21   arrest.  Murder is murder as far as the jail is

22   concerned.

23        Q     But would you agree with me that if it was a

24   high profile murder and other inmates in the prison or

25   the jail setting were aware, that that could cause an

# EXHIBIT 3

1  extra risk to inmate McCoy of retaliation?

2      A    Yes, that's possible.

3      Q    Okay.  And so would you agree with me then

4  that there was a potential that even though he had a

5  pending murder charge, that he would be in need of extra

6  protection as well?

7           MR. ELLIS:  Form.

8           THE WITNESS:  Using the word potential, yes.

9  BY MS. HAWKINS:

10     Q    Okay.  Well, you haven't reviewed any of his

11 classification documents either, have you?

12     A    I just said to you they were not provided.

13     Q    Okay.  And so you do not know why, having not

14 reviewed any of the documents, Bell and McCoy could have

15 needed extra protection?

16     A    If they had needed extra protection, I'm sure

17 that the jail in their own defense would have provided

18 such documentation.

19     Q    Well, now, the documentation exists

20 Mr. McAndrew, so why your attorney didn't provide it to

21 you, I don't know.  But I can assure you the jail has

22 classification documents on these individuals, so you

23 may want to ask Ms. Mattox about those classification

24 documents and why you didn't receive them because

25 they've been provided to her.

# EXHIBIT 3

88

1    A    I'll do that.

2    Q    So that's -- they -- they definitely do exist.

3         So would you agree with me that all inmates

4    deserve protection regardless of their charges?

5    A    Absolutely.

6    Q    You certainly don't get to pick and choose

7    which inmates you elect to protect, do you?

8    A    I would in fact pick and choose based on the

9    charges as I mentioned earlier until the arresting

10   authority or the Courts or the State Attorney's Office

11   had advised me differently.

12        I would pick and choose simply based on the

13   charge itself because that's all the jail has to go with

14   initially.  They get a very small narrative on an arrest

15   report that gives them a little bit of information about

16   the charge, and they have to make a decision

17   accordingly.

18   Q    So you would protect some individuals more

19   than others simply based on what they've been arrested

20   on?

21   A    Yes and no.  There's a level of custody that's

22   assigned to every inmate, and it could be minimum

23   custody or it could be closed custody or medium custody.

24   And custody itself will tell you a lot.  That's part of

25   the classification process.

# EXHIBIT 3

89

1          But going back to picking and choosing, yes, I

2    would certainly pick and choose based on the material I

3    had been provided by the arresting authority.

4          Q    What did you review that gave you some

5    indication this was planned if you believe it was?

6          A    I didn't see such evidence that I was aware.

7          Q    Did you review anything that suggested Wells

8    was being targeted?

9          A    As a past investigator and in reviewing this

10   case, I would certainly have considered it as an

11   investigator that because this man was a cripple,

12   handicapped kind of guy, small, and invisible, that he

13   would be subject as prey.

14         Q    Would you agree there was nothing to indicate

15   this was preplanned?

16         A    I just answered that.  No.

17              Let me ask, we've been going here two hours

18   and 15 minutes.  I sort of need a little bathroom break.

19              MS. HAWKINS:  Yeah, I was thinking about doing

20         it at 11:30.  But if you want to go ahead and take

21         it now, we can just go ahead and take it now.

22              THE WITNESS:  Yeah.

23              MS. HAWKINS:  Why don't we do 15 minutes.  Do

24         you think if we do 15 minutes, is that enough of a

25         quick break and for you to look for the documents

# EXHIBIT 3

90

```
 1        that we talked about earlier?
 2              THE WITNESS:  No, I can wait another 15
 3        minutes.
 4              MS. HAWKINS:  No, we can do a break now.  If
 5        you're ready now, there's no need -- 11:30 was just
 6        in my mind where I was going to stop.  And so we
 7        can stop now.
 8              THE WITNESS:  No, if that's a target time, I'm
 9        fine.  I can wait that long.
10              MS. HAWKINS:  Okay.  Well, let me look at my
11        questions right here, and it may really just be a
12        reasonable breaking point right now anyhow.
13              Yeah, let's just go ahead.  I think that was a
14        reasonable stop in my questions anyhow, so let's
15        just go ahead and do that.  Why don't we come back
16        like a quarter till?  That'll give you enough time
17        to take a quick break and then find documents.
18              THE WITNESS:  Okay.  Great.
19              (Recess from 11:17 a.m. to 11:45 a.m.)
20   BY MS. HAWKINS:
21        Q    I'd like to go back.  Were you able to find
22   the documents that we were talking about earlier?
23        A    Some of them.  Of course, there was a bathroom
24   break and having to try to find these documents, there's
25   so many of them.  I got -- I got some of the more
```

# EXHIBIT 3

91

1   important ones that I can -- I remember also that

2   Mr. Wells did not report this, that it was another guy.

3   It was another inmate.

4        Q    Okay.  Tell me about the injuries.  You talked

5   about this being horrific and him having horrific

6   injuries.  I'd like to know what those were.

7        A    Well, McCoy gave Bell the plastic glove that

8   fit over the end of the broom.  And when the broom was

9   retrieved in the video, the glove was no longer on the

10  end of the broom.  That's something that I remembered as

11  well, indicating that -- strongly indicating or

12  suspecting penetration.  The guy's name was Anderson,

13  the inmate, Shaun Anderson.

14          And he told Burkett when Burkett was doing his

15  review of things that he may have told him on the 14th,

16  the request was written on the 13th, and Burkett didn't

17  do the ancillary report until the 15th.  So those are

18  the delays to clean that up, if I can at all.

19       Q    Well, let me ask you about that.  Do you know

20  if the incident report was -- if the report by -- I'm

21  not going to call it the incident.  The report by

22  Anderson was written on the 13th.  Do you know when he

23  would have turned it in to the mailbox that they've got

24  there?  Do you know if he turned it in that day?

25       A    Well, he wasn't sure.  It was either the 13th

# EXHIBIT 3

92

1    or the 14th.

2         Q    Okay.  And how do you know he wasn't sure?

3         A    I have -- I have simply his words of what he

4    said.

5         Q    Okay.  And what words?  Where are you finding

6    those words?

7         A    He said that he told him on the -- he told

8    Burkett on the 14th and the request was on the 13th.

9         Q    Okay.

10        A    He made the request out on the 13th.

11        Q    And just for the record, what are you looking

12   at right now?

13        A    I'm looking at the investigation for one thing

14   and my own report.

15        Q    Okay.  All right.  So you're talking about the

16   statement of Anderson that was in the investigation?

17        A    Right.

18        Q    Because they did take witness statements in

19   this investigation, did they not?

20        A    Yes.

21        Q    Okay.  So -- and so he told him at some point

22   on the 14th, and you take issue with the fact that

23   Burkett did not write a report until the 15th; is that

24   fair?

25        A    That's fair.

# EXHIBIT 3

93

1         Q     All right.  Okay.  But I want to ask you about

2    the --

3         A     The incident report was on the 15th.

4         Q     Right, which was the next day.

5         A     Yes.

6         Q     Okay.  And you take issue with that, the fact

7    that the incident report was not until the next day when

8    the video could be reviewed, correct?

9         A     Correct.

10        Q     Okay.  And you don't know what time on the

11   14th Anderson told Burkett, do you?

12        A     No.

13        Q     So it could have been the very end of the day

14   on the 14th when Burkett told -- I mean, I'm sorry,

15   Anderson told Burkett such that there was no opportunity

16   to review all of the video footage between when he was

17   told on the 14th and when the incident report was

18   written on the 15th?

19        A     I believe that's correct.

20        Q     Okay.  I was asking about injuries.  Can you

21   tell me about the horrific injuries suffered by

22   Mr. Wells?

23        A     He was --

24        Q     Mr. McAndrew, do you believe that you're

25   struggling coming up with an answer for this because

# EXHIBIT 3

1   Mr. Wells suffered no injuries?

2          MR. ELLIS:  Form.

3          THE WITNESS:  I'm -- I'm not being able to

4      find the exact wording in my report for the

5      investigation.

6   BY MS. HAWKINS:

7      Q    I need to know what document you reviewed that

8   said he had injuries and what those injuries were.

9      A    It was a medical document that I cannot put my

10  hands on that indicated his injuries.

11     Q    And what were those injuries?

12     A    I don't -- I don't remember the exact -- and I

13  can't put my finger on that right now.

14     Q    Okay.  And who was the doctor?

15     A    I can't -- I can't remember.

16     Q    And where was he examined?

17     A    I'm sorry?

18     Q    Where was he examined?

19     A    I believe it was at a medical center or

20  another facility.

21     Q    And what facility was that?

22     A    I don't remember.  Like I say, I cannot find

23  that paper right this minute.

24     Q    All right.  Tell me -- you said something that

25  it could still be sexual battery even if there wasn't

# EXHIBIT 3

95

1    penetration if he was in a forced sexual position.  What

2    was the sexual position he was forced into?

3         A    Well, the video showed that inmate Robert

4    Wells who is handicapped and needs a walker to assist

5    him in walking was walking towards the shower with no

6    pants on.  Inmate Travis Bell gets up from a table where

7    he was seated, walks across the room and gets a broom

8    and asks if anyone has a glove.

9              Inmate McCoy who was making fun of inmate

10   Wells for not having pants on goes to his bunk to get a

11   blue glove.  Bell takes the glove and places it on the

12   end of the broom handle.  Inmate Bell then runs up

13   behind inmate Wells and attempts to push the broomstick

14   up -- (phone ringing) -- attempts to push the broomstick

15   up inmate Wells' rectum.  He pushes the broomstick hard

16   enough, and the glove comes off of the broomstick.

17             On June 18th, codefendant was interviewed in

18   his office by the Bay County Jail, and the codefendant

19   admitted that inmate Travis Bell had pushed the broom

20   handle up the victim's anus.

21        Q    And who -- and who said that?

22        A    The codefendant, McCoy.

23        Q    Okay.  All right.  And for the record, what

24   are you reading from?

25        A    I'm reading this from the Bay County Sheriff's

# EXHIBIT 3

96

1    Office incident report.

2         Q    Okay.  Thank you.

3         A    A statement was also obtained from the victim

4    who stated that this was done against his will and

5    without his permission.  It is also clear to this writer

6    that the victim had some mental disabilities as well.

7    Due to the time frame that the incident was reported and

8    the case being assigned, the only physical evidence

9    collected will be the statements and the videotape.

10              Travis Bell will be charged with sexual

11   battery and McCoy will be charged with principal in the

12   first degree to sexual battery.

13        Q    Okay.  So I'm going to ask you again.  You

14   said something about him being put in a sexual position.

15   What was the sexual position he was put in?

16        A    He was walking backwards, and Bell ran up

17   behind him pushing the broom up his anus.

18        Q    Okay.  So your position is --

19        A    And he had no pants on, and Bell came from

20   behind him.

21        Q    Okay.  All right.  And so going back to you

22   had said originally that as far as jail, prison rapes

23   go, this is more brutal than the others that you've

24   seen.

25              What about this was more brutal than the other

# EXHIBIT 3

97

1    rapes that you've seen?

2        A    Normal cases involving rape in jails and

3    prison result from a predator who is so feared that the

4    victim will allow themselves to be sexually abused,

5    raped, and will oftentimes not report it just as it

6    happens in public.

7             In PREA classes, officers are taught that rape

8    is not often reported because of the humiliation or the

9    fear of the predator or both.

10       Q    Okay.  I'm not really sure that actually

11   answered my question at all, but we'll move on.

12            Will you agree with me that these two

13   individuals were charged with crimes out of the

14   investigation from the Bay County Jail?

15       A    Say that again, ma'am.  I'm sorry.

16       Q    Would you agree with me that McCoy and Bell

17   were both charged with crimes for their actions against

18   Mr. Wells and they were charged by the investigator at

19   the jail, Mark Bailey?

20       A    They were, yes.

21       Q    Would you agree with me that they were both

22   prosecuted and ultimately served some form of a

23   punishment for their actions against Mr. Wells based on

24   that investigation?

25       A    I don't know what the outcome -- the court

# EXHIBIT 3

98

1   outcome was or what the Judge ruled.

2        Q    Well, you've said that it was a very flawed

3   investigation and there were all sorts of problems with

4   it.  But so would finding out if there was a successful

5   prosecution not matter in your opinion?

6        A    It would not matter at all because it would

7   not be related to my work and it would be outside my

8   area of expertise.

9        Q    Would you not agree that an investigation that

10  results in a successful prosecution is a successful

11  investigation?

12       A    Not always.  It all --

13       Q    Well, is a point of an investigation to

14  identify the perpetrators, the crime that occurred, and

15  bring them to justice?

16       A    Absolutely.

17       Q    Okay.  Were the perpetrators identified?

18       A    They were.

19       Q    Was a crime identified?

20       A    It was.

21       Q    Okay.  And you have said that you didn't

22  bother to find out if they were punished or not?

23       A    Once again, that goes beyond the area that I

24  was asked to examine in this case, and it goes beyond my

25  expertise at the same time.

# EXHIBIT 3

99

1      Q    So if they were punished, then they've met the

2    goals of an investigation, have they not?

3            MR. ELLIS:   Form.

4            THE WITNESS:   I'm not an attorney or a Judge.

5      I can't -- I'm not qualified to answer that

6      question.

7    BY MS. HAWKINS:

8      Q    Now, we talked a little bit about the C dorm

9    and your opinion that he was moved to C 3 as punishment,

10   and you insisted that this was not a protected custody

11   dorm, correct?

12     A    Correct.

13     Q    All right.  And you had on your list here that

14   you reviewed all the policies and you reviewed the Post

15   Orders as well at the jail?

16     A    I did.

17     Q    Okay.  And so you would have reviewed Post

18   Order for the C dorm in that?

19     A    Well, I'd have to go back to the things I've

20   reviewed.

21     Q    Well, let me help you.  You talk about on

22   Page 9 the Post Order for Detention Officer Custody Post

23   Dorm C, Pod 1, so I know that you've reviewed some of

24   those Post Orders, and I can bring this one up for you.

25   Let me try to share that screen.  There we go.

# EXHIBIT 3

1           All right.  Are you able to see that Post

2    Order?

3         A    Yes, I am.

4         Q    Okay.  And I'm not going to test you by making

5    you try to read anything unless I can try to Zoom in

6    here.

7               Is this a Post Order you would have reviewed?

8         A    July 2018, C 1, 3, and 4.  Yes, for Dorm C 1.

9    Dorm C, Pod 1.

10        Q    Well, would you agree with me that the area of

11   control up here actually says C 1, 3, and 4?

12        A    Yes.

13        Q    Okay.  And so at the top, it says C Dorm

14   Segregation, and then Area of Control 1, 3 and 4?

15        A    Yes, that's three different pods separate --

16   each one is separated from the other.

17        Q    Okay.  So then based on this Post Order, would

18   you not agree with me that C 3 is a C dorm segregation?

19        A    Every pod is a pod of segregation depending

20   upon its needs.

21        Q    Okay.  So your assumption that he was not in

22   segregation when he was moved to C 3 is simply an

23   assumption that flies in the face of this Post Order?

24        A    Say that again, ma'am.

25        Q    Your assumption that he was in a general

# EXHIBIT 3

1   population and was not in segregation or in protected

2   custody of any form flies in the face of this Post Order

3   that it has C 3 as a segregation dorm?

4           MR. ELLIS:  Form.

5           THE WITNESS:  He was not in protective

6       custody.

7   BY MS. HAWKINS:

8       Q    All right.  Now, I'm looking at your chart on

9   Page 11 of your amended addendum report, I guess, and

10  you have listed out from Florida Model Jail Standard 53A

11  how inmates should be separated, and it simply has adult

12  male felons and then adult male misdemeanors, correct?

13      A    Yes.

14      Q    All right.  And there's no breakdown on the

15  felons there.  It's felons and then misdemeanors are

16  broken out, correct?

17      A    Yes.

18      Q    All right.  And then you highlighted B which

19  says, Dangerous felons shall not be housed with

20  misdemeanors.

21      A    That's correct.

22      Q    Okay.  In this case, you once said something

23  about -- referred to Wells as having a misdemeanor

24  charge.  But then I asked you and you corrected, and you

25  agree with me that Wells had felony charges, correct?

# EXHIBIT 3

1      A    Yes.

2      Q    And you would agree with me that while you

3 didn't review his prior history, certainly there's a

4 potential that he had prior dangerous felonies as well?

5      A    He was charged with felonies, but nonviolent

6 felonies.

7      Q    Correct.  And I'm asking you why you didn't

8 review his criminal history.  It's possible that he

9 could have had violent felonies in his history that

10 would have come up in the classification process,

11 correct?

12      A    They were not identified in the classification

13 process as having a violent history.

14      Q    But they are identified in the jail records

15 that you received.

16      A    I'm sorry?

17      Q    They are identified in the jail records you

18 received and reviewed.  Did you just miss them?

19      A    No.

20      Q    You didn't miss them?

21      A    I did not miss them.

22      Q    So you know that they're there.  Okay.  So you

23 would agree with me then that you saw that he had a

24 prior robbery?

25      A    Yes.

# EXHIBIT 3

103

1    Q    Okay.  All right.  So we both agree then that
2  he had prior dangerous felonies in his criminal history
3  and that they review prior criminal history making a
4  classification decision?
5    A    He was still classified as nonviolent.  He
6  would have been by me, considering the time element, the
7  nature of the offense, and whether he had served any
8  serious time or any time at all.
9    Q    Would you agree with me that those charged
10  with pending misdemeanor charges, that they can have
11  very violent histories?
12    A    Of course.  That's the reason for the
13  classification process.
14    Q    But even if you've got a misdemeanor with a
15  violent felony in his history, it's your suggestion
16  based on this charge that he may be a very violent man.
17  But if he's only got a pending misdemeanor, he should be
18  in with only misdemeanors, correct?
19    A    If an inmate is charged with a misdemeanor and
20  he has been previously charged with a very serious
21  violent crime, it would mean that he has done time in
22  state prison, that he has served his time for that
23  particular crime and hopefully realized through his own
24  redemption that crime doesn't pay.
25    Q    Again, I don't know that was quite the answer

# EXHIBIT 3

1    to the question that you would hope that they would be

2    reformed.

3            But let me ask you if you're familiar with

4    training seminars, conferences, and other professional

5    development activities of Major Anglin and the other

6    managers or supervisors under his direction?

7        A    No.  I know Mr. Anglin from years past.  In

8    fact, he -- he worked under my supervision at one time.

9        Q    Okay.  How do you know then that none of those

10   folks working for Mr. Anglin, Major Anglin have

11   knowledge about the factors considered in claims of

12   deliberate indifference?

13       A    Deliberate indifference is something that has

14   to be decided by a Court.  The only way that an

15   investigator or someone like myself could use the word

16   deliberate indifference is through an opinion.  But the

17   decision on whether it is or it isn't belongs to The

18   Court.

19       Q    Sure.  Would you not agree with me that there

20   are factors that are lined out that The Court looks to

21   in considering if something is deliberate indifference?

22       A    Absolutely.

23       Q    Okay.  And would you not agree that you can be

24   aware of the factors that a Court looks to for

25   deliberate indifference without making the ultimate

# EXHIBIT 3

1  conclusion?

2       A    As long as it was a consequence or reckless

3  disregard or the consequences of one's own actions or

4  omissions, yes.

5       Q    Does the Florida basic recruit training for

6  corrections officers address liability issues?

7       A    Say that again.  I'm sorry.

8       Q    Does the Florida basic recruit training for

9  corrections officers address liability issues?

10      A    It does not.  FDLE controls the curriculum for

11  certification, correctional officers.  In fact, FDLE

12  maintains the certifications for all law enforcement

13  officers in the State of Florida that are state level or

14  below.

15      Q    Have you ever been a CJSTC certified academy

16  instructor?

17      A    And how is the question related to that?

18      Q    I'm just wondering if you've ever been a CJSTC

19  certified academy instructor, if you've done any of that

20  sort of instruction?

21      A    No, I haven't.

22      Q    Okay.

23      A    I've done a lot of instruction, but it was

24  in-service training after they had been certified.

25      Q    Do you have any specific criticism of the

# EXHIBIT 3

1   training at the Bay County Jail?

2        A    I don't know if I do or don't because I have

3   not -- I have not reviewed their training records.

4        Q    Have you ever hired anyone to work in the

5   field of criminal justice?

6        A    Thousands.

7        Q    Did any of those people that you hired ever

8   violate an agency policy?

9        A    Yes.

10       Q    And how were violations handled?

11       A    I fired a lot of people.  I suspended a lot of

12  people.  I gave letters of reprimand to a lot of people

13  depending upon the level of the offense.  I had a lot of

14  people decertified.

15       Q    You ever have a -- you ever have an employee

16  with a criminal record or a criminal charge before you

17  were involved in their hiring?

18       A    Absolutely not.  I would never hire anyone.

19  They would have never gotten past the background

20  investigation.  So if I had known they had a criminal

21  record, I certainly would not have hired them.

22       Q    Okay.  So if someone had a possession of

23  marijuana less than 20 grams conviction when they were

24  18, you're telling me there's not a single one of those

25  folks that had something like that that you hired?

# EXHIBIT 3

107

1      A    Well, if they were under 18, it would be a

2  juvenile charge, and those records would not be

3  available for hiring practices if it was a misdemeanor.

4      Q    Okay.  And what if they're over 18 and it's an

5  adult charge?  Are you telling me that you didn't hire a

6  single person in all of your years that had a prior no

7  valid DL, prior possession of marijuana charge to their

8  record?

9      A    Not a single person if I knew of the charge.

10     Q    Do you know if Mr. Beasley was initially

11 working under a TEA?

12     A    And what does your acronym stand for?

13     Q    TEA.  So I've just got that written down here,

14 so I was just wondering if you know about that, if you

15 know of that acronym or not.  If you don't know of that

16 acronym, then I'm moving on.

17     A    I don't know that acronym.

18     Q    Okay.  All right.  You gave an opinion about a

19 Randy Olson in this report here.  What role did

20 Mr. Olson have in this case involving Wells?

21     A    Do you know what page I should be looking on

22 there for Olson?

23     Q    Let's look here.  You start on Page 8.  It is

24 noteworthy and certainly respective of the hiring

25 practice that Bay County Jail hired Mr. Randy Olson.

# EXHIBIT 3

108

1   And that's the bottom of Page 8.

2        A    Yes.  But where do we come up with Olson?

3        Q    That's what I'm asking you, Mr. McAndrew,

4   because I don't think he's involved in this case at all.

5   So where did you come up with Mr. Olson?

6        A    I'm looking for it and I don't see it.

7        Q    Well, you talk about him in your report on

8   Page -- like I said, the bottom of Page 8.  It's the

9   second to last paragraph.  It's noteworthy and certainly

10  respective of the hiring practices that the Bay County

11  Jail hired Mr. Randy Olson.

12       A    I'm sorry.  It's noteworthy -- oh, yes.  That

13  was in the material that was provided to me that Olson

14  was hired as a detention specialist.  And, of course,

15  when you hire a detention specialist, it's with the

16  intention of getting them certified to be a correctional

17  officer, certified.  And this particular individual was

18  hired with the knowledge of his having a permanently

19  revoked Florida teaching certification, someone that

20  should have never been hired in law enforcement.

21       Q    Okay.  And so when was his teaching

22  certificate revoked in relation to when he was hired?

23       A    Fort Walton Beach High School.

24       Q    Okay.  When was it revoked in relation to when

25  he was hired?

# EXHIBIT 3

1        A    I don't know.

2        Q    Okay.  So what does he have to do with this

3    case?  Was he on duty that day?

4        A    It has nothing really to do with this case

5    except the fact that it shows that the overall

6    supervision of the jail includes not following the

7    Florida Model Standards in terms of hiring practices.

8        Q    Well, let me ask you, what did Mr. Olson do at

9    the jail?

10       A    He was a -- he was hired as a detention

11   specialist.

12       Q    Okay.  Well, what did he end up doing, do you

13   know?

14       A    I don't know.

15       Q    Okay.  Do you know if he did nothing more than

16   coordinated training for the jail?

17       A    The fact that he was allowed into secure areas

18   of the jail was a mistake.  The fact that he was hired

19   was a mistake.  The fact that --

20       Q    But as you said, though, it has no bearing on

21   this case, though, right?

22       A    Yes, it does have a bearing on this case.

23       Q    Well, he wasn't on duty that day, was he?

24       A    I don't believe so.

25       Q    All right.

# EXHIBIT 3

1      A      It would be of no consequence whether he was

2  on duty or not.  The reason that this statement is

3  incorporated in my report is to show that the hiring

4  practices at the jail were below standard.

5      Q      Was there anyone ever raped on his watch?

6      A      I don't know.  He should never have been on

7  watch, period.

8      Q      Do you know on Mr. Olson's employment

9  background investigation report, did it indicate whether

10  an SCIC or NCIC check was done?

11      A      On whose report, ma'am?

12      Q      Mr. Olson, his employment background, were

13  those checks done?

14      A      I don't know the details of any investigations

15  involving him other than the fact that his license was

16  permanently, not temporary suspension, but permanently

17  revoked.  That's a very serious thing.

18      Q      All right.  And do you know if that showed up

19  in a background investigation?

20      A      It should have.  I don't know if it did or

21  not.

22      Q      What's the purpose of a protective custody

23  dorm?

24      A      To do what the jail is required to do by all

25  of the standards, and that's to provide care, custody,

# EXHIBIT 3

111

1   and security.

2        Q    Were you able to review anything to refresh

3   your recollection on how long the duration of this --

4   the stick being poked, the rape, how long that occurred?

5        A    No.  You asked that question much earlier.

6   And once again, I don't know the exact length of time.

7        Q    Okay.  Do you believe a county jail should be

8   classified as a long-term medical treatment facility?

9        A    No.

10       Q    In your experience, does every inmate with a

11  medical condition or a history get housed in medical

12  housing or an infirmary?

13       A    No.

14       Q    What are some of the privileges that someone

15  does not get or the benefits in a jail that you're not

16  going to get if you're --

17       A    I'm sorry.  I'm not hearing your question.

18       Q    What are some of the privileges or benefits

19  that you would not get as an inmate who is housed in a

20  medical cell versus general population?

21       A    That would depend upon the jail, its location,

22  availability of programs or nonavailability.  A lot of

23  things that are offered to inmates are done by

24  volunteers that come from outside the jail system.

25  There are a lot of variables that would make that

# EXHIBIT 3

1  determination.

2      Q    Would you agree that you can't deprive someone

3  of those benefits simply because they have a mental

4  disability?

5      A    I do.

6      Q    Or a physical disability for that matter as

7  well?

8      A    I do.

9      Q    What percentage of inmates in jails present

10 with mental health issues or disorders?

11     A    Say that again, ma'am.

12     Q    What percentage of inmates in jails present

13 with mental health issues or disorders?

14     A    I don't remember the exact percentage, but

15 it's a large percentage of inmates have mental

16 disorders.

17     Q    Have you read any studies that speak to that?

18     A    I have.  And it's also included in the Florida

19 Department of Corrections annual report, but the

20 percentage itself I can't -- I can't remember.

21     Q    Would you agree with me that in jails that

22 there are a large number of individuals that are

23 incarcerated with mental health issues ranging from

24 bipolar, post-traumatic stress, depression, antisocial

25 personality disorder, amongst many others?

# EXHIBIT 3

113

1          A      I can't answer the question the way you have

2    asked it, but I can say that there are a large number of

3    inmates in jails and prisons with mental disorders.

4          Q      Okay.  Do you believe it's possible for jails

5    to place every individual who has a mental health

6    condition in a medical cell?

7          A      No.

8          Q      You know, on your original report in this

9    case, you did not mention PREA, but I think in your

10   supplement you did.  Why was there a change?

11         A      I don't know that I did not mention it in my

12   original report.  I'd have to go back and take a look at

13   that.  Because PREA certainly is the guiding light, one

14   might say, for any kind of sexual abuse inside a place

15   of incarceration in the United States of America

16   according to the Department of Justice.

17         Q      All right.  And so why would PREA -- if

18   PREA -- if we go back and we look at your first report

19   and PREA was omitted from your first report, why would

20   that have been?

21         A      Because there's the evidence of sexual

22   battery.  It certainly falls under PREA.

23         Q      Okay.

24         A      Even if it was attempted sexual battery, it

25   falls under PREA.

# EXHIBIT 3

114

1      Q    Right.  And yet you didn't mention PREA in

2  your first report?

3      A    I don't know that I did.  I would think that I

4  would have.

5      Q    All right.  Well, let's talk about your

6  supplement.  You said PREA observations should have been

7  noted.  What did you mean by that?

8      A    Say that again, ma'am.

9      Q    So in your supplement, you said PREA

10 observations should have been noted.  This was on

11 Page 11.

12     A    Should have been what?

13     Q    Noted.

14     A    Noted.

15     Q    Noted, yeah.

16     A    Yes.

17     Q    What did you mean by that?

18     A    Well, the investigation from Burkett or from

19 Bailey should have both listed PREA in both documents.

20 It should have been highlighted as a PREA violation, not

21 just sexual battery that they're being charged with, but

22 the fact that this is a PREA violation.

23     Q    All right.

24     A    Which is required by the Prison Rape

25 Elimination Act of 2003.  It's required.

# EXHIBIT 3

1    Q    Is it your testimony then that you did not

2 review any documentation where this was noted as PREA

3 and then forwarded to Investigator Mark Bailey, nor did

4 you review the PREA chart that included this case listed

5 under PREA?  Did you review any of that?

6    A    No.

7    Q    All right.  So certainly then if we have a

8 document where Major Anglin has written "PREA" on it and

9 forwarded it to Mark Bailey to investigate due to it

10 being a PREA, then PREA has been noted, has it not?

11    A    Yes.

12    Q    Okay.  All right.  In your experience, are all

13 administrative documents in a correctional agency signed

14 at the very moment that they are presented or read?

15    A    You're going to have to say that much slower.

16 I'm not getting that question at all.  I'm sorry.

17    Q    Okay.  So based on your experience having

18 worked in an institution and you obviously have worked

19 as a warden for many years, are all administrative

20 documents in a correctional agency signed at the very

21 moment that they are read or presented to an individual?

22    A    It depends on the document.  Not all, but

23 some, yes.

24    Q    So it is possible then for documents to be

25 presented and even read and then signed at a later time?

# EXHIBIT 3

116

1        A      Some documents, yes.

2        Q      What documents --

3        A      But some definitely not.

4        Q      Okay.  And what are the definitely not

5   documents that you believe can't -- wouldn't be signed

6   later?

7        A      Example in case would be incident reports,

8   investigations, sworn statement, anything notarized.

9   And a lot of things are notarized.  There's a long list

10  of things that must be signed at the time they are

11  written.

12       Q     All right.  And I have the document here ready

13  to share for you.  Let's see here.  Screen share.  All

14  right.

15            Now, you are familiar with Burkett's incident

16  report from the 15th, and this would have been the page

17  following it.  And will you read for me what it says in

18  the Major's Review section?  I'll try to blow it up for

19  you.

20       A     Okay.  The writing is not all that good.

21  Let's see.  Reviewed.  Forward to Mr. Struck.  And then

22  that's not legible.

23       Q     Yeah, I know it's really not.  Go down to the

24  Major's Review for me if you would.

25       A     Something -- Major to review.  And there's

# EXHIBIT 3

117

1  some sort of a signature and a date.  Assign to

2  Investigator Bailey for further investigation.  PREA.

3      Q    All right.  Then that document is evidence

4  that PREA was noted by Major Anglin on the 18th and they

5  assigned it for further review, did they not?

6      A    On that small informal document, yes.  Not on

7  the investigation itself.

8      Q    Okay.  Well, you told me earlier that they

9  noted sexual battery on the investigation, correct?

10     A    Correct.

11     Q    Okay.  And that would be the appropriate

12 criminal charge for a criminal case, would it not?

13     A    It would.

14     Q    Okay.  Is there a criminal charge called PREA?

15     A    No.  There are -- PREA is a law.  And this law

16 states how things must be covered and prevented -- and

17 presented.

18     Q    Correct.  So it's a law on how things should

19 be presented, but there's no reason why on a criminal

20 affidavit you would need to mention PREA, correct?  PREA

21 is not a violation of the law in and of itself.  The

22 violation of the law is sexual battery, is it not?

23          MR. ELLIS:  Form.

24          THE WITNESS:  That's correct.

25

# EXHIBIT 3

118

1   BY MS. HAWKINS:

2       Q    So there would be no need to put PREA on the

3   investigation, would there be, the criminal

4   investigation?

5       A    PREA defines the level of the charge that must

6   be addressed.

7       Q    Well, which criminal charge says PREA defines

8   the level?  Which criminal statute?  Which one?

9       A    It's -- of course, you're going with -- now

10  coming back to Florida statutes, and I'm talking about a

11  federal document that requires every law enforcement

12  agency in the entire United States and its possessions

13  to use PREA as a guide in terms of preventing rape and

14  sexual abuse, and prosecuting when it does happen.

15      Q    So the criminal violation is sexual battery,

16  correct?

17      A    That's correct.

18      Q    The criminal battery is not PREA, is it?

19      A    No.

20      Q    So there would be no need to put PREA on a

21  criminal complaint affidavit when the charge and the

22  violation of law is sexual battery, correct?

23      A    No, I don't agree with that.  I believe that

24  PREA should be listed on the document as having been

25  used as a guide in terms of formulating the charge.

# EXHIBIT 3

119

1      Q    And this is from your investigative experience
2    back in 1988?
3      A    No, ma'am, we didn't have PREA then.  I think
4    I mentioned that before.
5      Q    Right.  Well, they --
6           Would you agree with me an individual by the
7    name of -- we talked about Shaun Anderson getting a
8    statement against Bell and McCoy, correct?
9      A    That's correct.
10      Q    All right.  Shaun Anderson -- and you read his
11    statement here, it sounds like you read it over the
12    break -- believed that what Bell and McCoy did was
13    wrong, did he not?
14           MR. ELLIS:  Form.
15           THE WITNESS:  I believe so, yes.
16    BY MS. HAWKINS:
17      Q    Okay.  Was your opinion then that Shaun
18    Anderson was trying to help Mr. Wells or harm Mr. Wells?
19      A    There's no way of making that determination
20    without -- if he said I worked to harm someone, then I
21    would be able to answer that question, but that was not
22    part of his statement.
23      Q    What was the part of his statement?  Was it
24    trying to help bring the perpetrators to justice by
25    telling what happened?

# EXHIBIT 3

120

1    A    I don't know what was in the -- his mind when
2    he sent that notation forward, but it did result in
3    someone looking into the matter at hand.
4         Q    It did.  Okay.  And would you agree with me
5    that his was the only incident report that went forward
6    about what happened that day?  Were there any other
7    statements, anyone else come forward to say what
8    happened to Mr. Wells?
9         A    I don't remember any others that date.
10        Q    And you agree with me that Mr. Wells did not
11   come forward himself?  There's no incident report, and
12   you've given me this long spiel about how he was
13   probably scared and terrified of Bell and McCoy, so
14   that's why he didn't, correct?
15        A    Well, that long spiel as you say is factual in
16   terms of how things work with prisoners that are being
17   raped.  It's not like they're out in society where they
18   can move to the next town to get away from the person
19   that's trying to abuse them or kill them or whatever.
20   They're locked up with these people or with their
21   friends or their fellow gang members.  It's a dangerous
22   place to be, in jail or prison.
23        Q    So we know the answer to the question is that
24   Mr. Wells did not report this himself and that only
25   Mr. Anderson reported it, correct?

# EXHIBIT 3

121

1      A     That's correct.

2      Q     And but for the actions or Mr. Anderson, we

3   wouldn't have known what happened to Mr. Wells that day,

4   correct?

5            MR. ELLIS:  Form.

6            THE WITNESS:  No, we can't say that.  There

7        could have been many other ways that it could have

8        come about.

9   BY MS. HAWKINS:

10     Q     And how is that?  How would someone have known

11  about it if no one reported it?

12     A     Well, if no one reported it, it may have gone

13  unnoticed.  A lot of crimes do.  But you never know

14  what's going to happen in a day or two.  On the 15th,

15  16th, and 17th, there may have been a dozen reports sent

16  in.

17     Q     Okay.  But to your knowledge, there was no

18  other report done, correct?  No one else reported it?

19     A     Not to my knowledge.

20     Q     Shaun Anderson was also in C 1, was he not?

21     A     Yes.

22     Q     And that was due to him having some pending

23  sexual charges as well?

24     A     I believe so.

25     Q     And Shaun Anderson is in fact currently

# EXHIBIT 3

122

1    serving a seven-year sentence in the Department of

2    Corrections?

3        A    I don't know about that.

4        Q    Would you consider that to be a violent

5    offense?

6        A    Which offense, ma'am?

7        Q    Sexual battery.

8        A    Of course.

9        Q    And yet he did not harm Mr. Wells at any

10   point, did he?

11       A    Mr. Anderson you're talking about?

12       Q    Yeah.

13       A    Not to my knowledge, no.

14       Q    Do you know how long it takes for doors, the

15   locked doors that separate pods typically to be unlocked

16   in a prison or a jail?

17       A    It all depends on several variations, whether

18   they're being unlocked with vest keys or if they're

19   being unlocked electronically -- electrically, not

20   electronically.  Electrically.

21       Q    And how long usually does it take

22   electronically?

23       A    Not very long.  Going through the sally port

24   double doors you're talking about?

25       Q    Yeah.  Like if you went from the control room

# EXHIBIT 3

1  in C to the C 1 pod.

2      A    Oh.  Then you're talking about three doors.

3  You got to come out of the control room first, then you

4  have to go through the double doors.  So it could take a

5  minute or two depending on traffic.  There are

6  variables.  Maybe people coming in the opposite

7  direction, you have to wait for them to clear the door.

8      Q    Okay.  So how long would that take then

9  approximately for what we're talking about?

10      A    If you've got an inmate with you, it's going

11  to take longer because he has to be identified going

12  both ways, anybody that's not in a correctional

13  officer's uniform.  Even the correctional officers have

14  to show their ID.

15          But the exact time, I'd have to go to that

16  particular jail at that particular pod or quad and use a

17  stopwatch to answer that question.

18      Q    All right.  Now, you've testified a couple of

19  times and we just mentioned it again, that notion that

20  Wells was terrified of these individuals which is why he

21  didn't come forward.  But that -- you don't have any

22  evidence of that, do you?

23      A    No.  I base that on experience and having

24  dealt with hundreds of victims that fail to report

25  criminal activity because they were afraid or they were

# EXHIBIT 3

124

1   humiliated or both.

2       Q    And you read his statement that he gave to

3   Investigator Bailey, did you not?

4       A    I did.

5       Q    And in that statement -- let's see.  Do you

6   remember when he told Investigator Bailey that:  And he

7   took a rubber glove and stuck it over his stick and he

8   poked me in the butt, and I tell you what, if he wants

9   to do it again, I'll beat his ass?

10      A    Yes.

11      Q    All right.  And does that sound like a man who

12  is terrified of these individuals?

13      A    More so, yes.

14      Q    Okay.  All right.  And do you remember reading

15  in that statement when they said he was asked, and he

16  tried to actually insert it up your anus, and he said he

17  tried to?

18      A    That's correct.

19      Q    Do you remember reading that?

20      A    I believe that -- I believe that's correct.

21      Q    Okay.  And do you remember ever reading a

22  statement where Wells expressed fear and/or stated that

23  he was actually penetrated?

24      A    No.  The evidence that I based my opinion on

25  was the video showing him going with the glove, and when

# EXHIBIT 3

125

1   he pulled the handle back from Mr. Wells' anus, the

2   glove was no longer on the end of the stick.

3        Q    It had fell to the ground?

4        A    It doesn't say -- see that in the video.  You

5   don't see it falling to the ground.

6        Q    And not to be too graphic, but the glove could

7   have gotten stuck between his butt cheeks without there

8   being penetration, could it not?

9        A    Between his butt cheeks would have been

10  penetration.

11       Q    Not necessarily, but we can leave it with

12  that.

13            But he did not ever report penetration, did

14  he?

15       A    I don't believe so.

16       Q    All right.  I just need just a minute here.  I

17  think I'm done.  If we could just have probably just

18  about two minutes, I'll come back on and I should be

19  done hopefully here.

20       A    All right.

21            (Recess from 12:39 p.m. to 12:41 p.m.)

22            MS. HAWKINS:  All right.  I just have one

23       final question, and then I think we can address the

24       exhibits for housekeeping purposes since I really

25       didn't do that quite as I was going along.  And I

# EXHIBIT 3

126

1          don't know where we are at with exhibits that

2          Ms. Mattox has been marking.

3               MR. BAILEY:  36 was the last exhibit.

4               MS. HAWKINS:  36, okay.  I know she likes me

5          to try to stay in order, so --

6               MR. BAILEY:  I'm sorry, 46.

7               MS. HAWKINS:  Oh, 46, okay.  It's 46.  So

8          we'll be at 47 then for this when we start.  Let me

9          do my last question here for you, and then we'll

10         take care of that.

11   BY MS. HAWKINS:

12        Q    Mr. McAndrew, do you know why Mr. Olson was

13   awarded correctional officer of the year in 2018?

14        A    I do not.

15        Q    Were you aware he was awarded correctional

16   officer of the year in 2018?

17        A    I vaguely remember something, but I don't

18   remember any details or why.  It may have come up in

19   conversation as opposed to reading it someplace.  I

20   just -- I don't remember.

21               MS. HAWKINS:  Okay.  All right.  I don't have

22         any other questions.

23               THE WITNESS:  Okay.  Y'all have a nice day.

24               MS. HAWKINS:  Do you want me to do the

25         exhibits or -- and Adam, did you have anything to

# EXHIBIT 3

127

1        follow up with?

2                          CROSS-EXAMINATION

3    BY MR. ELLIS:

4        Q    Just briefly, Mr. McAndrew.  I'm here for the

5    plaintiff.  My name is Adam Ellis.  I won't keep you

6    here as long as you already have been, but I do want to

7    ask you a few things.

8            Do you think that the defendants in this case

9    had a duty to monitor the inmate population in realtime?

10       A    Without question.

11           MS. HAWKINS:  Form.

12   BY MR. ELLIS:

13       Q    Do you think that they should have noticed

14   someone having a broom stuck up his rear end at the time

15   it happened?

16       A    Without question.

17       Q    So you think they should have realized that

18   regardless of any video or reports?

19           MS. HAWKINS:  Form.

20           THE WITNESS:  Again, without question.

21   BY MR. ELLIS:

22       Q    So our client, Mr. Wells, should not have had

23   to report this at all for them to be aware of it, is

24   that what you're saying?

25       A    Absolutely.

# EXHIBIT 3

1          MS. HAWKINS:  Form.

2    BY MR. ELLIS:

3      Q    And do you think that they were negligent in

4    not being aware of that pretty obvious act at the time

5    that it happened?

6          MS. HAWKINS:  Form.

7          THE WITNESS:  They were indeed.

8    BY MR. ELLIS:

9      Q    Do you think that grabbing a glove from under

10   a mattress and putting that glove on the end of a

11   broomstick before the attack is an indication of

12   preplanning?

13     A    Yes, indeed.

14     Q    All right.  Hang on one second.

15         MR. ELLIS:  Give me just one second, please.

16     One minute, please.

17         All right.  That's all I have for you,

18     Mr. McAndrew.

19         MS. HAWKINS:  I just have a quick follow-up

20     based on that.

21                   REDIRECT EXAMINATION

22   BY MS. HAWKINS:

23     Q    It was not a violation of the Florida Model

24   Jail Standards to have the control room with the video

25   monitors up monitoring those pods, was it?

# EXHIBIT 3

1      A      I'm sorry I have to keep asking you to repeat

2    the question, but I'm just not getting it.

3      Q      There was no violation of Florida Model Jail

4    Standards having the video control room for the C pods,

5    correct?

6      A      You would have to read deeply into the

7    standards where security of all areas is required and

8    preapproved by the Florida Model Jail Standards

9    inspector and audited by that same inspector.

10      Q      Well, I read your report, and at no point in

11    your report do you address the control room and the

12    monitoring from the control room.

13      A      Well, that question has never come up until

14    just this instance, so.

15      Q      Well, certainly if it was a violation of

16    Florida Model Jail Standards, you would have pointed it

17    out on your report, would you not?

18      A      Well, perhaps I need to do another addendum.

19      Q      Well, are lots of jails and prisons monitored

20    by video?

21      A      Certainly.  It's -- this is 2022.  I can't

22    imagine a place of incarceration these days without

23    monitoring.  We all have rings on our houses.  There are

24    cameras every place we go.  You can't turn around that

25    you're not being videotaped going up and down the

# EXHIBIT 3

130

1  highways, your license plates being read.

2       Q    Would you agree with me that with those doors,

3  that it would take at least more than a minute to get

4  from the control room to in that pod, would it not?

5       A    As much as a minute, depending once again on

6  the variables that I mentioned earlier.

7       Q    Okay.  All right.  And so if this entire

8  incident from when a broom was grabbed and a glove

9  placed on it and the duration of the broom being used is

10 approximately a minute, no one would have even been able

11 to get into that pod within that minute, would they

12 have?

13            MR. ELLIS:  Form.

14            THE WITNESS:  Well, since it was a crime in

15       motion, getting there in less than a minute would

16       not have made a difference.  The crime had been

17       committed by this time.  But getting there and

18       instantly identifying the culprits, segregating

19       them, getting the victim to the medical department

20       for examination, and doing all the things that are

21       required by institutional policy could have

22       happened instantly instead of several days later.

23 BY MS. HAWKINS:

24       Q    Sure.  And the crime in this case took place

25 in under two seconds, did it not?

# EXHIBIT 3

1      A    I can't remember the exact time on the video,

2  but I know it was very quick.

3           MS. HAWKINS:  I don't have any other

4      questions.

5                      RECROSS-EXAMINATION

6  BY MR. ELLIS:

7      Q    Sir, certainly I want to be clear.  I'm not

8  suggesting that it's improper to have video cameras in

9  the jail.  And my question is would it be improper to

10 install those cameras and then not monitor the video

11 feed to keep tabs of the inmates?

12     A    No, that's the whole reason -- that's the

13 whole reason for having the cameras is to maintain

14 security through modern intelligence.

15     Q    Sure.  And the security system doesn't work

16 unless you have somebody actually keeping an eye on it,

17 right?

18     A    Of course, of course.

19     Q    Okay.  And is that the problem here that

20 nobody was doing that apparently?

21     A    That's the problem.

22          MR. ELLIS:  All right.  Thank you, sir.

23              FURTHER REDIRECT EXAMINATION

24 BY MS. HAWKINS:

25     Q    Mr. McAndrew, do you have any documents that

# EXHIBIT 3

132

1   show that it wasn't being monitored?

2        A    Yes, it shows that there is an uncertified

3   person who has no training in being a correctional

4   officer, has no certification whatsoever, has never been

5   to the academy, somebody off the street sitting there

6   that either knows what to do or doesn't know what to do

7   because they don't have any supervision.  They're left

8   alone.

9        Q    Well, I didn't ask you if he was uncertified.

10  I asked you if you have any evidence that he wasn't

11  monitoring those video feeds for the different pods?

12       A    Well, even if he was monitoring, he didn't

13  have the training and the certification to know how to

14  handle a situation, a serious crime being committed in

15  front of his eyes.

16       Q    Are you suggesting it takes special training

17  to know if someone is taking a broom and sticking it up

18  someone's backside and without training he wouldn't know

19  that's a bad thing?

20       A    In order to be legal, it certainly does

21  require someone who's certified.

22       Q    So lay witnesses who see crimes committed

23  every day, that doesn't count?

24       A    Certainly that counts.

25       Q    All right.  But you have to have special

# EXHIBIT 3

133

1  training to know that that's a crime?

2      A    I'm sorry, ma'am?

3      Q    You have to have special training to know

4  that's a crime?

5      A    You have to have special training in order to

6  know how to handle the crime.  You're not observing

7  something as a citizen on a street.  You're observing

8  someone who is in charge supposedly, someone that is in

9  charge and knows exactly what to do, exactly what number

10 to call, exactly what kind of alarms to set off.  And he

11 couldn't have gone through the doors anyhow because he

12 could not have been in the control room.  That would

13 have been illegal had he been certified.  He had to call

14 people from the outside.  That's the whole reason for

15 the monitoring system.

16     Q    Would you agree with me that because this

17 incident occurred in under two seconds, that he could

18 have been sneezing and missed the entire thing?

19          MR. ELLIS:  Form.

20          THE WITNESS:  Anything in this world of course

21      is possible, but based on my experience, I would

22      say that if a certified trained experienced officer

23      was sitting there doing his job as required, would

24      have certainly noticed something like this going

25      on, and he would have the evidence on the camera,

# EXHIBIT 3

1          and he would have notified the proper security

2          staff to come and handle the situation.

3    BY MS. HAWKINS:

4          Q    So is it your position uncertified law

5    enforcement officers never blow their nose or sneeze or

6    look down at their feet or turn away?

7               MR. ELLIS:  Form.

8    BY MS. HAWKINS:

9          Q    Or look at one of the other monitors?

10         A    It's my professional opinion that uncertified

11   people are not correctional officers, don't know what to

12   do as a correctional officer.  But if they had a

13   correctional officer certified sitting there supervising

14   them and telling them what to do and helping them as

15   they are required to do, then the process I just

16   mentioned could have happened.

17         Q    How many monitors are in the control room?

18         A    There's one, two -- I can't -- I don't

19   remember how many monitors.  There's at least one that

20   showed exactly what happened in this case.

21         Q    Okay.  And that control room was for all of C,

22   right, all of the C pod?

23         A    I don't know.

24         Q    Was that not on the roster card that you

25   looked at?

# EXHIBIT 3

1      A    I don't remember if it covers the entire pod

2  and the nooks and crannies.

3      Q    Okay.  So you don't know what C dorm control

4  actually looks at?

5      A    I don't understand the question.

6      Q    Well, we're talking about Roster Card C.  Let

7  me try to find it here.  There we go.  No, it's Roster

8  Card D.  Hold on.  Let's see.  Make sure.  We'll do the

9  Roster Card D as our first exhibit, which I guess is 47.

10     (Exhibit Number 47 marked for identification.)

11 BY MS. HAWKINS:

12     Q    All right.  So we're talking about Beasley

13 here on C dorm control.

14     A    Yes.

15     Q    And you can tell that C dorm includes Dorm 1,

16 3, and 4 and Dorm 2, correct?

17     A    I believe so.  The print is pretty small,

18 so -- there we go.

19     Q    Made it bigger for you.

20     A    Okay.

21     Q    So if it's the control room for all of the C

22 pod, do you know how many monitors are in it?

23     A    No.

24     Q    Okay.  So it's quite possible that he was

25 looking at one of the other monitors for three seconds

# EXHIBIT 3

136

1  and missed the two-second incident that took place,

2  correct?

3          MR. ELLIS:  Form.

4          THE WITNESS:  No, because the monitors always

5      are in a cluster where you're looking at all of

6      them at the same time.

7  BY MS. HAWKINS:

8      Q    Okay.  So it's not possible he was focused on

9  something in one and not watching the other monitor?

10 Your position is that you are watching and studying all

11 monitors at all times, and you don't blink and you don't

12 sneeze if you're a certified correctional officer?

13     A    He could have been doing one of a thousand

14 things.  The case in point, of course, is that he wasn't

15 qualified to know what to do should he have seen

16 something.

17         MS. HAWKINS:  All right.  I don't have any

18     other questions.

19              FURTHER RECROSS-EXAMINATION

20 BY MR. ELLIS:

21     Q    Just real quick.  Putting aside whether the

22 people are certified or not, sir, can we infer that

23 because there was no report or any action from the

24 control room, that this incident was missed by the

25 control room?

# EXHIBIT 3

1      A     It certainly was.

2            MR. ELLIS:  All right.  Thank you, sir.

3            MS. HAWKINS:  All right.  So 47, we can do the

4      D Card.  And 48, we'll do the Post Order.  49, the

5      Incident Report.  And then Exhibit 50, we'll do

6      the -- the Full Investigative Report because I

7      talked about one of those statements and I think

8      Mr. McAndrew was reading portions of it during his

9      deposition.

10     (Exhibit Number 48 marked for identification.)

11     (Exhibit Number 49 marked for identification.)

12     (Exhibit Number 50 marked for identification.)

13           MS. HAWKINS:  Okay.  And we'll -- I'll --

14     we'll get someone to send those records, those

15     exhibits over to you.

16           COURT REPORTER:  Okay.  Thank you.

17           THE WITNESS:  I'll read.

18           COURT REPORTER:  Do you want to order the

19     transcript today, Jennifer?

20           MS. HAWKINS:  Yes, please.

21           COURT REPORTER:  Do you want to order a copy,

22     Adam?

23           MR. ELLIS:  I'll hold off for now.  I

24     appreciate it.

25                 (Deposition concluded.)

# EXHIBIT 3

138

1

2                          CERTIFICATE OF OATH

3    STATE OF FLORIDA            )

4    COUNTY OF BAY               )

5

6    In my capacity as a Notary Public of the State of

7    Florida, I certify that on the 28th day of March,

8    2022, at 8:57 a.m., RON McANDREW personally appeared

9    before me and took an oath or affirmation for the

10   purpose of giving testimony in the matter of Robert

11   Gene Wells v. Tommy Ford, et al.

12   Produced Identification.  Type of Identification

13   Produced: Driver's license.

14   DATED this 6th day of April, 2022.

15

16

17

18   _____
     STEPHANIE R. ZEITVOGEL, FPR-C
19   Notary Public - State of Florida
     My Commission No.  HH153919
20   Expires:  October 27, 2025

21

22

23

24

25

# EXHIBIT 3

139

```
 1

 2                    CERTIFICATE OF REPORTER

 3

 4    STATE OF FLORIDA              )

 5    COUNTY OF BAY                 )

 6    I, Stephanie R. Zeitvogel, Stenographic Reporter, do

 7    hereby certify that I was authorized to and did

 8    stenographically report the deposition of RON

 9    McANDREW; that a review of the transcript was

10    requested; and that the foregoing transcript, pages

11    1 through 141, is a true and complete record of my

12    stenographic notes.

13    I FURTHER CERTIFY that I am not a relative,

14    employee, or attorney, or counsel of any of the

15    parties, nor am I a relative or employee of any of

16    the parties' attorney or counsel connected with the

17    action, nor am I financially interested in the

18    action.

19    DATED this 6th day of April 2022, at Panama City,

20    Bay County, Florida.

21

22    _____

23                    Stephanie R. Zeitvogel, FPR-C

24

25
```

# EXHIBIT 3

140

1   Please attach to the March 28, 2022 deposition of RON
    McANDREW in the case of Robert Gene Wells v. Tommy Ford,
2   et al.

3   INSTRUCTIONS:  Please read the transcript of your
    deposition and make note on this page of any changes.
4   Do not mark on the transcript itself.  Please sign and
    date this sheet.

5                         ERRATA SHEET

6   PAGE   LINE   ERROR OR AMENDMENT             REASON

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20

21  Under penalties of perjury, I declare that I have read
    my deposition and that it is true and correct subject to
22  any changes in form or substance entered here.

23  _____        _____
    DATE                       RON McANDREW
24

25  REPORTER: SRZ

# EXHIBIT 3

141

1                Precision Reporting & Video
            info@precisionreportingandvideo.com
2                    (850)737-9071

3 April 6, 2022

4 RON McANDREW
c/o Marie Mattox, P.A.
5 adam@mattoxlaw.com
emerson@mattoxlaw.com
6
Re: Robert Gene Wells v. Tommy Ford, et al.
7
Deposition of Ron McAndrew, 3/28/2022
8
Dear Mr. McAndrew,
9
With reference to your deposition taken in connection
10 with the above-referenced case, please be advised that
the transcript of the deposition has been completed and
11 is awaiting signature.

12 Please contact our office for the purpose of setting up
the reading and signing the transcript. Office hours are
13 from 9:00 a.m. until 5:00 p.m., Monday through Friday.

14 If this has not been taken care of, however, within 30
days, or by the time of trial, whichever comes first, we
15 shall conclude that the reading and subscribing of the
depositions has been waived.
16

17 Yours very truly,

18

19

20 Stephanie R. Zeitvogel, FPR-C
Stenographic Court Reporter
21
cc: pleadings@warnerlaw.us
22

23

24

25

Robert Gene Wells v.
Tommy Ford, et al

# EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

**$**

**$1,400 (1)**
17:9
**$250 (2)**
17:11;20:17
**$350 (1)**
17:8

**[**

**[phonetic] (2)**
11:10,10

**A**

**AA (3)**
7:8;29:12,17
**ability (2)**
44:3;80:15
**able (13)**
13:13,23;14:6;
41:19;42:16;69:16;
73:21;90:21;94:3;
100:1;111:2;119:21;
130:10
**Absolutely (12)**
42:7;51:16;59:13;
66:19;70:12;81:18;
82:9;88:5;98:16;
104:22;106:18;
127:25
**abuse (3)**
113:14;118:14;
120:19
**abused (1)**
97:4
**academy (4)**
27:6;105:15,19;
132:5
**accepted (1)**
8:14
**according (3)**
17:9;29:2;113:16
**accordingly (3)**
29:25;83:24;88:17
**accurate (5)**
4:23;19:22;38:17;
42:21;73:7
**accurately (7)**
13:24;14:7,11,15;
15:1;41:20;42:16
**accused (3)**
72:17;78:14;79:24
**acronym (4)**
107:12,15,16,17
**across (3)**
10:13;15:12;95:7
**Act (6)**
14:12;28:24;56:12,
17;114:25;128:4
**action (3)**

79:3;80:15;136:23
**actions (6)**
50:11;84:9;97:17,
23;105:3;121:2
**activities (1)**
104:5
**activity (3)**
73:14;81:4;123:25
**acts (4)**
84:5,24;85:20;86:2
**actual (3)**
58:17;59:17;75:2;
76:15
**actually (13)**
23:3;26:23;42:18;
44:4;78:24;82:5,23;
97:10;100:11;124:16,
23;131:16;135:4
**Adam (3)**
126:25;127:5;
137:22
**add (1)**
21:12
**addendum (5)**
12:6,18;25:11;
101:9;129:18
**addition (2)**
12:14;69:20
**additional (1)**
80:10
**address (7)**
7:6;24:16;66:9;
105:6,9;125:23;
129:11
**addressed (1)**
118:6
**addresses (1)**
84:4
**adequate (3)**
52:22,23;54:15
**adhered (1)**
31:4
**administration (2)**
7:9;31:2
**administrative (3)**
79:10;115:13,19
**admit (1)**
10:6
**admitted (1)**
95:19
**adult (5)**
84:19,20;101:11,
12;107:5
**adults (1)**
85:15
**advised (2)**
84:9;88:11
**affidavit (7)**
57:10,13,17,21;
76:15;117:20;118:21
**affirm (1)**
4:1
**afraid (1)**

123:25

**again (33)**
14:5,24;23:2,22;
24:16;38:2;39:24;
42:13;43:12;46:6;
47:8;50:21;57:18;
58:18;65:5;73:19;
78:2;85:23;86:6,19;
96:13;97:15;98:23;
100:24;103:25;105:7;
111:6;112:11;114:8;
123:19;124:9;127:20;
130:5
**against (8)**
25:15;42:9;84:7,9;
96:4;97:17,23;119:8
**agency (4)**
106:8;115:13,20;
118:12
**ago (4)**
16:11;37:13;52:17;
85:11
**agree (57)**
4:22;5:24;31:21;
36:23;37:5;42:4;43:9,
14;44:18;45:4;46:21;
50:18;60:5;64:8;
66:10;67:10;71:4,9;
72:25;73:17,20;74:7;
75:8,18;77:4,24;78:6;
79:1;80:13;81:21,23;
85:5;86:23;87:3;88:3;
89:14;97:12,16,21;
98:9;100:10,18;
101:25;102:2,23;
103:1,9;104:19,23;
112:2,21;118:23;
119:6;120:4,10;
130:2;133:16
**agreed (2)**
79:13;81:7
**agreement (1)**
24:15
**ahead (5)**
35:15;89:20,21;
90:13,15
**Air (1)**
8:4
**alarms (1)**
133:10
**allegation (1)**
73:13
**alleged (9)**
67:1,24;77:25;78:3,
8;80:16;81:18,20,24
**allow (3)**
4:17,18;97:4
**allowed (6)**
8:25;15:10;16:1,7,
10;109:17
**allowing (1)**
35:25
**almost (3)**

8:10;9:18;23:16
**alone (1)**
132:8
**along (1)**
125:25
**although (2)**
25:23;29:1
**always (3)**
16:13;98:12;136:4
**amend (1)**
6:20
**amended (1)**
101:9
**America (1)**
113:15
**amongst (1)**
112:25
**amount (1)**
19:24
**ancillary (1)**
91:17
**and/or (9)**
7:24;23:16;36:4;
39:11;50:20;51:7;
72:9;84:25;124:22
**Anderson (14)**
91:12,13,22;92:16;
93:11,15;119:7,10,18;
120:25;121:2,20,25;
122:11
**Anglin (10)**
4:12;5:4;59:2,23;
104:5,7,10,10;115:8;
117:4
**annual (2)**
29:2;112:19
**answered (5)**
35:1;44:7;51:20;
89:16;97:11
**anticipate (2)**
15:2;17:1
**antisocial (1)**
112:24
**anus (5)**
39:12;95:20;96:17;
124:16;125:1
**apologize (1)**
21:24
**apparently (1)**
131:20
**appears (1)**
29:4
**apply (1)**
4:16
**appointed (5)**
8:18,20,22,23;59:2
**appreciate (1)**
137:24
**approaching (2)**
22:13
**appropriate (2)**
50:24;117:11
**approval (1)**

19:9
**approved (3)**
50:15,16;51:21
**Approximately (19)**
17:17;20:14,16;
21:10,11,13,16,18,22;
22:4,6,8,12,14;26:15;
31:18;33:1;123:9;
130:10
**area (14)**
48:18;55:2;61:10;
63:8,20,22;65:16;
66:8;78:16;86:20;
98:8,23;100:10,14
**areas (6)**
12:5;13:8;21:14;
83:24;109:17;129:7
**armed (1)**
25:19
**around (4)**
7:17;8:17;78:13;
129:24
**arraignment (1)**
44:22
**arrangement (1)**
17:4
**arrest (11)**
30:1,2,4;44:3,8,14,
21;45:3,14;86:21;
88:14
**arrested (6)**
24:5;45:6;64:15;
78:12;85:2;88:19
**arresting (2)**
88:9;89:3
**arrests (2)**
29:22;50:8
**arrived (2)**
23:25;29:13
**arriving (2)**
24:2,5
**arson (1)**
28:15
**ascertain (3)**
50:23;79:2,4
**ascertained (2)**
50:19;78:19
**Asia (3)**
8:8,9;10:16
**aside (1)**
136:21
**ass (1)**
124:9
**assaulted (1)**
60:21
**Assign (1)**
117:1
**assigned (20)**
55:18,20;56:15;
59:24;60:1;61:1,7,8,
9;63:8;64:25;82:22,
24;83:3,13,19,23;
88:22;96:8;117:5

Case 5:21-cv-00019-TKW-MJF    Document 43-3    Filed 04/20/22    Page 144 of 160

Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

**assigning (2)**
59:16;83:7
**Assignment (4)**
46:12,13;47:18,18
**assist (1)**
95:4
**assistant (2)**
27:8;32:20
**assisted (1)**
35:6
**associated (3)**
11:7;41:6,9
**association (1)**
35:17
**assume (9)**
15:17;24:24;54:25;
57:15,19;58:14;
64:11,19;78:10
**assuming (1)**
82:13
**assumption (6)**
82:10,20;84:13;
100:21,23,25
**assumptions (1)**
68:2
**assure (1)**
87:21
**attack (1)**
128:11
**attacked (1)**
60:17
**attempt (1)**
39:11
**attempted (5)**
28:15;43:7,10,11;
113:24
**attempts (2)**
95:13,14
**attended (1)**
7:19
**attention (7)**
5:13;32:1,7,10,13,
16;53:17
**Attorney (9)**
5:14;17:10,21;
24:15,20,22;71:23;
87:20;99:4
**Attorney's (11)**
29:23;30:8,8,11,13;
43:21;44:2,16;45:11,
13;88:10
**audited (1)**
129:9
**author (2)**
13:1;56:11
**authority (5)**
30:2,20;44:3;88:10;
89:3
**automatically (2)**
24:10;81:3
**availability (1)**
111:22
**available (2)**

70:24;107:3
**average (1)**
34:10
**awaiting (1)**
26:8
**awarded (3)**
29:16;126:13,15
**aware (19)**
5:1,6,9;6:3,7;12:16;
45:19;59:19,22;
61:23;65:22;66:5;
82:4;86:25;89:6;
104:24;126:15;
127:23;128:4
**away (6)**
32:19;67:15;82:11,
14;120:18;134:6

**B**

**Ba (1)**
11:10
**bachelor's (1)**
7:11
**back (40)**
7:23;8:11;9:8,21;
10:7;16:12;21:11;
23:2;24:12,14,15;
29:16;32:1;36:9,24;
37:1;38:9;39:3;40:19;
41:15,24;42:23;47:4;
50:14;54:8;56:3;67:3;
72:23;77:2;89:1;
90:15,21;96:21;
99:19;113:12,18;
118:10;119:2;125:1,
18
**background (5)**
24:7;106:19;110:9,
12,19
**backside (1)**
132:18
**backwards (1)**
96:16
**bad (1)**
132:19
**bags (2)**
71:21,22
**Bailey (16)**
15:22;18:11,24;
19:7,20,25;22:9;
97:19;114:19;115:3,
9;117:2;124:3,6;
126:3,6
**base (1)**
123:23
**based (18)**
5:10;25:1;47:3;
50:24;51:7;84:14;
85:7;88:8,12,19;89:2;
97:23;100:17;103:16;
115:17;124:24;
128:20;133:21

**basic (3)**
27:4;105:5,8
**Basically (1)**
25:14;28:16,20
**basing (1)**
5:16
**basis (1)**
9:5
**bathroom (2)**
89:18;90:23
**bathrooms (1)**
77:20
**batteries (1)**
30:23;33:1,11
**battery (28)**
26:11;28:8,11,13,
14,14;30:12;32:2,7;
42:6,24,25;43:5,11;
45:21;85:15;94:25;
96:11,12;113:22,24;
114:21;117:9,22;
118:15,18,22;122:7
**Bay (25)**
4:11;5:3,10;6:4,17;
7:2;24:5;26:1;47:23;
53:17;61:23;62:11;
63:20,21;64:2,19;
65:14;83:8;85:25;
95:18,25;97:14;
106:1;107:25;108:10
**Beach (10)**
27:21,22,24;28:4;
29:9,10,13,14,24;
108:23
**bearing (2)**
109:20,22
**Beasley (8)**
46:14,17;48:12,12,
21;53:10;107:10;
135:12
**beat (1)**
124:9
**became (1)**
27:8
**become (1)**
85:16
**bed (2)**
75:11,21
**beds (5)**
50:20,25;51:4,7,8
**beginning (2)**
24:4;72:17
**behind (10)**
36:12;52:6;63:18;
64:3,13;65:16;77:19;
95:13;96:17,20
**behind-the-door (2)**
77:12,18
**Belgian (1)**
8:6
**belief (1)**
53:22;57:4,7
**Bell (30)**

34:23;35:6,11,17;
36:5,8,16;38:21;
39:10,18;45:20;
74:21;79:9;80:1;84:6,
17;86:11;87:14;91:7;
95:6,11,12,19;96:10,
16,19;97:16;119:8,
12;120:13
**Bell's (1)**
86:2
**belongs (1)**
104:17
**below (2)**
105:14;110:4
**benefits (3)**
111:15,18;112:3
**best (3)**
44:4;47:22;76:24
**better (1)**
28:23
**beyond (4)**
56:15;86:20;98:23,
24
**bid (1)**
9:11
**bigger (1)**
135:19
**bill (1)**
23:23
**billing (5)**
18:17,23;19:25;
23:3,5
**bipolar (1)**
112:24
**bit (5)**
6:15;11:2,5;88:15;
99:8
**blink (1)**
136:11
**blow (2)**
116:18;134:5
**blue (1)**
95:11
**boom (1)**
75:5
**both (19)**
4:13;21:3;25:14,15,
16,17;27:25;28:3;
36:16;85:6,15;97:9,
17,21;103:1;114:19,
19;123:12;124:1
**bother (1)**
98:22
**bottom (5)**
24:16;83:5,17;
108:1,8
**bought (1)**
32:10
**bread (1)**
68:16
**break (10)**
40:11;41:19;42:14,
20;89:18,25;90:4,17,

24;119:12
**breakdown (1)**
101:14
**breaking (1)**
90:12
**briefly (1)**
127:4
**bring (5)**
81:14;83:14;98:15;
99:24;119:24
**Brings (1)**
22:12
**broken (1)**
101:16
**broom (42)**
33:22;38:17,19,22;
39:10,11,17;41:2;
67:8,11,12;68:8,14,
15,19,20,21;69:9,11,
13,15,18;70:9;71:1,3,
5,10,11;74:20;75:2,6;
91:8,8,10;95:7,12,19;
96:17;127:14;130:8,
9;132:17
**brooms (3)**
68:5,9,12
**broomstick (5)**
95:13,14,15,16;
128:11
**brought (5)**
5:13;31:25;32:6,13,
16
**brutal (5)**
14:11,21;33:18,19,
20;34:1,10;38:15;
39:14,21,22;40:25;
96:23,25
**bunk (23)**
60:21,23;63:11;
65:23,24;66:2,3;82:5,
5,7,11,14,22,23,24;
83:3,4,5,17,25;84:1,4;
95:10
**bunks (1)**
83:7
**Burkett (22)**
55:17;56:4,13,15,
19;57:23;58:3,7,16,
20,22;59:17,19;91:14,
14,16;92:8,23;93:11,
14,15;114:18
**Burkett's (6)**
55:11;57:4;58:2;
59:6,8;116:15
**business (4)**
8:9;9:18;17:2;
60:19
**butt (3)**
124:8;125:7,9
**button (1)**
76:8

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 145 of 160

Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

## C

**call (8)**
20:7;44:11;52:11,
14,16;91:21;133:10,
13
**called (3)**
9:3,12;117:14
**came (7)**
8:11,13,14;11:8;
38:25;67:4;96:19
**camera (1)**
133:25
**cameras (7)**
48:1,9,22;129:24;
131:8,10,13
**can (60)**
4:18,19;6:14;10:1;
13:4;17:7;24:1,14;
25:22;26:3,15;28:13;
29:19;33:18;35:22,
24;39:15;42:21;45:4,
10;50:7,11;51:1;54:2;
55:3;58:5;62:9;63:24;
67:12;68:19;70:19;
74:12;75:16;76:3,7,
24;78:13;80:2,20;
81:21;87:21;89:21;
90:2,4,7,9;91:1,18;
93:20;99:24;100:5;
103:10;104:23;113:2;
120:18;125:11,23;
135:15;136:22;137:3
**canceled (2)**
23:17,19
**capacity (2)**
51:3,6
**captain (1)**
8:15
**Card (13)**
46:13,13,17,18,19;
47:18,18;49:1;
134:24;135:6,8,9;
137:4
**cards (2)**
46:11;47:20
**care (4)**
25:17,21;110:25;
126:10
**career (2)**
7:15;69:8
**case (60)**
5:2,7;6:5;7:1;8:1;
12:25;13:10,11,17;
14:2,9;15:3,9,16,18;
16:18,20,25;19:6;
24:3,8,10,13;31:1;
33:21,23;34:6,8,8,9;
43:25;44:9,13;45:24;
52:12;53:16;57:16,
20;59:17,23;60:7;
65:21;89:10;96:8;

98:24;101:22;107:20;
108:4;109:3,4,21,22;
113:9;115:4;116:7;
117:12;127:8;130:24;
134:20;136:14
**cases (17)**
7:19;9:15;15:10,15,
21;16:2,4,16,17;
26:11;28:8,11;29:19;
30:10,12;32:3;97:2
**category (2)**
34:3,4
**cause (1)**
86:25
**cell (11)**
33:4;60:20;63:11,
19;64:6;77:23,23;
83:13,19;111:20;
113:6
**cells (10)**
33:6,7;50:20,25;
51:1,3,7;64:12,21;
78:15
**Center (4)**
7:10;31:15;32:3;
94:19
**Central (3)**
8:24;31:14;32:3
**certain (1)**
25:10
**certainly (35)**
19:2;21:19;23:4,22;
29:1;32:4;34:9;37:9,
16;42:7;52:24;56:19;
67:25;71:2;73:4;81:7,
9;82:19;88:6;89:2,10;
102:3;106:21;107:24;
108:9;113:13,22;
115:7;129:15,21;
131:7;132:20,24;
133:24;137:1
**certificate (1)**
108:22
**certification (6)**
7:14;52:7;105:11;
108:19;132:4,13
**certifications (1)**
105:12
**certified (23)**
7:9;27:6;29:18;
48:10;52:5,9;53:1,7,
10;54:24;60:4,6;
105:15,19,24;108:16,
17;132:21;133:13,22;
134:13;136:12,22
**change (4)**
9:21;50:8,11;
113:10
**changed (2)**
22:3,19
**changing (1)**
37:22
**charge (32)**

17:10,12;19:2;
43:20,22;44:23;45:7;
53:25;65:1;66:12;
80:7;84:18,19,22;
87:5;88:13,16;
101:24;103:16;
106:16;107:2,5,7,9;
117:12,14;118:5,7,21,
25;133:8,9
**charged (13)**
17:15;84:21;86:15;
96:10,11;97:13,17,18;
102:5;103:9,19,20;
114:21
**charges (27)**
29:20;30:2;43:15;
44:4,19;45:5,19,20,
21;57:2,3,5,8;66:6,25;
83:21;84:12,15,23;
85:7;86:2,14;88:4,9;
101:25;103:10;
121:23
**charm (1)**
76:10
**chart (6)**
52:11,14,16,19;
101:8;115:4
**check (3)**
41:11;77:2;110:10
**checks (1)**
110:13
**cheeks (2)**
125:7,9
**child (2)**
85:20;86:3
**children (2)**
85:8,15
**Chiles' (1)**
7:13
**choose (4)**
88:6,8,12;89:2
**choosing (1)**
89:1
**CI (1)**
33:10
**cigarette (1)**
11:8
**Circuit (2)**
29:24;72:2
**circumstances (3)**
23:20;84:16;86:14
**citizen (2)**
52:6;133:7
**city (3)**
9:9,13;11:16
**CJSTC (2)**
105:15,18
**claim (1)**
54:1
**Claims (2)**
15:13;104:11
**classes (1)**
97:7

**classification (25)**
62:2;63:12;66:14,
17,21;67:1;83:9,12,
21;84:1,12;85:3,22;
86:1,7,10,13;87:11,
22,23;88:25;102:10,
12;103:4,13
**classified (2)**
103:5;111:8
**classify (1)**
66:11
**clean (2)**
31:2;91:18
**clear (6)**
22:4;28:1;42:2;
96:5;123:7;131:7
**clearly (2)**
5:15;83:11
**client (1)**
127:22
**close (1)**
67:14
**closed (1)**
88:23
**cluster (1)**
136:5
**codefendant (3)**
95:17,18,22
**collected (1)**
96:9
**College (5)**
7:8;29:8,9,14,16
**colleges (1)**
7:17
**colonel (1)**
8:18
**coming (3)**
93:25;118:10;123:6
**committed (7)**
28:18;30:6;72:4;
84:6;130:17;132:14,
22
**common (1)**
28:17
**community (4)**
7:16;29:9,14,16
**companies (1)**
11:9
**company (2)**
10:20,22
**compensated (3)**
16:22;17:1,4
**complaint (2)**
76:15;118:21
**complaints (1)**
29:23
**complete (3)**
4:20;12:7;56:14
**completed (5)**
7:15,20;27:6;29:14;
60:6
**computer (1)**
81:13

**concerned (2)**
72:21;86:22
**concluded (1)**
137:25
**conclusion (3)**
58:20;61:7;105:1
**condition (2)**
111:11;113:6
**conditions (1)**
56:23
**conducted (2)**
43:6;56:6
**conference (1)**
18:15
**conferences (1)**
104:4
**confinement (34)**
30:19;48:1;59:14;
60:17,18,20;61:3,10,
13,15,17,22,24;62:13,
19,22,25;63:2,5,14,
20,22,24;64:1,20,24;
65:2,8,9,11,13,15;
66:20;79:10
**confirm (6)**
6:11;12:13;54:3,5;
68:21;82:25
**Congo (1)**
8:6
**consequence (2)**
105:2;110:1
**consequences (1)**
105:3
**consider (1)**
122:4
**considerably (1)**
26:2
**considered (6)**
40:24;66:15;85:8;
86:8;89:10;104:11
**considering (2)**
103:6;104:21
**consult (1)**
20:4
**consultant (1)**
9:19
**consultation (5)**
17:11,21;18:7,8,23
**consulted (4)**
18:9,21;19:19;20:6
**consulting (2)**
20:9,12
**contact (3)**
38:22;67:11;75:2
**contacted (1)**
11:14
**contacts (1)**
78:11
**content (1)**
36:15
**contingent (1)**
9:5
**control (22)**

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 146 of 160

Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

48:17,22;49:1;76:3;
77:21;100:11,14;
122:25;123:3;128:24;
129:4,11,12;130:4;
133:12;134:17,21;
135:3,13,21;136:24,
25
**controls (1)**
105:10
**conversation (1)**
126:19
**conversations (1)**
22:9
**convicted (2)**
26:6,7
**conviction (1)**
106:23
**cooperate (1)**
72:12
**cooperation (1)**
72:16
**cooperative (3)**
72:8,12,13
**coordinated (1)**
109:16
**copy (1)**
137:21
**corrected (2)**
6:1,24;101:24
**correcting (1)**
37:18
**correction (2)**
5:18;47:25
**correctional (25)**
8:13;26:23;27:5,12,
16,17,18;28:17;30:3;
39:18;44:10;51:13;
105:11;108:16;
115:13,20;123:12,13;
126:13,15;132:3;
134:11,12,13;136:12
**corrections (15)**
7:21,24;13:3;26:13;
27:2;28:22,25,25;
29:3,22;31:14;105:6,
9;112:19;122:2
**councilman (1)**
9:9
**counsel (2)**
43:2,13
**count (3)**
23:16;38:24;132:23
**counted (1)**
23:15
**Counting (1)**
18:2
**countless (1)**
7:20
**country (2)**
15:12;85:14
**counts (2)**
25:9;132:24
**County (37)**

4:11;5:4,10;6:4,17;
7:2;8:21;9:3,4,5;13:3;
5,8;44:14;45:15;
47:23;53:17;61:23;
62:12;63:20,22;64:2,
19;65:14;83:8;85:25;
95:18,25;97:14;
106:1;107:25;108:10;
111:7
**couple (3)**
11:11;22:20;123:18
**course (32)**
5:24;6:2,8,22;
13:19;14:10;15:4;
16:17;17:12;23:1;
24:3;31:23;34:2;47:2;
65:21;66:25;69:17;
70:4;71:3;79:3,6,17;
80:2;90:23;103:12;
108:14;118:9;122:8;
131:18,18;133:20;
136:14
**courses (3)**
7:16,16;29:15
**COURT (26)**
4:1;9:17;11:1,4;
12:20;15:6,13,14;
25:2;45:17;50:11;
68:2,3;69:1,5,6;71:23,
25;97:25;104:14,18,
20,24;137:16,18,21
**courtroom (1)**
71:19
**courts (3)**
9:16;15:12;88:10
**covered (3)**
41:16;71:4;117:16
**covering (2)**
10:12;71:10
**covers (1)**
135:1
**crannies (1)**
135:2
**credibility (2)**
25:4,7
**credit (1)**
9:1
**crime (27)**
30:6;37:17;45:12;
56:8;58:17;59:7;
67:24;68:15;69:4;
70:6;74:11;78:14;
79:24;80:6;81:2;
98:14,19;103:21,23,
24;130:14,16,24;
132:14;133:1,4,6
**crimes (19)**
28:15,18,19;29:1,4;
43:17;56:8,19;64:16;
70:15,19,22;72:4,18;
85:8;97:13,17;
121:13;132:22

**criminal (31)**
7:9;29:19;30:2;
43:15,19,22;45:19;
66:5,12,16;67:2;
73:13;81:4;102:8;
103:2,3;106:5,16,16,
20;117:12,12,14,19;
118:3,7,8,15,18,21;
123:25
**criminals (2)**
30:21,21
**cripple (1)**
89:11
**criticism (1)**
105:25
**CROSS-EXAMINATION (1)**
127:2
**culprits (1)**
130:18
**curious (1)**
32:6
**current (1)**
66:12
**currently (2)**
16:22;121:25
**curriculum (1)**
105:10
**custody (17)**
25:17;63:17;64:20;
78:16;83:22;84:24;
88:21,23,23,23,24;
99:10,22;101:2,6;
110:22,25
**CV (2)**
26:19;27:7

**D**

**Dade (4)**
7:8;29:8,11,16
**Dana (1)**
11:10
**dangerous (14)**
30:21;60:24;62:4;
64:14,15,16;80:2;
84:11,14,17;101:19;
102:4;103:2;120:21
**dangerousness (1)**
83:23
**data (1)**
82:6
**date (5)**
12:17;46:19;51:12;
117:1;120:9
**day (27)**
45:16;46:2;69:22;
76:24;77:3,5;79:6,12,
13,14;80:3,14;81:8,
10,16,17;91:24;93:4,
7,13;109:3,23;120:6;
121:3,14;126:23;
132:23
**days (10)**

9:2;28:21;30:16,19;
76:12,13;81:6;85:14;
122;130:22
**day's (2)**
75:19;81:16
**Daytona (9)**
27:20,22,24;28:4;
29:9,9,13,14,24
**deal (2)**
10:22;31:3
**dealing (1)**
79:19
**dealt (2)**
30:20;123:24
**death (1)**
33:5
**decertified (1)**
106:14
**decide (1)**
25:3
**decided (1)**
104:14
**deciding (1)**
66:23
**decision (7)**
30:9;69:6;71:24;
79:7;88:16;103:4;
104:17
**decisions (2)**
69:1;71:20
**decline (1)**
29:5
**deeply (1)**
129:6
**defendants (1)**
127:8
**defense (1)**
87:17
**define (1)**
84:11
**defines (2)**
118:5,7
**definitely (6)**
22:10;36:17;43:12;
88:2;116:3,4
**definition (2)**
42:6,23
**degree (6)**
7:8,12;29:12,17;
41:14;96:12
**delay (2)**
76:19;80:14
**delayed (3)**
73:2,3,5
**delays (1)**
91:18
**deliberate (5)**
104:12,13,16,21,25
**Dell (1)**
84:17
**deny (1)**
72:14
**Department (11)**

7:18;13:2;26:13;
29:3,22;31:14;56:11;
112:19;113:16;122:1;
130:19
**depend (4)**
85:1,2,22;111:21
**depending (4)**
100:19;106:13;
123:5;130:5
**depends (2)**
115:22;122:17
**depo (1)**
23:6
**deposition (25)**
4:14,15;6:5,9,16,
25;7:5,6,11:19;12:3;
17:7,20,23;18:1,5,10,
16,22;19:17;23:17,
17;38:11;41:12;
137:9,25
**depression (1)**
112:24
**deprive (1)**
112:2
**deputy (4)**
8:18;44:11,12,14
**describe (3)**
24:1;33:18;39:16
**described (2)**
33:17;39:14
**describes (1)**
40:8
**deserve (1)**
88:4
**design (1)**
7:17
**detailed (1)**
56:3
**details (4)**
67:1,14;110:14;
126:18
**detention (9)**
48:14,23;49:10,14;
53:3;99:22;108:14,
15;109:10
**determination (5)**
25:4,7;67:15;112:1;
119:19
**determine (4)**
46:4;50:5;58:22;
67:21
**determined (3)**
46:16;48:25;50:6
**determines (1)**
43:22
**developed (1)**
51:21
**development (2)**
7:15;104:5
**difference (1)**
130:16
**different (12)**
16:14;21:14;25:22;

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 147 of 160

Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

26:4;27:25;31:17,17,
19;42:13;75:1;
100:15;132:11
**differently (1)**
88:11
**difficult (1)**
60:23
**DIRECT (1)**
4:8
**direction (3)**
37:3;104:6;123:7
**director (5)**
9:6;30:24;57:6,7;
58:15
**disabilities (1)**
96:6
**disability (2)**
112:4,6
**disagree (1)**
81:21
**disallowed (2)**
15:6;16:7
**disappointment (1)**
5:20
**disciplinary (1)**
30:19
**discipline (2)**
30:15;64:22
**disgusting (1)**
33:23
**disorder (1)**
112:25
**disorders (4)**
112:10,13,16;113:3
**disregard (1)**
105:3
**DL (1)**
107:7
**DNA (8)**
67:8,13,21;70:21,
23;71:1,5,10
**doctor (1)**
94:14
**document (26)**
12:9;40:10;41:15,
19,21,23;42:1,15,21;
47:6,9,10;55:1;59:1,5,
16;61:16;94:7,9;
115:8,22;116:12;
117:3,6;118:11,24
**documentation (6)**
20:3;49:4,6;87:18,
19;115:2
**documents (22)**
11:18;17:15;40:6;
47:17;66:1;86:11;
87:11,14,22,24;89:25;
90:17,22,24;114:19;
115:13,20,24;116:1,2,
5;131:25
**dollar (1)**
10:24
**done (17)**

4:14;54:16,18;
66:18;68:11;76:9;
83:20;96:4;103:21;
105:19,23;110:10,13;
111:23;121:18;
125:17,19
**door (7)**
48:1;63:18;64:3,13;
65:16;77:20;123:7
**doors (7)**
122:14,15,24;
123:2,4;130:2;133:11
**dorm (30)**
60:25;61:1,6,10,10,
13;62:8,9,9,11,13;
63:15,16;64:20,20;
99:8,11,18,23;100:8,
9,13,18;101:3;
110:23;135:3,13,15,
15,16
**Dormitory (2)**
48:20;64:9
**double (2)**
122:24;123:4
**down (13)**
24:6,11;25:1;73:24;
74:12;75:16;76:4,9;
85:4;107:13;116:23;
129:25;134:6
**dozen (1)**
121:15
**Dr (1)**
25:9
**dramatically (2)**
50:8,11
**drug (2)**
65:1;80:7
**dual (1)**
44:15
**Dublin (2)**
9:17;15:14
**due (4)**
59:2;96:7;115:9;
121:22
**duly (1)**
4:6
**duration (3)**
34:11;111:3;130:9
**during (6)**
7:5;13:6;14:4;28:7;
42:14;137:8
**duty (14)**
46:5,8,17,23;47:7,
11,14,21;51:14;
52:13;109:3,23;
110:2;127:9
**duty-free (1)**
10:23

---

### E

**earlier (10)**
41:18;73:15;74:24;

79:12;88:9;90:1,22;
111:5;117:8;130:6
**East (3)**
8:7,8;10:15
**effect (2)**
45:13;72:15
**effort (2)**
59:8;71:16
**efforts (1)**
59:6
**eight (1)**
76:5
**either (5)**
32:5;43:7;87:11;
91:25;132:6
**elect (1)**
88:7
**elected (1)**
9:9
**electrically (2)**
122:19,20
**electronically (3)**
122:19,20,22
**element (1)**
103:6
**elements (1)**
43:17
**eliminate (1)**
74:19
**Elimination (6)**
14:12;28:24;56:12,
17;69:25;114:25
**ELLIS (38)**
9:24;32:18;37:21;
39:6;43:18;44:6,24;
45:8;69:23;71:13;
75:14,24;82:1;85:10;
86:5;87:7;94:2;99:3;
101:4;117:23;119:14;
121:5;127:3,5,12,21;
128:2,8,15;130:13;
131:6,22;133:19;
134:7;136:3,20;
137:2,23
**else (9)**
12:14;32:17;44:1;
46:15;59:12;67:24;
70:7;120:7;121:18
**e-mail (1)**
15:22
**emergencies (1)**
14:13
**emergency (22)**
9:4;12:23,25;13:2,
4,7,11,12,16,20,21;
14:1,4,5,5,9,9,14,18,
18,23;20:1
**employee (1)**
106:15
**employment (2)**
110:8,12
**empty (3)**
51:1,3,4

end (11)
67:8;68:13;81:17;
91:8,10;93:13;95:12;
109:12;125:2;127:14;
128:10
**Enforcement (12)**
7:18;29:18;57:12,
25;58:7,13;60:4,6;
105:12;108:20;
118:11;134:5
**enough (7)**
7:7;51:13;52:2;
53:11;89:24;90:16;
95:16
**entering (1)**
37:11
**entire (7)**
75:19;81:16;83:13;
118:12;130:7;133:18;
135:1
**entirely (1)**
71:14
**entirety (1)**
74:22
**entrance (1)**
36:25
**entry (1)**
82:6
**error (3)**
6:6,7,23
**errors (1)**
9:21
**escape (3)**
11:12;28:15,15
**evacuation (5)**
5:11;6:4,10,18;7:2
**even (16)**
36:13;40:20;41:2;
44:19;48:22;62:20;
69:15;81:9;87:4;
94:25;103:14;113:24;
115:25;123:13;
130:10;132:12
**evening (1)**
20:6
**events (1)**
7:20
**everybody (1)**
26:6
**evidence (32)**
15:4;30:6;41:10;
44:13;60:13,15,16;
67:5,6,7;68:1,3,22;
69:5,6;70:6,21,23;
71:1,10,16;77:7;
84:10;89:6;96:8;
113:21;117:3;123:22;
124:24;132:10;
133:25
**exact (17)**
36:10,14;39:3;
42:21;49:16;61:10;
67:15;72:23;73:9;

74:24;77:2;94:4,12;
111:6;112:14;123:15;
131:1
**exactly (8)**
37:14;39:25;58:10;
65:7;133:9,9,10;
134:20
**EXAMINATION (4)**
4:8;128:21;130:20;
131:23
**examine (1)**
98:24
**examined (3)**
4:6;94:16,18
**example (4)**
17:8;36:21;62:4;
116:7
**except (1)**
109:5
**exhibit (7)**
126:3;135:9,10;
137:5,10,11,12
**exhibits (4)**
125:24;126:1,25;
137:15
**exist (1)**
88:2
**exists (1)**
87:19
**expecting (1)**
32:4
**expensive (2)**
11:7,8
**experience (11)**
24:7;25:2;26:10;
28:10;39:19;111:10;
115:12,17;119:1;
123:23;133:21
**experienced (1)**
133:22
**expert (11)**
4:23;5:2,20,21;
9:13,15;11:15;15:7,
12;17:16;19:14
**expertise (4)**
66:8;86:20;98:8,25
**explained (4)**
80:17,21,22,25
**expressed (2)**
5:19;124:22
**extent (1)**
40:14
**extra (9)**
23:14,14,15;85:21;
86:3;87:1,5,15,16
**extracted (1)**
46:6
**extremely (1)**
72:18
**eye (1)**
131:16
**eyes (1)**
132:15

# EXHIBIT 3

eyesight (2)
    79:16;80:18

## F

face (3)
    50:10;100:23;101:2
facilities (1)
    28:4
facility (5)
    27:24;28:4;94:20,
    21;111:8
facing (1)
    79:21
fact (19)
    5:19;6:4;45:6;
    53:20;56:24,25;64:9;
    88:8;92:22;93:6;
    104:8;105:11;109:5,
    17,18,19;110:15;
    114:22;121:25
factors (3)
    104:11,20,24
facts (3)
    5:22;24:24;25:1
factual (1)
    120:15
factually (2)
    5:11,15
fail (3)
    7:19;10:4;123:24
failing (1)
    81:19
Fair (4)
    7:7;64:19;92:24,25
falling (1)
    125:5
falls (2)
    113:22,25
false (1)
    25:3
familiar (3)
    14:12;104:3;116:15
far (9)
    7:23;8:7;10:15;
    16:12;17:15;67:15;
    82:11;86:21;96:22
FDLE (4)
    70:10,13;105:10,11
fear (2)
    97:9;124:22
feared (1)
    97:3
federal (4)
    9:16;15:12;17:10;
    118:11
fee (3)
    17:3,6;21:9
feed (1)
    131:11
feeds (1)
    132:11
feet (1)

134:6
fell (1)
    125:3
fellow (1)
    120:21
felon (2)
    84:11,17
felonies (9)
    66:6,23;80:8,11;
    102:4,5,6,9;103:2
felons (6)
    62:4;64:15;101:12,
    15,15,19
felony (2)
    101:25;103:15
few (2)
    37:13;127:7
field (1)
    106:5
figure (1)
    9:25
file (5)
    15:16,18;29:23;
    43:25;58:25
filed (2)
    57:5,8
filing (2)
    57:2,3
filling (1)
    32:20
final (1)
    125:23
finally (1)
    10:19
find (20)
    8:12;10:23;28:15;
    40:11;41:19;53:19;
    59:16;73:11,18,22;
    74:16;75:12,23;
    90:17,21,24;94:4,22;
    98:22;135:7
finding (3)
    66:2;92:5;98:4
findings (1)
    5:10
fine (1)
    90:9
finger (2)
    76:8;94:13
fingerprints (5)
    68:14,19,23;69:9,
    12
finish (6)
    4:17,18;35:15;
    49:20;74:20;75:5
fired (1)
    106:11
Firm (8)
    4:13;8:6;9:12;10:9,
    10;11:14,15,16
first (21)
    4:6;11:14;12:8;
    24:5,5,8;34:3;54:1;

57:24;58:2,24;73:14;
    76:25;78:6;81:5;
    96:12;113:18,19;
    114:2;123:3;135:9
fit (2)
    42:5;91:8
fits (1)
    66:21
five (8)
    9:2;18:2;19:18;
    22:19;23:4,16,23;
    31:16
flawed (3)
    59:6,8;98:2
flies (2)
    100:23;101:2
flip (1)
    24:12
Florida (52)
    7:11,17,18;8:17,22,
    24;11:20,22,23,23;
    12:5;13:2;18:6;20:15,
    23;21:1,3,17;22:5;
    26:13;27:20;29:3,8;
    31:13,15;32:3,24;
    33:3;47:24;48:2,11;
    50:15,17;51:22;56:9,
    10;83:11,17;84:2;
    85:13;101:10;105:5,
    8,13;108:19;109:7;
    112:18;118:10;
    128:23;129:3,8,16
focused (1)
    136:8
folks (6)
    45:15;46:11;63:18;
    64:21;104:10;106:25
follow (4)
    53:18;64:4;83:10;
    127:1
following (8)
    72:10;79:14;80:3,
    14;81:8,10;109:6;
    116:17
follows (1)
    4:7
follow-up (1)
    128:19
footage (1)
    93:16
Force (3)
    8:4;28:16;83:4
forced (6)
    42:8,10,17,19;95:1,
    2
Ford (2)
    4:11;5:3
forgetting (1)
    22:23
forgot (1)
    27:15
Form (35)
    9:24;32:18;37:21;

39:6;43:18;44:6,24;
    45:8;69:23;71:13;
    73:5;75:14,24;77:21;
    82:1,21;85:10;86:5;
    87:7;94:2;97:22;99:3;
    101:2,4;117:23;
    119:14;121:5;127:11,
    19;128:1,6;130:13;
    133:19;134:7;136:3
formal (1)
    44:14
formally (1)
    44:21
formulate (1)
    46:5
formulated (2)
    24:25;76:20
formulating (7)
    11:24;12:10,15;
    15:3;25:5,8;118:25
Fort (3)
    15:8,8;108:23
forthcoming (1)
    73:1
forward (7)
    15:5;116:21;120:2,
    5,7,11;123:21
forwarded (3)
    56:22;115:3,9
found (4)
    6:1;26:9;65:23;
    74:5
four (14)
    8:4,25;20:14,22;
    21:2,5,13,22;22:4,8,
    13;23:15;30:18;31:17
fragrances (1)
    11:6
frame (2)
    76:4;96:7
France (3)
    8:5,7;10:13
freedom (1)
    36:3
French (5)
    8:6;10:9,10,24;11:9
friends (1)
    120:21
front (8)
    26:20;35:25;36:5,
    21,22;37:2;74:15;
    132:15
full (6)
    51:5;56:14;79:6,12,
    13;137:6
fun (1)
    95:9
further (8)
    6:18;12:18;14:25;
    68:23;117:2,5;
    131:23;136:19

## G

gain (1)
    30:16
gang (2)
    78:10;120:21
Garban (1)
    11:9
gather (1)
    69:4
gathered (4)
    43:21;67:25;68:2;
    69:12
gave (21)
    5:2;6:5;7:1;9:1;
    19:7,8;35:9;36:18,21;
    47:7,20;49:3,16;50:2;
    52:20;54:10;89:4;
    91:7;106:12;107:18;
    124:2
general (11)
    10:15;61:4,8,17,20;
    65:3,6,20;86:4;
    100:25;111:20
generally (1)
    63:23
geographical (1)
    26:2
gets (2)
    95:6,7
gist (1)
    6:15
given (9)
    10:4;19:1;37:18;
    47:23;56:5;58:12;
    68:3;78:22;120:12
gives (1)
    88:15
giving (5)
    5:16;11:19;12:16;
    41:12;60:21
glove (13)
    91:7,9;95:8,11,11,
    16;124:7,25;125:2,6;
    128:9,10;130:8
goals (1)
    99:2
goes (5)
    17:18;55:20;95:10;
    98:23,24
Good (4)
    4:10;8:9;24:12;
    116:20
Goodness (1)
    31:20
gosh (1)
    19:5
Governor (1)
    7:13
grabbed (1)
    130:8
grabbing (1)

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 149 of 160
Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

128:9
**graduation (1)**
29:15
**Graham (1)**
16:17
**grams (1)**
106:23
**graphic (1)**
125:6
**great (2)**
31:3;90:18
**grocery (1)**
68:16
**ground (2)**
125:3,5
**Guam (1)**
10:19
**guards (4)**
46:4,5,8;49:25
**guess (2)**
101:9;135:9
**guide (2)**
118:13,25
**guiding (1)**
113:13
**guilty (1)**
26:9
**Gulf (2)**
8:21;33:10
**gut (1)**
8:14
**guy (2)**
89:12;91:2
**guys (3)**
46:25;79:19;80:4
**guy's (1)**
91:12

**H**

**half (4)**
8:5;23:8,14;24:11
**hand (1)**
120:3
**handicapped (5)**
34:19;60:22;65:1;
89:12;95:4
**handle (21)**
33:22;38:17,20,22;
39:11,11,17;41:3;
68:19,24;69:10,11,13,
15,18;95:12,20;
125:1;132:14;133:6;
134:2
**handled (7)**
32:17;39:18;68:20,
21,24;70:9;106:10
**hands (3)**
58:4;80:20;94:10
**Hang (2)**
46:15;128:14
**happen (4)**
54:6;58:9;118:14;

121:14
**happened (21)**
10:1;32:6,22;44:10;
46:1;54:1,6;58:1;
72:13;73:16,21;77:5;
119:25;120:6,8;
121:3;127:15;128:5;
130:22;134:16,20
**happening (3)**
6:2;75:23;77:1
**happens (2)**
81:17;97:6
**hard (4)**
45:9;55:6;74:1;
95:15
**harm (3)**
119:18,20;122:9
**HAWKINS (54)**
4:9,12;10:8;11:13;
22:2;32:23;37:24;
39:9;43:23;44:17;
45:1,18;70:1;71:17;
75:17;76:11;82:3;
85:18;86:9;87:9;
89:19,23;90:4,10,20;
94:6;99:7;101:7;
118:1;119:16;121:9;
125:22;126:4,7,11,21,
24;127:11,19;128:1,6,
19,22;130:23;131:3,
24;134:3,8;135:11;
136:7,17;137:3,13,20
**head (8)**
21:15;27:9;36:7;
37:14;39:4;46:9;48:7;
63:9
**health (4)**
112:10,13,23;113:5
**hear (1)**
47:10
**hearing (1)**
111:17
**help (3)**
99:21;119:18,24
**helping (1)**
134:14
**Heppenstall (3)**
49:10,17;53:1
**Heppenstall's (1)**
49:9
**herein (1)**
4:6
**hey (1)**
83:2
**hierarchy (1)**
85:6
**High (6)**
9:17;15:14;86:17,
18,24;108:23
**highlighted (2)**
101:18;114:20
**highways (1)**
130:1

himself (3)
66:2;120:11,24
**Hinkle (2)**
5:2,19
**Hinkle's (1)**
5:6
**hire (3)**
106:18;107:5;
108:15
**hired (14)**
8:13;106:4,7,21,25;
107:25;108:11,14,18,
20,22,25;109:10,18
**hiring (6)**
106:17;107:3,24;
108:10;109:7;110:3
**histories (1)**
103:11
**history (19)**
7:22,24;15:16,19;
26:14;65:22;66:5,12,
16,23;67:2;102:3,8,9,
13;103:2,3,15;111:11
**hit (1)**
86:17
**hold (3)**
35:23;135:8;137:23
**Homestead (2)**
29:8,13
**Hong (1)**
10:19
**Honolulu (1)**
10:20
**hope (1)**
104:1
**hopefully (2)**
103:23;125:19
**horrible (6)**
14:11,21;33:17,18,
20;34:1
**horribly (2)**
33:23;39:21
**horrific (4)**
40:24;91:5,5;93:21
**Hough's (1)**
25:9
**hour (8)**
17:8,11,22;20:11,
12,17;22:12;76:6
**hours (30)**
18:3;19:18;20:14,
21,23,25;21:2,5,7,13,
19,22,22;22:4,6,8,10,
13,13,19,21;23:3,4,8,
14,16,23;74:3;76:5;
89:17
**hours' (1)**
75:12
**house (1)**
65:16
**housed (8)**
62:4,18;64:17;
65:12;66:24;101:19;

111:11,19
**housekeeping (1)**
125:24
**houses (1)**
129:23
**housing (2)**
86:8;111:12
**Howard (1)**
48:12
**humiliated (1)**
124:1
**humiliation (3)**
41:6,9;97:8
**hundred (3)**
10:24;19:5;40:7
**hundreds (1)**
123:24
**hurt (1)**
82:12
**hurtful (1)**
33:23
**hurting (1)**
82:15

**I**

**ID (1)**
123:14
**idea (2)**
31:20;62:17
**identification (4)**
135:10;137:10,11,
12
**identified (7)**
15:25;98:17,19;
102:12,14,17;123:11
**identify (5)**
13:20;68:7;80:16,
23;98:14
**identifying (1)**
130:18
**identities (1)**
78:18
**ignore (2)**
70:5;71:15
**illegal (1)**
133:13
**imagine (3)**
28:14;70:19;129:22
**immediately (2)**
73:1;78:25
**importance (1)**
13:8
**important (3)**
13:6;66:22;91:1
**importantly (1)**
59:10
**impossible (1)**
14:25
**improper (2)**
131:8,9
**inadequate (5)**
49:25;52:21,21,25;

53:14
**incarcerated (1)**
112:23
**incarceration (4)**
13:5;25:15;113:15;
129:22
**incident (32)**
14:23;46:2;47:14,
21;49:3,8;57:1,23;
58:23;59:20;72:9,21;
74:5;22;75:9,13;
91:20,21;93:3,7,17;
96:1,7;116:7,15;
120:5,11;130:8;
133:17;136:1,24;
137:5
**include (3)**
13:5;20:23;21:1
**included (4)**
19:22;37:16;
112:18;115:4
**includes (2)**
109:6;135:15
**including (1)**
19:20
**incorporated (1)**
110:3
**incorrect (1)**
6:19
**indeed (2)**
128:7,13
**indicate (2)**
89:14;110:9
**indicated (2)**
61:14;94:10
**indicating (2)**
91:11,11
**indication (2)**
89:5;128:11
**indifference (5)**
104:12,13,16,21,25
**individual (12)**
30:3;44:19;53:5;
64:12,21;66:11;
69:20;78:7;108:17;
113:5;115:21;119:6
**individuals (13)**
34:22;43:16;64:3,5;
65:16;72:22;84:23;
87:22;88:18;97:13;
112:22;123:20;
124:12
**infer (1)**
136:22
**infirmary (1)**
111:12
**informal (1)**
117:6
**information (16)**
4:24;5:17;6:11;
10:4;19:21;22:16;
26:21;34:14;35:2;
43:20;44:13;46:6;

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 150 of 160
**Robert Gene Wells v.**
**Tommy Ford, et al**
EXHIBIT 3
**Deposition of Ron McAndrew**
March 28, 2022

47:20;56:3;74:15;
88:15
**initially (3)**
65:12;88:14;107:10
**injured (4)**
40:1,2,5,14
**injuries (13)**
39:22,25;40:15;
42:2;91:4,6;93:20,21;
94:1,8,8,10,11
**injury (2)**
40:8;67:7
**inmate (31)**
15:9;26:4,7;30:17;
33:3,22;39:18;69:21;
70:9;77:21;84:6;85:9,
17,19;87:1;88:22;
91:3,13;95:3,6,9,9,12,
13,15,19;103:19;
111:10,19;123:10;
127:9
**inmates (34)**
25:25;31:16;33:5,8;
49:22;50:3,4,9,19,24;
51:10,11,15;60:18;
62:3;63:25;64:13;
75:10,19;84:7,8,9,13;
85:7;86:24;88:3,7;
101:11;111:23;112:9,
12,15;113:3;131:11
**innocent (1)**
26:9
**inquire (1)**
84:8
**insert (1)**
124:16
**in-service (1)**
105:24
**inside (1)**
113:14
**insisted (1)**
99:10
**inspector (6)**
8:16;27:11;50:16;
51:22;129:9,9
**install (1)**
131:10
**instance (2)**
13:8;129:14
**instantly (4)**
15:23;50:12;
130:18,22
**instead (3)**
45:14;67:19;130:22
**institution (4)**
8:17;27:12;44:10;
115:18
**institutional (1)**
130:21
**institutions (1)**
28:18
**instruction (2)**
105:20,23

**instructor (2)**
105:16,19
**intelligence (1)**
131:14
**intention (1)**
108:16
**interim (1)**
30:24
**interrupt (2)**
35:16;49:18
**interview (1)**
16:20
**interviewed (3)**
15:9;16:19;95:17
**interviewing (1)**
74:13
**interviews (1)**
17:12
**into (13)**
6:19;9:8,9;60:17;
63:7;66:3;76:6;77:8;
95:2;109:17;120:3;
129:6;130:11
**investigate (6)**
57:20;58:2,13,24;
59:7;115:9
**investigated (6)**
28:8,13;55:19;
57:16;70:15,22
**investigating (7)**
26:10;28:11;39:21;
57:22,24;69:4;76:1
**investigation (49)**
34:14;41:24;44:5;
53:15;54:11,14,21,25;
55:12;56:6,14;58:4,
21;59:15;60:7,9;
61:19;65:20;67:4;
73:2,4,5;74:1,2;76:14,
18,23;78:19;79:3;
92:13,16,19;94:5;
97:14,24;98:3,9,11,
13;99:2;106:20;
110:9,19;114:18;
117:2,7,9;118:3,4
**investigations (6)**
28:12;43:6;45:11;
56:18;110:14;116:8
**investigative (6)**
29:7;30:7;82:10,20;
119:1;137:6
**investigator (49)**
8:16;26:12,24;27:2,
11,15,21,22;28:3,5,6;
29:21;31:24;32:12;
43:4,15,16,24;54:16,
18,20;55:17;56:15,
22;58:17,21,23;59:2,
17,24;60:1;67:9,25;
69:2,3;70:14;71:20;
72:1;74:11;76:15,22;
89:9,11;97:18;
104:15;115:3;117:2;

124:3,6
**investigators (3)**
56:9;70:18;72:8
**investigator's (1)**
54:22
**invisible (1)**
89:12
**invoice (2)**
23:9,10
**involved (3)**
57:25;106:17;108:4
**involving (7)**
28:12;44:13;84:19;
86:14;97:2;107:20;
110:15
**issue (5)**
24:17;78:9;85:16;
92:22;93:6
**issues (6)**
64:23;105:6,9;
112:10,13,23
**Italy (1)**
10:13
**item (1)**
12:22
**items (5)**
11:18;12:11;19:5,
13,14

**J**

**Jail (106)**
5:11;6:4,10,17;7:2,
25;9:4,19;11:21,23;
12:5;13:3;18:6;20:15,
24;21:1,3,17;22:5;
24:5;25:12,23,24;
26:1,5,7;30:23;31:1,5,
8;34:10;38:16;39:15;
45:15;47:24,24;48:2,
11;50:9,10,15,17;
51:21,22;53:17;56:9;
57:6,7;58:12,15;
61:23;62:3,12;63:16,
20,22;64:2,12,19;
65:15;72:9;78:12;
79:25;83:8,11,14,18,
24;84:2;85:6,21,25;
86:21,25;87:17,21;
88:13;95:18;96:22;
97:14,19;99:15;
101:10;102:14,17;
106:1;107:25;108:11;
109:6,9,16,18;110:4,
24;111:7,15,21,24;
120:22;122:16;
123:16;128:24;129:3,
8,16;131:9
**jails (9)**
25:24;84:25;97:2;
112:9,12,21;113:3,4;
129:19
**jail's (4)**

124:3,6
12:23,24,24;80:14
**Japan (1)**
10:18
**Jennifer (2)**
4:12;137:19
**job (6)**
8:8,12;48:16;49:13;
74:12;133:23
**John (3)**
18:11,23;19:20
**Judge (7)**
5:2,6,19;6:12;9:22;
98:1;99:4
**Judicial (2)**
29:24;72:2
**July (1)**
100:8
**June (2)**
59:14;95:17
**justice (6)**
7:9;56:11;98:15;
106:5;113:16;119:24
**juvenile (1)**
107:2

**K**

**Keep (6)**
21:10;55:4,7;127:5;
129:1;131:11
**keeping (1)**
131:16
**keys (1)**
122:18
**kill (1)**
120:19
**killed (1)**
79:20
**kind (6)**
55:6;79:23;86:8;
89:12;113:14;133:10
**knew (5)**
36:13;47:14,21;
75:4;107:9
**knowing (2)**
50:3;51:11
**knowledge (10)**
20:4;24:8;25:2;
47:22;84:5;104:11;
108:18;121:17,19;
122:13
**known (6)**
6:21;79:4;81:9;
106:20;121:3,10
**knows (2)**
132:6;133:9
**Kong (1)**
10:19
**Korea (1)**
10:18

**L**

**large (4)**
25:25;112:15,22;
113:2
**larger (1)**
25:25
**last (6)**
5:7;20:6;70:15;
108:9;126:3,9
**late (4)**
60:11,12;67:5;
76:19
**latent (1)**
69:17
**later (5)**
15:21;23:1;115:25;
116:6;130:22
**Law (23)**
4:13;7:18;9:12;
11:15,16;29:18;
56:10;57:12,25;58:7,
13;60:4,6;105:12;
108:20;117:15,15,18,
21,22;118:11,22;
134:4
**Lawton (1)**
7:13
**lay (1)**
132:22
**least (6)**
24:11;29:2;31:22;
53:7;130:3;134:19
**leave (3)**
66:9;77:22;125:11
**leaving (5)**
37:2,12;79:25
**Lebanon (1)**
10:17
**left (5)**
21:24;31:2;79:6,11;
132:7
**legal (8)**
24:18,21,23;25:16;
43:1,12;44:22;132:20
**legible (1)**
116:22
**length (3)**
75:2,22;111:6
**less (7)**
20:11;29:1;31:5;
51:2,5;106:23;130:15
**letters (1)**
106:12
**level (6)**
8:14;88:21;105:13;
106:13;118:5,8
**liability (2)**
105:6,9
**license (2)**
110:15;130:1
**lieutenant (1)**
8:15
**lift (1)**
69:16

# EXHIBIT 3

**lifted (2)**
69:9;70:8

**light (1)**
113:13

**lighters (1)**
11:8

**likelihood (1)**
83:23

**likes (1)**
126:4

**likewise (1)**
17:7

**line (2)**
11:6;53:4

**lined (1)**
104:20

**lines (1)**
10:25

**link (2)**
18:15,18

**list (8)**
16:2;19:1;24:6;
46:12;47:16;66:25;
99:13;116:9

**listed (8)**
12:11,18;19:14,15;
101:10;114:19;115:4;
118:24

**little (8)**
11:2,5;51:5;79:22,
23;88:15;89:18;99:8

**live (1)**
10:2

**lived (2)**
9:10;10:18

**loaf (1)**
68:16

**local (1)**
44:11

**locate (1)**
59:20

**located (3)**
49:15;54:5;59:22

**location (6)**
49:16;59:13;62:20;
64:12;72:24;111:21

**locations (2)**
31:17,17

**locked (11)**
25:15;30:5;33:4,6;
44:9,20;45:4,5;78:16;
120:20;122:15

**log (1)**
18:20

**Long (26)**
11:10;20:9,19;21:8;
26:14;34:11,11,24;
38:22;57:23;74:21;
75:3,4,15;90:9;105:2;
111:3,4;116:9;
120:12,15;122:14,21,
23;123:8;127:6

**longer (7)**

62:21,24;77:24;
78:3;91:9;123:11;
125:2

**long-term (1)**
111:8

**look (22)**
6:18;12:13;17:7;
23:9;39:24;40:6,19;
41:15,25;42:15;54:9,
25;72:23;74:4;81:24;
89:25;90:10;107:23;
113:12,18;134:6,9

**looked (7)**
12:15;24:3;47:6,11;
49:19;55:5;134:25

**looking (22)**
13:12;14:19;24:8;
47:4;49:1,19,20;55:2,
7;66:16;73:25;74:17;
75:11;85:23;92:11,
13;101:8;107:21;
108:6;120:3;135:25;
136:5

**looks (4)**
83:3;104:20,24;
135:4

**lose (1)**
79:22

**lost (2)**
8:8;9:11

**lot (17)**
28:24;34:20;41:8;
67:8,9;74:8;85:2;
88:24;105:23;106:11,
11,12,13;111:22,25;
116:9;121:13

**lots (1)**
129:19

**low (1)**
85:9

**lowest (1)**
85:9

**Lucas (2)**
5:3;7:1

**Luxury (1)**
10:23

## M

**ma'am (24)**
4:21;14:16;15:4;
24:22;28:5;38:2;47:8;
57:18;58:19;59:18;
65:5;72:10;73:19;
75:16;76:16;78:2;
97:15;100:24;110:11;
112:11;114:8;119:3;
122:6;133:2

**Madame (1)**
11:10

**mailbox (1)**
91:23

**maintain (1)**

131:13

**maintains (1)**
105:12

**major (9)**
8:16;27:17;59:2,23;
104:5,10;115:8;
116:25;117:4

**Major's (2)**
116:18,24

**makes (3)**
54:1;69:1,6

**making (8)**
48:5;67:11;75:2;
95:9;100:4;103:3;
104:25;119:19

**male (1)**
101:12,12

**man (5)**
7:23;60:16;89:11;
103:16;124:11

**manageable (1)**
33:9

**Management (1)**
7:10

**manager (2)**
7:10;10:15

**managers (1)**
104:6

**mandatory (3)**
5:11;6:10,17

**many (47)**
9:20;10:2,2;13:8;
20:21;21:7;22:21;
30:12,14,22;31:18;
33:1,11;34:15;35:8;
39:10,19;41:4;49:22;
50:3,13;51:11;52:1,2,
9,22;63:25;68:5;69:8,
19,19;70:22;71:25;
74:3;76:9,12,13;
79:21,21;85:12;
90:25;112:25;115:19;
121:7;134:17,19;
135:22

**March (3)**
22:24,25;23:6

**marijuana (2)**
106:23;107:7

**Mark (3)**
97:19;115:3,9

**marked (4)**
135:10;137:10,11,
12

**marking (1)**
126:2

**Martin (4)**
27:16,18,23;28:6

**material (16)**
15:5;18:11,13;20:1;
21:12;23:21;37:16;
46:7;47:3,5;61:14;
65:20;70:20;84:10;
89:2;108:13

materials (3)
12:19;19:1,3

**matter (4)**
98:5,6;112:6;120:3

**Mattox (16)**
5:14;18:7,8;19:8,9,
19;20:5,6,10,13;
22:10,12;23:11,18;
87:23;126:2

**Mattox's (1)**
19:19

**mattress (1)**
128:10

**may (19)**
11:11;12:20;13:7;
14:17,22,22;15:19;
19:10;35:2;73:16,16,
25;87:23;90:11;
91:15;103:16;121:12,
15;126:18

**maybe (3)**
40:11;64:22;123:6

**mayor (1)**
9:3

**mayor's (1)**
9:10

**McANDREW (11)**
4:5,10;81:20;87:20;
93:24;108:3;126:12;
127:4;128:18;131:25;
137:8

**McCoy (28)**
34:23,24;35:4,9;
36:4,8,12,13,17;
37:10,14,25;38:3;
45:20;79:9;80:1;84:6;
86:13;87:1,14;91:7;
95:9,22;96:11;97:16;
119:8,12;120:13

**mean (6)**
35:16,22;93:14;
103:21;114:7,17

**meaning (1)**
56:25

**means (1)**
21:11

**meant (1)**
28:3

**media (2)**
85:1;86:18

**medical (12)**
25:20;39:24;41:21,
23;94:9,19;111:8,11,
11,20;113:6;130:19

**Mediterranean (2)**
8:7;10:13

**medium (1)**
88:23

**meet (1)**
56:19

**members (4)**
20:7;26:1;78:11;
120:21

**memory (3)**
11:12;16:11;23:1

**men (4)**
36:8;72:17;80:18;
85:12

**mental (8)**
96:6;112:3,10,13,
15,23;113:3,5

**mention (4)**
113:9,11;114:1;
117:20

**mentioned (10)**
37:13;41:18;73:14;
77:3;80:24;88:9;
119:4;123:19;130:6;
134:16

**mere (4)**
35:11,17,23;36:20

**met (2)**
56:22;99:1

**Miami (5)**
7:8;8:12;29:8,11,16

**Middle (1)**
8:7

**might (4)**
27:14;72:20;73:21;
113:14

**military (1)**
9:1

**Miller (1)**
16:16

**mind (3)**
21:10;90:6;120:1

**minimum (2)**
17:8;88:22

**minor (3)**
65:1;84:19,21

**minors (1)**
84:24

**minute (11)**
39:1;52:17;94:23;
123:5;125:16;128:16;
130:3,5,10,11,15

**minutes (7)**
37:13;38:25;89:18,
23,24;90:3;125:18

**misdemeanor (8)**
79:23;80:6;101:23;
103:10,14,17,19;
107:3

**misdemeanors (6)**
62:5;64:17;101:12,
15,20;103:18

**miss (3)**
102:18,20,21

**missed (5)**
133:18;136:1,24

**mistake (3)**
10:6;109:18,19

**mistakes (4)**
5:25;6:1;10:3;
22:21

**mix (1)**

16:4
**Model (27)**
11:20,23;12:5;18:6;
20:15,24;21:1,3,17;
22:5;47:24;48:2,11;
50:15,16,17;51:22;
56:9;83:11,18;84:2;
101:10;109:7;128:23;
129:3,8,16
**modern (1)**
131:14
**modifying (1)**
15:2
**moment (4)**
11:12;50:7;115:14,
21
**monitor (5)**
47:25;74:15;127:9;
131:10;136:9
**monitored (2)**
129:19;132:1
**monitoring (7)**
48:9;128:25;
129:12,23;132:11,12;
133:15
**monitors (8)**
128:25;134:9,17,
19;135:22,25;136:4,
11
**month (1)**
59:14
**moot (1)**
85:16
**More (35)**
20:23,25;21:19;
22:10,16;23:4;26:3;
28:21;30:20,21;32:1;
33:20;34:1,10;38:15;
39:1,14;40:24;41:20;
52:3,24;56:3;59:19;
62:20;65:15;68:8;
75:12;84:14;88:18;
90:25;96:23,25;
109:15;124:13;130:3
**morning (3)**
4:10;18:2;75:10
**Morocco (1)**
10:14
**most (6)**
12:7;25:25;45:15;
59:10;70:19;83:20
**motion (2)**
76:7;130:15
**move (3)**
78:7;97:11;120:18
**moved (11)**
63:11;77:7;78:1,4,
15,20,23,24,25;99:9;
100:22
**moving (1)**
107:16
**much (16)**
17:14,25;21:14,17,

18;23:5;25:18;30:15,
17;74:24;76:19,20;
85:16;111:5;115:15;
130:5
**multiple (2)**
28:12;61:24
**multitude (3)**
13:5;77:22;78:12
**murder (11)**
28:14;44:9;64:16;
72:18;86:15,16,17,21,
21,24;87:5
**must (3)**
116:10;117:16;
118:5
**Myers (1)**
15:8
**myself (3)**
7:6;22:25;104:15

**N**

**name (5)**
54:22;60:3;91:12;
119:7;127:5
**named (1)**
16:14
**names (9)**
15:15,21;16:5,8,9;
19:12;34:22;35:9;
46:8
**narrative (1)**
88:14
**narrow (3)**
74:12;75:16;85:4
**national (3)**
9:6;41:4;56:10
**nature (1)**
103:7
**NCIC (2)**
83:19;110:10
**necessarily (1)**
125:11
**necessary (2)**
68:10;74:6
**necessity (1)**
66:20
**neckties (2)**
10:24;11:8
**need (30)**
16:8;30:4;40:9;
45:3;52:3,10,23;56:6;
63:25;64:3,5,13,21;
67:13;68:18;73:17,
20;74:4,9;79:1;85:21;
87:5;89:18;90:5;94:7;
117:20;118:2,20;
125:16;129:18
**needed (8)**
29:15;52:1,4,5;
66:24;86:3;87:15,16
**needs (2)**
95:4;100:20

**negligent (1)**
128:3
**new (13)**
8:21;9:6;15:3,4,13;
20:2;44:19,20,23;
45:5,7;50:8,10
**news (1)**
86:17
**next (4)**
79:18;93:4,7;
120:18
**nice (1)**
126:23
**night (1)**
75:11
**nobody (1)**
131:20
**nonavailability (1)**
111:22
**noncertified (3)**
47:25;52:6,13
**None (4)**
33:3;52:12;70:24;
104:9
**non-protection (1)**
77:11
**non-protective (2)**
61:9,12
**nonviolent (3)**
65:1;102:5;103:5
**nooks (1)**
135:2
**nor (1)**
115:3
**normal (2)**
51:3;97:2
**normally (2)**
25:23;45:12
**nose (1)**
134:5
**notarized (2)**
116:8,9
**notation (3)**
40:16;59:13;120:2
**note (2)**
40:10;84:17
**noted (9)**
114:7,10,13,14,15;
115:2,10;117:4,9
**notes (1)**
21:12
**noteworthy (3)**
107:24;108:9,12
**noticed (2)**
127:13;133:24
**notified (1)**
134:1
**notion (1)**
123:19
**number (25)**
16:13;32:5;49:25;
50:4,6,11,18,20,23;
25;51:7,9,15,23,24,

25;52:1;77:20;
112:22;113:2;133:9;
135:10;137:10,11,12
**numbers (1)**
22:20
**nurses (1)**
65:23
**nutrition (1)**
25:20

**O**

**object (1)**
71:4
**obligation (1)**
25:20
**obligations (1)**
25:16
**observations (2)**
114:6,10
**observed (1)**
35:6
**observing (2)**
133:6,7
**obtained (1)**
96:3
**obvious (2)**
60:22;128:4
**obviously (4)**
11:22;12:8;16:6;
115:18
**occur (2)**
33:14;46:2
**occurred (12)**
9:22;30:23;31:19;
33:1,12;46:22;73:7,
11,12;98:14;111:4;
133:17
**off (20)**
8:2;21:14;27:14;
36:7;37:14;39:4;46:9,
17;48:7;63:8;68:14,
19;69:9,11,13;70:9;
95:16;132:5;133:10;
137:23
**offense (4)**
103:7;106:13;
122:5,6
**offer (1)**
43:20
**offered (1)**
111:23
**office (16)**
10:20;19:10;20:7;
29:23;30:8,8,11,13;
43:21;44:2,16;45:12,
13;88:10;95:18;96:1
**officer (21)**
8:13,15;27:5;49:11,
14;53:3;55:11;57:12;
58:7,13;60:4,6;99:22;
108:17;126:13,16;
132:4;133:22;134:12,

13;136:12
**officers (12)**
47:25;50:5,6;51:14;
97:7;105:6,9,11,13;
123:13;134:5,11
**officer's (1)**
123:13
**often (3)**
20:7;84:24;97:8
**oftentimes (1)**
97:5
**old (1)**
7:23
**Olson (12)**
46:14;107:19,20,
22,25;108:2,5,11,13;
109:8;110:12;126:12
**Olson's (1)**
110:8
**omissions (1)**
105:4
**omitted (1)**
113:19
**once (17)**
14:5,24;23:2;24:12;
30:5;42:13;43:12;
46:6;78:4,9,18;85:23;
86:19;98:23;101:22;
111:6;130:5
**one (64)**
8:16;9:22;24:17;
27:16;31:12;32:20;
34:3;39:20;40:8,8,24;
47:19;48:6,12,25;
50:5;53:4,6,7,11;54:7,
19;55:19;57:5,20,20;
58:2;63:22,23;64:1;
65:15;68:8;70:5,5;
77:4;79:13,20;82:7;
92:13;99:24;100:16;
104:8;106:24;113:13;
118:8;121:11,12,18;
125:22;128:14,15,16;
130:10;134:9,18,19;
135:25;136:9,13;
137:7
**ones (4)**
15:25;19:7,8;91:1
**one's (1)**
105:3
**only (18)**
16:7;21:8,9,21;
43:9,10;62:23;63:22,
23;64:1;74:10;80:5;
96:8;103:17,18;
104:14;120:5,24
**open (3)**
8:20;64:9;72:16
**operate (1)**
25:18
**operations (1)**
10:16

**opinion (34)**
4:24;5:3,16,23;
6:20;7:25;11:25;
12:15;15:2,3;24:25;
25:5,8,9;46:5;47:23;
49:24;50:2;51:13;
52:20;54:10,13;56:5;
76:21;78:15,22;79:8;
98:5;99:9;104:16;
107:18;119:17;
124:24;134:10
**opinions (7)**
12:10;23:25;24:2,
18,21,23;46:14
**opportunity (6)**
8:12;33:5;42:15;
69:2;76:5;93:15
**opposed (2)**
52:5;126:19
**opposite (1)**
123:6
**Orange (7)**
9:3,4;13:3;30:23;
31:1,5,8
**Order (13)**
99:18,22;100:2,7,
17,23;101:2;126:5;
132:20;133:5;137:4,
18,21
**Orders (2)**
99:15,24
**original (4)**
23:15;63:19;113:8,
12
**originally (5)**
22:18;23:7;72:7,11;
96:22
**Orlando (3)**
8:24;25:24;31:14
**others (9)**
11:12;33:21;34:1;
36:16;84:14;88:19;
96:23;112:25;120:9
**out (24)**
10:12;15:11;23:9;
27:4;53:19,21,22;
54:5;61:15,17;77:7,
19;78:1,4;92:10;
97:13;98:4,22;
101:10,16;104:20;
120:17;123:3;129:17
**outcome (2)**
97:25;98:1
**outlined (5)**
14:10,14,20;25:10;
83:10
**outlines (2)**
14:4;56:18
**outside (7)**
60:20;61:2;66:8;
86:19;98:7;111:24;
133:14
**over (16)**

4:17;8:18;9:4;
15:13;19:5;22:13;
23:23;28:23;31:16;
40:7;76:22;91:8;
107:4;119:11;124:7;
137:15
**overall (1)**
109:5
**own (13)**
12:4;20:15;21:8;
24:7,7,7;36:3;64:22;
72:19;87:17;92:14;
103:23;105:3

---

**P**

**page (12)**
21:8;55:13,14;
99:22;101:9;107:21,
23;108:1,8,8;114:11;
116:16
**pages (2)**
20:19;21:8
**paid (1)**
23:12
**Panama (1)**
9:12;11:15
**pants (3)**
95:6,10;96:19
**paper (5)**
58:25;71:21,21;
82:24;94:23
**papers (1)**
39:24
**paperwork (1)**
59:23
**paragraph (2)**
55:16;108:9
**part (15)**
36:17,19;37:17;
38:16;41:8;66:14,17;
67:2;68:21;73:3,25;
86:6;88:24;119:22,23
**participant (3)**
35:13,18,20
**particular (13)**
7:5;13:9;19:6;
46:17;48:18;63:13;
74:11;79:7;84:4;
103:23;108:17;
123:16,16
**pass (3)**
7:19;36:1,6
**pass/fail (1)**
7:12
**passed (2)**
76:20;78:13
**past (6)**
28:23;39:19;67:1;
89:9;104:7;106:19
**Patou (1)**
11:9
**pay (1)**

103:24
**pending (5)**
84:15;87:5;103:10,
17;121:22
**penetrated (2)**
41:2;124:23
**penetration (23)**
40:21,23;41:8,10,
13,17;42:5,25;43:5,7,
8,10;45:24;67:17,21,
22;71:6,12;91:12;
95:1;125:8,10,13
**people (28)**
10:3;19:10;25:15;
29:19;34:15,21;35:8,
21;41:4,8;52:3;55:6;
66:9;74:13;78:12;
82:14;83:12,14;
106:7,11,12,12,14;
120:20;123:6;133:14;
134:11;136:22
**perceived (2)**
14:5,9
**percentage (5)**
112:9,12,14,15,20
**perfumes (1)**
10:24
**perhaps (1)**
129:18
**period (2)**
28:7;110:7
**permanently (3)**
108:18;110:16,16
**permission (1)**
96:5
**perpetrate (1)**
85:8
**perpetrated (1)**
86:2
**perpetrating (1)**
85:20
**perpetrator (1)**
79:17
**perpetrators (11)**
77:9,25;78:3,8;
79:2,5;80:16,23;
98:14,17;119:24
**person (12)**
30:5;34:20;52:13;
53:8;54:8;57:16;
58:24;68:24;107:6,9;
120:18;132:3
**personal (1)**
36:3
**personality (1)**
112:25
**personally (2)**
15:9;16:18
**personnel (2)**
25:19;72:9
**pertained (1)**
86:11
**Phone (3)**

8:2;21:23;95:14
**physical (3)**
67:7;96:8;112:6
**physically (3)**
35:12,23;48:15
**pick (5)**
69:20;76:4;88:6,8,
12;89:2
**picked (6)**
46:25;47:1,2,3;
74:21;75:5
**picking (1)**
89:1
**picture (2)**
73:16;85:24
**piece (2)**
68:1;70:5
**Pierce (1)**
15:8
**Pittman (1)**
11:17
**place (12)**
13:4,16,21,22;73:1;
113:5,14;120:22;
129:22,24;130:24;
136:1
**placed (4)**
63:7;64:13;79:10;
130:9
**places (7)**
16:14;25:14;49:5,6;
78:17;81:6;95:11
**plaintiff (9)**
14:11,21;16:20;
24:4;34:5,7;36:9,16;
127:5
**planned (1)**
89:5
**plans (17)**
12:23,25;13:2,4,12,
14,17,19,21,23;14:4,
6,14,19,24,24;20:1
**plastic (3)**
69:18;71:22;91:7
**plates (1)**
130:1
**Please (9)**
7:22;17:3;22:1;
38:2;58:18;75:16;
128:15,16;137:20
**pm (4)**
75:22,22;125:21,21
**pod (28)**
48:19,20;50:4,7;
51:10,12,15;62:13;
63:13;64:1,24;65:13;
68:5;69:21;70:10;
74:13;77:13;99:23;
100:9,19,19;123:1,16;
130:4,11;134:22;
135:1,22
**pods (6)**
61:24;100:15;

122:15;128:25;129:4;
132:11
**point (7)**
81:21;90:12;92:21;
98:13;122:10;129:10;
136:14
**pointed (1)**
129:16
**poked (2)**
111:4;124:8
**policies (1)**
99:14
**policy (2)**
106:8;130:21
**politics (1)**
9:9
**poor (1)**
60:16
**population (14)**
26:4;50:8;51:2;
61:4,8,18,20;65:4,6;
85:9;86:4;101:1;
111:20;127:9
**port (1)**
122:23
**portions (1)**
137:8
**position (43)**
6:25;9:10;13:15,25;
14:17;31:7;33:25;
35:20;36:2,4,8;37:25;
38:3;42:8,10,18,19,
24;48:21;54:4,17;
56:13,21;58:6,16;
63:21;65:6,14;68:18;
70:8,25;73:10;77:15,
17;80:5;81:15;95:1,2;
96:14,15,18;134:4;
136:6
**positions (4)**
8:15;27:25;36:11,
15
**possession (2)**
106:22;107:7
**possessions (1)**
118:12
**possibility (1)**
81:4
**possible (17)**
14:13;32:21;68:1,3;
69:5;71:14,15;77:9;
82:11;85:25;87:2;
102:8;113:4;115:24;
133:21;135:24;136:8
**possibly (9)**
28:14;31:23;32:15;
33:15;54:7;70:19;
73:3;78:21;85:20
**Post (11)**
99:14,17,22,22,24;
100:1,7,17,23;101:2;
137:4
**post-traumatic (1)**

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 154 of 160

Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

112:24
**potential (4)**
77:25;87:4,8;102:4
**power (1)**
30:15
**powers (2)**
30:1,4
**practice (1)**
107:25
**practices (4)**
107:3;108:10;
109:7;110:4
**PREA (40)**
56:8,8,18;58:17,23;
59:3;97:7;113:9,13,
17,18,19,22,25;114:1,
6,9,19,20,22;115:2,4,
5,8,10,10;117:2,4,14,
15,20,20;118:2,5,7,
13,18,20,24;119:3
**preapproved (1)**
129:8
**predator (3)**
78:9;97:3,9
**predators (2)**
78:10;80:1
**prep (4)**
17:9;18:17;23:15,
16
**preparation (9)**
11:19;12:2;18:10,
22;19:4,17,22;23:6;
38:10
**prepare (2)**
7:6;21:21
**prepared (2)**
22:25;23:21
**preparing (6)**
17:15;18:1,4;19:18;
22:19,22
**preplanned (1)**
89:15
**preplanning (1)**
128:12
**presence (6)**
26:3;35:11,17,23,
24;36:20
**present (4)**
35:12;69:5;112:9,
12
**presented (5)**
115:14,21,25;
117:17,19
**presently (1)**
51:15
**president (1)**
10:15
**presumed (1)**
26:9
**pretty (4)**
45:9;85:16;128:4;
135:17
**prevalent (1)**

28:21
**prevented (1)**
117:16
**preventing (5)**
37:1,3,11,11;
118:13
**previous (1)**
31:2
**previously (8)**
4:15;6:21;9:20;
14:20;23:18;37:18;
39:20;103:20
**prey (1)**
89:13
**principal (1)**
96:11
**print (1)**
135:17
**prints (5)**
69:16,17,19;70:9,
10
**prior (15)**
6:12;22:25;23:21;
57:25;66:6,6,16;
80:23;102:3,4,24;
103:2,3;107:6,7
**prison (37)**
8:21,22;9:19;14:12;
25:13;26:5,6;28:24;
30:5,18,20;32:8,25;
33:2,3,7,12;34:10;
38:16;39:15;45:16;
56:11,17;70:16;72:5;
79:21;85:6,13,17,21;
86:24;96:22;97:3;
103:22;114:24;
120:22;122:16
**prisoners (1)**
120:16
**prisons (7)**
25:25;31:6,19;
50:10;84:24;113:3;
129:19
**privileges (2)**
111:14,18
**probably (7)**
18:2;26:20;79:21,
24;82:8;120:13;
125:17
**problem (3)**
36:17;131:19,21
**problems (1)**
98:3
**proceeding (1)**
44:20
**proceeds (1)**
16:25
**process (22)**
5:18;6:24;44:21,22,
22;62:3;66:15,17;
69:24;83:7,9,12;85:3,
4,23;86:1,7;88:25;
102:10,13;103:13;

134:15
**products (4)**
10:21,23;11:4,7
**professional (4)**
10:6;84:13;104:4;
134:10
**profile (3)**
86:17,18,24
**program (2)**
7:12,13
**programs (1)**
111:22
**promoted (1)**
10:14
**prompt (2)**
6:11,18
**proper (5)**
28:25;54:16,18;
82:19;134:1
**properly (1)**
74:12
**prosecuted (3)**
30:9;45:21;97:22
**prosecuting (1)**
118:14
**prosecution (3)**
30:11;98:5,10
**protect (4)**
77:8;78:7;88:7,18
**protected (3)**
48:1;99:10;101:1
**protection (14)**
63:25;64:22,25;
72:19;77:10,14,18;
85:17,21;86:3;87:6,
15,16;88:4
**protective (31)**
59:14;60:17,18,20;
61:2,15,21;62:13,19,
21,25;63:2,5,13,17,
19,24;64:1,20,24;
65:2,8,9,11,12,15;
66:20;78:16;84:24;
101:5;110:22
**prove (1)**
68:23
**provide (4)**
24:23;25:20;87:20;
110:25
**provided (30)**
12:19;13:19;15:17;
17:6;18:11;19:6,9,11,
13,20;20:2,3;24:18,
21;35:2,3;36:16;46:7,
10,13,15;47:3;49:24;
51:12;86:12;87:12,
17,25;89:3;108:13
**providing (1)**
18:25
**public (4)**
7:9,10;31:8;97:6
**pull (1)**
23:9

**pulled (2)**
26:19;125:1
**punish (1)**
77:8
**punished (3)**
60:21;98:22;99:1
**punishment (2)**
97:23;99:9
**purchase (1)**
8:25
**purports (1)**
5:21
**purpose (1)**
110:22
**purposes (1)**
125:24
**push (2)**
95:13,14
**pushed (1)**
95:19
**pushes (1)**
95:15
**pushing (1)**
96:17
**put (20)**
25:1;29:19;43:25;
44:4,18;45:5,20;
61:17,20;64:2;71:21,
21;76:5,8;94:9,13;
96:14,15;118:2,20
**putting (3)**
43:15;128:10;
136:21

**Q**

**quad (1)**
123:16
**qualifications (1)**
56:20
**qualified (6)**
59:9,10,11;76:22;
99:5;136:15
**quarter (1)**
90:16
**quick (5)**
89:25;90:17;
128:19;131:2;136:21
**quite (3)**
103:25;125:25;
135:24

**R**

**ran (2)**
9:10;96:16
**Randy (3)**
107:19,25;108:11
**ranging (1)**
112:23
**rape (29)**
14:11,12,17,21;
28:24;33:18,19,20;

34:1,10,10;39:14,16,
23;41:6;42:7;53:19;
55:18,19;56:11,17;
64:16;72:18;84:21;
97:2,7;111:4;114:24;
118:13
**raped (10)**
33:22;34:12,16,22;
39:17;41:5;79:20;
97:5;110:5;120:17
**rapes (9)**
31:10,18;33:11;
38:16;39:15,19;
40:25;96:22;97:1
**raping (2)**
34:24;35:4
**rate (7)**
17:13,18,20,21,23,
24;29:2
**rather (1)**
43:1
**read (14)**
56:3;100:5;112:17;
115:14,21,25;116:17;
119:10,11;124:2;
129:6,10;130:1;
137:17
**reading (7)**
95:24,25;124:14,
19,21;126:19;137:8
**ready (2)**
90:5;116:12
**real (2)**
44:3;136:21
**realize (1)**
35:14
**realized (2)**
103:23;127:17
**really (6)**
24:12;90:11;97:10;
109:4;116:23;125:24
**realtime (1)**
127:9
**rear (1)**
127:14
**reason (7)**
80:12;103:12;
110:2;117:19;131:12,
13;133:14
**reasonable (3)**
17:9;90:12,14
**reasonably (1)**
50:19
**reasons (3)**
16:14;54:19;77:22
**reassigned (2)**
60:19,25
**receive (2)**
29:6;87:24
**received (2)**
102:15,18
**recent (2)**
5:1;83:20

# EXHIBIT 3

**Reception (3)**
    8:24;31:15;32:3
**Recess (2)**
    90:19;125:21
**reckless (1)**
    105:2
**recognized (1)**
    86:3
**recollection (2)**
    43:3;111:3
**record (8)**
    4:20,23;17:11;
    92:11;95:23;106:16,
    21;107:8
**records (7)**
    31:8;78:24;102:14,
    17;106:3;107:2;
    137:14
**RECROSS-EXAMINATION (2)**
    131:5;136:19
**recruit (4)**
    8:13;27:4;105:5,8
**rectum (2)**
    39:17;95:15
**redemption (1)**
    103:24
**REDIRECT (2)**
    128:21;131:23
**reduced (1)**
    45:20
**reference (4)**
    7:4;14:23;52:18;
    55:3
**referenced (1)**
    12:4
**referred (3)**
    43:25;44:2;101:23
**reformed (1)**
    104:2
**refresh (1)**
    111:2
**refused (2)**
    16:18;70:12
**refuted (1)**
    25:10
**regardless (4)**
    71:6,11;88:4;
    127:18
**regards (1)**
    23:25
**regulations (2)**
    25:18;31:4
**relate (2)**
    7:25;12:25
**related (3)**
    7:21;98:7;105:17
**relates (1)**
    14:1
**relation (3)**
    37:10;108:22,24
**relative (1)**
    22:16
**relevant (1)**

**13:17**
**relied (1)**
    11:24
**rely (1)**
    70:2
**relying (1)**
    67:19
**remain (1)**
    45:16
**remember (69)**
    7:4;16:9;19:7,11;
    20:8;23:20;30:14,25,
    25;31:11;32:2,9,22;
    33:13,16;34:13;35:3;
    36:7,10,14,15;37:14,
    15;38:8;39:8,13,25;
    40:7,14,15,17;41:7;
    43:7;46:3,7,19,24;
    47:4;48:19;51:9;
    54:22;56:2;58:10;
    60:3;69:12,13;74:23,
    24;76:24;80:10;84:3,
    20;91:1;94:12,15,22;
    112:14,20;120:9;
    124:6,14,19,21;
    126:17,18,20;131:1;
    134:19;135:1
**remembered (1)**
    91:10
**remove (1)**
    79:4
**removed (4)**
    61:21;63:2,4,6
**rendering (2)**
    5:22;7:25
**renders (1)**
    4:24
**repeat (4)**
    11:1,5;21:25;129:1
**report (78)**
    9:21;11:20;12:4,7,
    8,10,13,18;14:10;
    17:13,16;18:6;19:14,
    15;20:15,19,22;21:3,
    8,18,20;22:5,9,11;
    24:19;25:10;30:7,7;
    41:5,9;48:4,8;49:8;
    55:2;63:10;76:25;
    79:17;80:19;88:15;
    91:2,17,20,20,21;
    92:14,23;93:3,7,17;
    94:4;96:1;97:5;101:9;
    107:19;108:7;110:3,
    9,11;112:19;113:8,12,
    18,19;114:2;116:16;
    120:5,11,24;121:18;
    123:24;125:13;
    127:23;129:10,11,17;
    136:23;137:5,6
**reported (21)**
    40:20,23;76:13,14,
    21;77:4;79:13,14;
    80:3,13,14,23;81:2,8,

    12;96:7;97:8;120:25;
    121:11,12,18
**REPORTER (6)**
    4:1;11:1,4;137:16,
    18,21
**reports (6)**
    29:3;44:15;81:4;
    116:7;121:15;127:18
**representative (1)**
    17:10
**representing (2)**
    4:12;24:14
**reprimand (1)**
    106:12
**request (5)**
    31:8;77:21;91:16;
    92:8,10
**requested (2)**
    18:12;19:21
**require (3)**
    42:25;56:8;132:21
**required (14)**
    13:6;50:13;51:18;
    53:5;68:4;71:20,22;
    110:24;114:24,25;
    129:7;130:21;133:23;
    134:15
**requirement (1)**
    51:16
**requirements (2)**
    14:4;56:18
**requires (3)**
    43:5;62:3;118:11
**research (1)**
    38:9
**researching (1)**
    24:6
**resentencing (2)**
    15:10;16:16
**respective (2)**
    107:24;108:10
**responsibility (1)**
    57:24
**rest (1)**
    33:8
**restrain (2)**
    34:18,20
**restraining (14)**
    34:15;35:8,10,19,
    21,22,24;36:1,19,20;
    37:19;38:1,4,7
**restraint (1)**
    36:22
**result (2)**
    97:3;120:2
**results (1)**
    98:10
**retained (1)**
    9:14
**retaliation (1)**
    87:1
**retired (1)**
    9:2

**retirement (1)**
    9:8
**retrieved (1)**
    91:9
**returned (3)**
    50:10;74:21;75:6
**review (30)**
    4:23;12:2;13:9;
    14:25;17:11;18:4;
    23:2;36:10;38:10,13;
    40:4;59:1;74:9;78:23;
    86:10;89:4,7;91:15;
    93:16;102:3,8;103:3;
    111:2;115:2,4,5;
    116:18,24,25;117:5
**reviewed (31)**
    12:4,10,15,17;18:6,
    14;21:5;23:4,21;40:6;
    51:9;61:14;65:21;
    66:1,25;70:19;83:21;
    84:10;87:10,14;93:8;
    94:7;99:14,14,17,20,
    23;100:7;102:18;
    106:3;116:21
**reviewing (17)**
    17:15;20:14,22;
    21:2,7,20,20;22:5,7,8,
    11;37:15;39:3,8;
    80:15;86:1;89:9
**reviews (1)**
    83:20
**revised (1)**
    13:4
**revoked (4)**
    108:19,22,24;
    110:17
**Rick (2)**
    4:12;5:4
**right (96)**
    4:22;17:25;19:16;
    21:21;24:24;25:12;
    27:3,10,13,18;28:7,
    17;30:1,22;31:13,18;
    33:10;34:6,24;35:7;
    38:19;42:23;43:3;
    45:2,23;46:21;47:16,
    17;49:9,22;50:2;53:4,
    16;54:22;55:1,4;61:6;
    62:6,18;63:10;67:10;
    72:6;79:18;81:13;
    82:4;90:11,12;92:12,
    15,17;93:1,4;94:13,
    23,24;95:23;96:21;
    99:13;100:1;101:8,
    14,18;103:1;107:18;
    109:21,25;110:18;
    113:17;114:1,5,23;
    115:7,12;116:12,14;
    117:3;119:5,10;
    123:18;124:11,14;
    125:16,20,22;126:21;
    128:14,17;130:7;
    131:17,22;132:25;

    134:22;135:12;
    136:17;137:2,3
**ringing (1)**
    8:2;21:23;95:14
**rings (1)**
    129:23
**risk (1)**
    87:1
**robbery (2)**
    66:7;102:24
**Robert (2)**
    4:11;95:3
**Rochas (1)**
    11:11
**role (3)**
    48:13;49:9;107:19
**RON (1)**
    4:5
**room (18)**
    48:17,22;49:1;
    77:21;95:7;122:25;
    123:3;128:24;129:4,
    11,12;130:4;133:12;
    134:17,21;135:21;
    136:24,25
**roster (15)**
    46:11,12,13;47:12,
    13,18,18,20;49:1;
    50:7,15;134:24;
    135:6,7,9
**row (1)**
    33:6
**rubber (1)**
    124:7
**rule (1)**
    17:10
**ruled (1)**
    98:1
**rules (2)**
    25:17;31:4
**ruling (6)**
    5:1,7,9;6:12;9:22;
    12:20
**run (1)**
    31:2
**runs (1)**
    95:12

**S**

**safe (3)**
    57:15,19;64:11
**safest (1)**
    79:3
**safety (2)**
    25:21;79:4
**salesman (1)**
    10:12
**sally (1)**
    122:23
**same (18)**
    4:16;5:25;16:13;
    17:13;25:13,18;27:5;

28:15,18,19;42:1,12;
65:2;71:15;81:22;
98:25;129:9;136:6
**sanctioned (1)**
7:18
**saw (2)**
84:10;102:23
**saying (6)**
14:3;27:12;53:9,10;
85:12;127:24
**scared (1)**
120:13
**scary (2)**
79:18;80:19
**schedule (2)**
17:6;21:9
**scheduled (2)**
22:24;23:7
**School (1)**
108:23
**schooling (1)**
7:7
**SCIC (2)**
83:20;110:10
**screen (2)**
99:25;116:13
**scroll (4)**
73:24;74:16;81:14,
15
**Sean (5)**
55:11,17;56:13,15;
57:4
**search (1)**
9:6
**seated (1)**
95:7
**second (6)**
33:21;61:19;67:4;
108:9;128:14,15
**seconds (5)**
38:25;39:5;130:25;
133:17;135:25
**section (1)**
116:18
**secure (4)**
62:20;63:15,16;
109:17
**security (6)**
25:20;111:1;129:7;
131:14,15;134:1
**seeing (5)**
24:9;27:7,11,17;
80:3
**seems (1)**
12:7
**segregating (1)**
130:18
**Segregation (6)**
100:14,18,19,22;
101:1,3
**self-protection (1)**
82:8
**seminars (2)**

7:20;104:4
**send (2)**
44:11;137:14
**sent (5)**
23:10,12;33:8;
120:2;121:15
**sentence (1)**
122:1
**sentencing (1)**
30:17
**separate (7)**
9:14;19:14;21:4;
62:3;78:8;100:15;
122:15
**separated (2)**
100:16;101:11
**separately (1)**
74:13
**sergeant (1)**
8:15
**series (1)**
37:4
**serious (11)**
29:4;31:24;39:25;
45:12;67:24;68:15;
69:4;103:8,20;
110:17;132:14
**served (4)**
8:5;97:22;103:7,22
**services (1)**
10:21
**serving (1)**
122:1
**set (2)**
63:24;133:10
**setting (5)**
26:23;70:16;77:18;
85:21;86:25
**settings (2)**
85:6,6
**Seventh (2)**
29:24;72:2
**seven-year (1)**
122:1
**several (6)**
23:1;30:16;31:22;
45:2;122:17;130:22
**severe (1)**
30:20
**sexual (45)**
26:11;28:8,11,13,
14;30:12,22;32:2,7;
33:1,11;42:6,8,10,18,
19,24,24;43:4,11;
45:21;84:18,19,23;
85:15,20;86:2;94:25;
95:1,2;96:10,12,14,
15;113:14,21,24;
114:21;117:9,22;
118:14,15,22;121:23;
122:7
**sexually (1)**
97:4

**shall (1)**
101:19
**shape (1)**
73:5
**share (3)**
99:25;116:13,13
**Shaun (6)**
91:13;119:7,10,17;
121:20,25
**Sheriff (4)**
4:11;5:3;44:11,15
**Sheriff's (1)**
95:25
**shift (7)**
46:10,19,23;47:7,
11,14;48:16
**shops (1)**
10:24
**short (1)**
39:5
**shorten (1)**
6:14
**show (3)**
110:3;123:14;132:1
**showed (5)**
40:4;47:11;95:3;
110:18;134:20
**shower (4)**
36:25;37:2;60:17;
95:5
**Showers (1)**
77:20
**showing (1)**
124:25
**shows (2)**
109:5;132:2
**shut (1)**
8:2
**sign (1)**
57:13
**signature (1)**
117:1
**signed (7)**
57:10,21;115:13,
20,25;116:5,10
**simply (15)**
26:8;32:2;33:15;
37:19;41:5,7;43:25;
82:6;84:14;88:12,19;
92:3;100:22;101:11;
112:3
**single (9)**
12:9;33:4,7;76:4;
78:15;81:16;106:24;
107:6,9
**sit (2)**
74:15;76:6
**sitting (4)**
52:6;132:5;133:23;
134:13
**situation (4)**
79:7,12;132:14;
134:2

**six (2)**
26:12,15
**skipped (1)**
8:18
**slate (1)**
31:3
**sleep (2)**
83:4,4
**slept (2)**
82:5,23
**slightly (1)**
75:1
**slow (2)**
76:4,8
**slower (3)**
11:2,5;115:15
**slowly (1)**
76:7
**small (7)**
18:19;19:24;85:8;
88:14;89:12;117:6;
135:17
**smaller (2)**
25:23;26:2
**sneeze (2)**
134:5;136:12
**sneezing (1)**
133:18
**society (1)**
120:17
**solid (1)**
30:6
**solved (1)**
70:6
**somebody (7)**
35:23;68:16;79:20,
20;81:4;131:16;132:5
**some-more-than-others (1)**
34:4
**someone (28)**
5:20;32:16;35:24;
42:8;44:1,9;45:6;
46:15;54:1;58:12;
60:23;72:12;80:4;
82:12;104:15;106:22;
108:19;111:14;112:2;
119:20;120:3;121:10;
127:14;132:17,21;
133:8,8;137:14
**someone's (1)**
132:18
**someplace (1)**
126:19
**Sometimes (3)**
10:3;55:7;64:5
**somewhat (1)**
29:4
**somewhere (2)**
16:2,4
**soon (2)**
79:8,25
**sorry (34)**
6:14;8:3;11:3;

21:25;25:6;26:25;
27:1,8;28:1;31:17;
32:14;33:13;34:7;
35:14;40:16,17;47:9;
50:22;52:15;55:9;
76:1,16;78:2;93:14;
94:17;97:15;102:16;
105:7;108:12;111:17;
115:16;126:6;129:1;
133:2
**sort (7)**
4:15;10:21;13:16;
85:5;89:18;105:20;
117:1
**sorts (1)**
98:3
**sound (1)**
124:11
**sounds (2)**
44:25;119:11
**Southeast (3)**
8:8,9;10:16
**Southern (1)**
10:13
**Spain (1)**
10:14
**speak (3)**
4:16;20:7;112:17
**special (6)**
7:20;86:8;132:16,
25;133:3,5
**specialist (5)**
48:14,23;108:14,
15;109:11
**specific (3)**
32:5;68:7;105:25
**specifically (3)**
13:7;15:25;48:3
**speculate (1)**
37:9
**speed (2)**
76:3,8
**spend (5)**
18:1;20:9;21:7;
22:4,6
**spending (1)**
10:16
**spent (12)**
19:18;20:14,21;
21:2,5,17,18;22:8,17,
19,22;23:13
**spiel (2)**
120:12,15
**spoke (5)**
53:21,22;54:5,8
**staff (13)**
18:7,9,22;19:9,19;
20:8,13;26:1;31:3;
52:2,9;53:17;134:2
**staffing (12)**
50:6;51:17,18;52:1,
3,5,11,14,16,18;53:5,
11

# EXHIBIT 3

**stand (1)**
107:12

**Standard (3)**
48:2;101:10;110:4

**Standards (30)**
11:21,24;12:5;18:7;
20:15,24;21:1,3,17,
20;22:6,9,11;47:24;
48:11;50:16,17;
51:22;56:10;83:11,
18;84:2,4;109:7;
110:25;128:24;129:4,
7,8,16

**standing (2)**
35:25;37:15

**Stark (1)**
8:23

**Starke (1)**
32:24

**start (7)**
4:19;44:22;74:20;
75:5,9;107:23;126:8

**started (5)**
10:12;24:4;26:22;
27:1,4

**starters (1)**
59:9

**starts (1)**
44:20

**State (30)**
7:11,17;8:17,22;
9:16;15:12,13,13;
29:23;30:7,8,10,13;
31:6;33:3,9;43:21;
44:2,15;45:11,13,16;
50:10;71:23;79:21;
85:13;88:10;103:22;
105:13,13

**stated (5)**
5:10;38:15;67:4;
96:4;124:22

**statement (14)**
6:23;41:7;92:16;
96:3;110:2;116:8;
119:8,11,22,23;124:2,
5,15,22

**statements (6)**
55:22,24;92:18;
96:9;120:7;137:7

**States (6)**
8:4,11;9:16;113:15;
117:16;118:12

**statute (1)**
118:8

**statutes (2)**
56:10;118:10

**stay (1)**
126:5

**stepping (1)**
86:19

**steps (1)**
24:1

**Sterling (1)**

**7:13**

**stick (5)**
39:10,11;111:4;
124:7;125:2

**sticking (1)**
132:17

**still (15)**
27:10;29:1;35:14,
20;37:25;38:3;40:24;
49:19,19;79:16;
80:18,20,25;94:25;
103:5

**stole (1)**
68:16

**stop (3)**
90:6,7,14

**stopwatch (1)**
123:17

**store (1)**
68:17

**street (4)**
28:16,19;132:5;
133:7

**stress (1)**
112:24

**strongly (1)**
31:4;91:11

**Struck (1)**
116:21

**struggling (1)**
93:25

**Stuart (2)**
27:20,23

**stuck (3)**
124:7;125:7;127:14

**studies (1)**
112:17

**studying (1)**
136:10

**subject (2)**
16:19;89:13

**submit (2)**
45:10;71:22

**submitted (4)**
44:15;45:11;70:10,
20

**subsequently (1)**
14:22

**successful (3)**
98:4,10,10

**successfully (1)**
69:9

**suffered (2)**
93:21;94:1

**suggested (1)**
89:7

**suggesting (2)**
131:8;132:16

**suggestion (1)**
103:15

**summary (1)**
19:23

**SUP (1)**

**11:10**

**supervised (1)**
70:18

**supervising (3)**
48:17;52:7;134:13

**supervision (4)**
28:6;104:8;109:6;
132:7

**supervisors (1)**
104:6

**supplement (5)**
67:23;70:4;113:10;
114:6,9

**support (1)**
67:23

**supposed (3)**
80:22;81:1;83:10

**supposedly (1)**
133:8

**sure (18)**
5:22;6:16;11:6;
22:3;48:5;74:3;78:21;
80:21;81:11;82:9;
87:16;91:25;92:2;
97:10;104:19;130:24;
131:15;135:8

**surface (2)**
69:16;71:3

**surrounded (1)**
72:17

**suspecting (1)**
91:12

**suspended (1)**
106:11

**suspension (1)**
110:16

**swabs (1)**
68:13

**swear (2)**
4:1,4

**sweep (1)**
69:22

**swore (1)**
57:17

**sworn (5)**
4:6;57:12;58:7,13;
116:8

**system (5)**
83:22;85:17;
111:24;131:15;
133:15

## T

**table (1)**
95:6

**tabs (1)**
131:11

**talk (6)**
53:15;72:14;83:2;
99:21;108:7;114:5

**talked (6)**
20:8;90:1;91:4;

**99:8;119:7;137:7**

**talking (12)**
34:5;35:15;81:22;
90:22;92:15;118:10;
122:11,24;123:2,9;
135:6,12

**tampered (2)**
60:14;67:5

**tampering (1)**
67:3

**target (1)**
90:8

**targeted (1)**
89:8

**taught (3)**
7:16;41:4;97:7

**TEA (2)**
107:11,13

**teaching (2)**
108:19,21

**tearing (2)**
40:15,18

**technically (1)**
45:6

**telling (4)**
106:24;107:5;
119:25;134:14

**tells (2)**
39:19;83:22

**temporary (1)**
110:16

**ten (1)**
42:13

**terms (14)**
13:9;16:12;24:8;
25:16;27:14;36:9;
41:8;84:12;85:3,16;
109:7;118:13,25;
120:16

**terrified (3)**
120:13;123:20;
124:12

**test (1)**
100:4

**tested (2)**
67:8;71:1

**testified (5)**
4:7;9:15;15:11;
29:24;123:18

**testify (3)**
16:1,10;71:25

**testifying (2)**
15:7;42:17

**testimony (18)**
4:2;12:16;15:10;
16:15,23;17:1,5;
20:13;23:13;36:18;
37:19,23;38:6;40:13;
47:19;67:16,20;115:1

**testing (4)**
23:1;67:13,21;
70:11

**Thailand (1)**

**10:19**

**Thanks (2)**
26:19;28:23

**That'll (1)**
90:16

**theft (2)**
28:16,16

**therefore (1)**
14:15

**thinking (2)**
41:22;89:19

**Third (1)**
55:16

**thorough (1)**
23:2

**thoroughly (1)**
14:20

**though (7)**
48:23;63:3;81:8;
82:23;87:4;109:20,21

**thought (1)**
48:4

**thousand (1)**
136:13

**Thousands (1)**
106:6

**threat (2)**
35:24;80:4

**threaten (1)**
80:1

**three (6)**
22:13;30:18;50:5;
100:15;123:2;135:25

**throughout (5)**
9:16;33:7;65:21;
83:13;85:14

**Thursday (1)**
5:7;9:23

**thus (1)**
22:14

**tie (1)**
70:4

**till (1)**
90:16

**times (17)**
9:20;10:2;15:11;
16:13;22:20;32:13,
15;39:10;45:2;47:25;
69:8;71:25;72:3;76:9;
82:16;123:19;136:11

**title (3)**
61:10;65:7;86:20

**titled (1)**
13:7

**today (11)**
7:6;11:19;12:3,16;
19:4,17;23:22;28:22;
38:11;41:12;137:19

**together (1)**
43:25

**told (24)**
6:9,16;7:1;16:3;
17:19,20,21;19:23;

Case 5:21-cv-00019-TKW-MJF   Document 43-3   Filed 04/20/22   Page 158 of 160

Robert Gene Wells v.
Tommy Ford, et al

EXHIBIT 3

Deposition of Ron McAndrew
March 28, 2022

21:2;22:18;36:19;
47:13;73:11;91:14,
15;92:7,7,21;93:11,
14,15,17;117:8;124:6
**Tommy (2)**
4:11;5:3
**Tomoka (2)**
27:12;44:10
**took (14)**
9:6;13:16,22;24:1;
30:10;55:22;57:24;
73:1;75:4;76:22;
77:10;124:7;130:24;
136:1
**top (30)**
10:25;11:6;21:15;
24:16;36:7;37:14;
39:4;46:9;48:7;60:21,
23;63:9,11,11;65:23,
24;66:2,3;82:5,5,7,10,
14,22,23,24;83:3,4,
17;100:13
**total (3)**
21:2,5,13
**towards (1)**
95:5
**town (1)**
120:18
**traffic (1)**
123:5
**trained (3)**
29:6;56:9;133:22
**training (20)**
7:20;29:7,19;30:3;
31:3;52:8;104:4;
105:5,8,24;106:1,3;
109:16;132:3,13,16,
18;133:1,3,5
**transcript (1)**
137:19
**transfer (1)**
30:19
**transferred (2)**
29:15;50:9
**transpired (1)**
58:10
**Travis (3)**
95:6,19;96:10
**treated (1)**
14:22
**treatment (1)**
111:8
**trial (7)**
16:25;17:18,22,23;
26:8;44:16;45:17
**tried (2)**
124:16,17
**true (7)**
10:5;24:24;25:3;
62:23,25;63:1;85:12
**truth (3)**
4:3,3,3
**try (13)**

4:16,18;75:23;
79:17,19;80:19;
90:24;99:25;100:5,5;
116:18;126:5;135:7
**trying (5)**
54:25;59:20;
119:18,24;120:19
**turn (4)**
24:10;28:23;
129:24;134:6
**turned (2)**
91:23,24
**Twice (1)**
15:8
**two (40)**
15:21,24;16:6,7,9,
14;20:23,25;21:4,4,
19,22;22:6,10;23:8,8,
14;27:14;30:18;
34:17,21;35:8,9,21;
39:5;46:10;47:19,19;
50:5;60:18;72:17;
80:17;89:17;97:12;
121:14;123:5;125:18;
130:25;133:17;
134:18
**two-second (1)**
136:1
**two-year (1)**
7:12
**typically (1)**
122:15

**U**

**ultimate (1)**
104:25
**Ultimately (2)**
57:9;97:22
**unable (1)**
14:8
**unarmed (1)**
25:19
**unauthorized (2)**
54:15,18
**uncertified (6)**
27:5;48:14;132:2,9;
134:4,10
**under (14)**
7:12;28:6;70:18;
79:16;104:6,8;107:1,
11;113:22,25;115:5;
128:9;130:25;133:17
**uniform (1)**
123:13
**unintelligible (1)**
10:25
**United (5)**
8:4,11;9:16;113:15;
118:12
**University (1)**
7:11
**unlawful (4)**

56:6,7;58:22;60:10
**unless (4)**
15:4;16:18;100:5;
131:16
**unlocked (3)**
122:15,18,19
**unnoticed (1)**
121:13
**untouched (2)**
79:7,12
**up (53)**
8:13,14;10:7;17:7;
21:12;25:2,15;26:19;
30:5;33:4,6;44:9,20;
45:4,5;54:8;63:24;
69:20;74:21;75:5,10,
19,20;76:3,8;78:16;
81:14;91:18;93:25;
95:6,12,14,15,20;
96:16,17;99:24;
100:11;102:10;108:2,
5;109:12;110:18;
116:18;120:20;
124:16;126:18;127:1,
14;128:25;129:13,25;
132:17
**updated (1)**
13:3
**upon (9)**
9:5;11:24;25:1;
85:1,2,22;100:20;
106:13;111:21
**use (4)**
48:1;104:15;
118:13;123:16
**used (6)**
21:10;38:17;69:20,
21;118:25;130:9
**using (2)**
24:7;87:8
**usually (2)**
74:12;122:21

**V**

**vacation (1)**
32:19
**vaguely (1)**
126:17
**valid (2)**
16:15;107:7
**variables (3)**
111:25;123:6;130:6
**variations (1)**
122:17
**various (2)**
46:5;83:24
**verifiable (1)**
9:15
**verified (1)**
78:19
**versus (4)**
46:17;77:8;82:5;

111:20
**vest (1)**
122:18
**vice (1)**
10:14
**victim (11)**
33:24;53:21,22;
54:4;79:4,16;80:18;
96:3,6;97:4;130:19
**victims (1)**
123:24
**victim's (1)**
95:20
**video (61)**
37:6,16;38:10,13,
24,25;53:20,24,25;
54:2,5;56:1;59:20,22;
67:11,14,17;68:20,24;
69:21;70:2;73:8,11,
15,18,22,23,23;74:3,
8,10,14,16;75:12,23;
76:2,3,5;79:8;80:15,
24;81:1,3,5,10,16,25;
91:9;93:8,16;95:3;
124:25;125:4;127:18;
128:24;129:4,20;
131:1,8,10;132:11
**videotape (1)**
96:9
**videotaped (1)**
129:25
**Vietnam (1)**
10:19
**viewed (1)**
79:9
**violate (1)**
106:8
**violation (12)**
47:24;48:3,10;
114:20,22;117:21,22;
118:15,22;128:23;
129:3,15
**violations (1)**
106:10
**violence (2)**
31:5;84:6
**violent (11)**
66:6,23;72:18;
80:17;102:9,13;
103:11,15,16,21;
122:4
**volunteers (1)**
111:24

**W**

**wait (3)**
90:2,9;123:7
**wake (3)**
75:10,19,20
**walk (1)**
34:19
**walker (2)**

34:19;95:4
**walking (3)**
95:5,5;96:16
**walks (1)**
95:7
**Walton (1)**
108:23
**wants (1)**
124:8
**warden (10)**
8:19,20,22,23;27:8;
31:13,24;32:8,25;
115:19
**wardens (1)**
32:20
**Warner (4)**
4:13
**watch (4)**
56:1;75:23;110:5,7
**watching (4)**
48:22;68:24;136:9,
10
**way (5)**
24:11;73:5;104:14;
113:1;119:19
**ways (3)**
42:13;121:7;123:12
**weeks (1)**
23:1
**Wells (60)**
4:11;12:25;14:1,9;
34:8,25;35:5,10,21;
36:5,12,13,22;37:10;
38:1,4,23;40:20;
64:24;65:12;66:2,22;
67:11,12;72:7,11,15;
73:6;75:3;76:12,13,
14,21,25;80:4,5;82:4;
83:2;89:7;91:2;93:22;
94:1;95:4,10,13;
97:18,23;101:23,25;
107:20;119:18,18;
120:8,10,24;121:3;
122:9;123:20;124:22;
127:22
**Wells' (2)**
95:15;125:1
**Wells's (4)**
39:12;65:22;66:5;
67:20
**weren't (4)**
16:10;32:12,13,16
**Werth (1)**
11:11
**Wes (1)**
11:17
**Wewahitchka (1)**
8:21
**what's (9)**
6:2;19:15;26:4;
49:6;62:14,16;71:20;
110:22;121:14
**whatsoever (1)**

# EXHIBIT 3

132:4

**whenever (1)**
75:21
**whereby (4)**
44:20;59:1;64:20;
66:1
**whole (8)**
4:3;24:3;34:20;
73:23;85:23;131:12,
13;133:14
**who's (3)**
43:15;60:16;132:21
**whose (1)**
110:11
**willing (1)**
10:6
**window (1)**
52:7
**wing (1)**
70:18
**within (2)**
80:18;130:11
**without (23)**
13:21;14:19,24;
38:18;39:2,8;47:4;
50:3;51:11;52:7;
55:20;73:11;81:1,12;
96:5;104:25;119:20;
125:7;127:10,16,20;
129:22;132:18
**WITNESS (44)**
4:4,6;9:25;11:3,6;
15:7;21:24;25:8;
32:19;37:22;39:7;
43:19;44:7,25;45:9;
55:22,24;67:19;
69:24;71:14;75:15,
25;82:2;85:11;86:6;
87:8;89:22;90:2,8,18;
92:18;94:3;99:4;
101:5;117:24;119:15;
121:6;126:23;127:20;
128:7;130:14;133:20;
136:4;137:17
**witnesses (2)**
25:5;132:22
**wondering (2)**
105:18;107:14
**wood (1)**
69:18
**wooden (4)**
68:19;69:9,11,15
**word (5)**
21:10;22:14;78:13;
87:8;104:15
**wording (1)**
94:4
**words (3)**
92:3,5,6
**work (15)**
7:22;9:13;11:15;
18:25;24:14,16;29:7;
55:21;70:18,22;74:1;

98:7;106:4;120:16;
131:15
**worked (13)**
8:6;10:10,18,19;
25:24;28:6;32:25;
33:21;44:12;104:8;
115:18,18;119:20
**working (7)**
25:12,12;26:23;
27:2;72:5;104:10;
107:11
**works (1)**
76:9
**world (2)**
10:3;133:20
**worry (1)**
72:19
**worth (4)**
74:3;75:12,19;
81:16
**write (1)**
92:23
**writer (1)**
96:5
**writing (1)**
116:20
**written (6)**
91:16,22;93:18;
107:13;115:8;116:11
**wrong (2)**
10:4;119:13

## Y

**Y'all (1)**
126:23
**year (8)**
9:7;10:16;27:5,9,
14,16;126:13,16
**years (21)**
8:5,6,25;9:2,19;
10:10;16:11;26:12,
15;27:15;28:23;
30:16,18;32:1;39:19;
43:4;79:21;85:11;
104:7;107:6;115:19
**yesterday (1)**
23:22
**York (1)**
15:13

## Z

**zero (5)**
8:10;52:24,25;
53:12,14
**zone (4)**
5:11;6:10,18;7:2
**Zoom (5)**
18:15,15,18;55:6;
100:5

## 1

**1 (27)**
48:20;49:22;50:3,
13,19,24;51:7,10,12,
19;52:10;62:13,24;
63:6;64:8;77:8;78:1,
4;99:23;100:8,8,9,11,
14;121:20;123:1;
135:15
**1,775 (1)**
26:1
**10 (2)**
55:14;63:11
**10:00 (1)**
75:22
**11 (3)**
72:3;101:9;114:11
**11:00 (1)**
75:22
**11:17 (1)**
90:19
**11:30 (2)**
89:20;90:5
**11:45 (1)**
90:19
**12 (5)**
7:15;20:19;21:8;
72:3;75:12
**12:39 (1)**
125:21
**12:41 (1)**
125:21
**124 (1)**
12:11
**12-page (1)**
21:18
**12th (1)**
21:8
**13th (5)**
91:16,22,25;92:8,
10
**14th (11)**
22:24,25;23:6,22;
91:15;92:1,8,22;
93:11,14,17
**15 (5)**
16:11;89:18,23,24;
90:2
**150 (1)**
16:2
**156 (1)**
15:11
**15th (6)**
91:17;92:23;93:3,
18;116:16;121:14
**16 (1)**
16:11
**16th (1)**
121:15
**17 (1)**
9:18

**17th (1)**
121:15
**18 (5)**
8:6;10:10;106:24;
107:1,4
**18th (2)**
95:17;117:4
**1979 (3)**
8:8;27:4;29:11
**1981 (1)**
27:10
**1982 (2)**
26:16;27:11
**1984 (1)**
29:11
**1987 (3)**
26:16,22;27:11
**1988 (5)**
8:19;26:24;27:1,8;
119:2
**1992 (2)**
8:20;33:11
**1996 (3)**
8:21;32:25;33:11
**1998 (3)**
8:23;31:19;32:25

## 2

**2 (2)**
62:14;135:16
**20 (2)**
32:1;106:23
**2001 (2)**
8:25;31:19
**2003 (5)**
14:13;28:24;56:12,
17;114:25
**2005 (1)**
9:12
**2018 (8)**
12:5;50:17;59:14;
71:2;83:11;100:8;
126:13,16
**2022 (1)**
129:21
**24/7 (1)**
33:6
**27 (1)**
9:1

## 3

**3 (17)**
62:16,18;63:3,7,11;
65:3,6;77:8,12;99:9;
100:8,11,14,18,22;
101:3;135:16
**3,000 (1)**
31:16
**350 (1)**
17:22
**36 (2)**

126:3,4

## 4

**4 (4)**
100:8,11,14;135:16
**4,500 (1)**
25:25
**40 (1)**
7:16
**46 (3)**
126:6,7,7
**47 (4)**
126:8;135:9,10;
137:3
**48 (2)**
137:4,10
**49 (2)**
137:4,11

## 5

**5,000 (1)**
17:17
**5:00 (1)**
75:21
**50 (2)**
137:5,12
**500 (1)**
16:6
**53A (1)**
101:10
**594 (2)**
9:14;16:4

## 6

**6:00 (1)**
75:21

## 8

**8 (3)**
107:23;108:1,8
**80-hour (1)**
7:16
**80s (2)**
70:16,23
**81 (2)**
26:18,18
**87 (2)**
26:18;27:18
**88 (1)**
27:18

## 9

**9 (1)**
99:22
**90 (1)**
30:19
**91 (2)**
46:12;47:17

**Robert Gene Wells v.**
**Tommy Ford, et al**

## EXHIBIT 3

**92 (2)**
46:12;47:18