UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ROBERT GENE WELLS,
    Plaintiff,

v.                    CASE NO.: 5:21-cv-00019-TKW-MJF

TOMMY FORD, in his official
capacity as SHERIFF of
BAY COUNTY, and RICK ANGLIN,
In his supervisor capacity

    Defendants.
_____

### **DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, RON McANDREW, AND INCORPORATED MEMORANDUM OF LAW**

Defendants, Tommy Ford, in his official capacity as Sheriff of Bay County, Florida, and Rick Anglin, in his individual and supervisory capacities, hereby file their Motion to Exclude Testimony of Plaintiff's Expert Witness, **Ron McAndrew**, and the Incorporated Memorandum of Law, pursuant to Rule 702, Fed. R. Civ. P., and *Daubert v. Merrell Dow Pharms., Inc.*[1], and states:

1.    On February 19, 2021, Robert Gene Wells, (hereinafter, "Plaintiff"), filed a First Amended Complaint which asserted seven claims

---

[1] 509 U.S. 579 (1993).

against the Sheriff and Anglin related to an incident that occurred on June 13, 2018, while he was incarcerated at the Bay County Jail. [ECF No. 13]

2.      The remaining causes of actions asserted in Plaintiff's First Amended Complaint are as follows:

Count I – Deliberate Indifference Failure to Protect against Sheriff

Count II – Deliberate Indifference Failure to Protect against Anglin

Count III – Deliberate Indifference to Medical Needs against Sheriff

Count V – Common Law Negligent Training against Sheriff

Count VI – Common Law Negligence against Sheriff

Count VII – Violations of Title II of the Americans with Disabilities Act
        against Sheriff

3.      Plaintiff identified Ron McAndrew as an expert witness who intends to offer certain opinions regarding Prison and Jail Operations.

4.      Defendants, Sheriff, and Anglin submit that the opinions expressed by Mr. McAndrew in his report (Addendum Report to Expert's Submission dated July 28, 2021 (which includes all original opinions opined in his Expert Witness Report dated May 19, 2021)) is referenced as ECF No. 43-4[2], and his deposition dated March 28, 2022, is referenced as ECF No.

---

[2] McAndrew's Initial Expert Report dated May 19, 2021 is ECF No. 43-2, but is identical in content to the opinions in the Addendum referenced in this Motion.

43-3), attached hereto, and incorporated by reference herein, should be excluded from consideration.

5.     Defendants are challenging Mr. McAndrew's general qualifications in the field of Prison and Jail operations; along with McAndrew's qualifications as it relates to medical diagnosis, treatment, planning, credibility of witnesses, and investigations.

6.     Defendants are also challenging Mr. McAndrew's opinions on the basis that they do not comply with the requirement of Rule 702, Federal Rules of Evidence, in that the opinions are not based upon sufficient facts or data, the opinions are not the product of reliable principles and methods, the proposed expert has not reliably applied the principles and/or methods to the facts of the case, the proposed expert's opinions will not help the trier of fact to understand the evidence or to determine a fact in issue.  Furthermore, the proposed expert's opinions are irrelevant to the issues presented in this litigation.

## **Memorandum of Law**

## **Standard of Review**

Pursuant to *Daubert*, a district court must ensure that expert testimony admitted under Rule 702, Federal Rules of Evidence, is both relevant and reliable. 509 U.S. at 589–90. In doing so, district courts are effectively

gatekeepers, so as "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony'." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

When analyzing whether an expert's testimony is admissible (i.e., not speculative, unreliable, irrelevant, or unhelpful), the trial court must act as the gatekeeper and complaint a "'rigorous three-part inquiry,'" which assesses the following:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix v. Evenflo Co. Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010); see also *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (Expert opinion is not admissible if the opinion is unreliable, irrelevant, or unhelpful to the fact finder.). The Eleventh Circuit "refers to these three considerations separately as "'qualification, reliability, and helpfulness,'" and the Court "must take care not to conflate" these distinct concepts. *Hendrix*, 255 F.R.D. at 578 citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2005) and

*Quiet Tech. DC-8, Inc. v. Hurel-Bubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of these requirements. *Hendrix*, 609 F.3d at 1194.

Even though certain expert testimony may be admissible under Rule 702, such may be subject to exclusion if it is either irrelevant or if "its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309–10 (11th Cir.1999). The Court "must take care to weigh the value of such evidence against its potential to mislead or confuse," because "expert testimony may be assigned talismanic significance in the eyes of lay jurors." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir.2004) (en banc).

An expert may only testify about matters within the scope of his expertise. *City of Tuscaloosa v. Harcross Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *Rojas Mamani v. Sanchez Berzain*, 07-22459-CIV, 2018 WL 2980371, at *6 (S.D. Fla. Feb. 26, 2018). A district court must "examine the credentials of the proposed expert in light of the subject matter of the

testimony." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012).

Testimony from a qualified expert is "admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Frazier*, 387 F.3d at 1261. The testimony of an expert is generally not admissible "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.*

An expert opinion must be able to "assist the untrained lay juror in determining intelligently a particular disputed issue of fact or understanding the evidence in [the] case." *U.S. v. Falcon* 245 F.Supp.2d 1239, 1245 (S.D. Fla. 2003). Furthermore, the Eleventh Circuit has held, "absent extreme or unusual circumstances, expert [] testimony concerning truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility." *Id.* citing *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996).

While an expert may opine on an ultimate issue of fact, he may not "merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Likewise, an expert "may not testify to the legal implication of conduct; the court must be the jury's only

source of law." *Id*., see *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990) (expert evidence consisting merely of legal conclusions not helpful when it unduly invades the province of the jury by telling the jury what result to reach on an ultimate issue).

McAndrew prepared two reports titled "Expert Witness Report of Ron McAndrew" and "Expert Witness Report of Ron McAndrew, Addendum Report to Expert's Submission." McAndrew provides no references or examples or methodology to support many of his claims, and only relies on the Florida Model Jail Standards, making no reference to any other peer-reviewed articles, regulations, or scientifically accepted authority in formulating his opinions. See *Daubert*, 509 U.S. at 594. At times, his report has information that is speculative and/or contradicts sworn testimony and record evidence. As it pertains to the second and third prongs of the test, McAndrew's opinions offered in his Expert Reports do not assist the trier of fact and offer nothing more than mere arguments, which the attorney can argue in opening statements and closing arguments.

In addition, McAndrew attempts to offer opinions on an investigation which occurred but lacks the background in investigations to offer any such opinions.

Those opinions which Defendants seek to exclude, even in the event this Court should find McAndrew meets the educational and/or professional qualifications to testify as an expert, are as follows:

## **Opinions Challenged**

McAndrew provides nothing to support his alleged opinions in his report and addendum report, and his opinions are speculative, not based on any training, experience, or methodology of a prison and jail operations expert.  Additionally, his opinions are often directly contradicted by record evidence, lack any foundation, and lack the requisite experience to render such opinions furthermore, his opinions do not offer insight beyond the understanding and experience of the average citizen. At times, his reports have information that is speculative and/or contradicts sworn testimony and other record evidence. As such, Defendants are challenging the following from McAndrew's reports:

1.     That Dr. Hough Sr. provided "absolutely no evidence" that he was ever awarded an FDLE certification; therefore, he "is not qualified to refute or qualify any form of correctional practices for any correctional setting in Florida." (ECF 43-4, p. 3).

2.      That "Wells was violently raped by Travis Bell with McCoy participating near the Bay County Jail's protective confinement shower." (ECF 43-4, p. 7).

3.      That "Anglin was the last person to review reports for Bell and McCoy" (ECF 43-4, p. 7).

4.      That in McAndrew's "professional opinion that the Bay County Jail was in direct violation of Florida Model Jail Standards 2.1, 2.1A 1.3 by allowing non-certified correctional officers at times to monitor the protective confinement area with the use of cameras and without the direct sight and sound of supervision of a certified correctional officer." (ECF 43-4, p. 8)

5.      That "non-certified correctional officers" were allowed to "monitor the protective confinement area with the use of cameras and without direct sight and sound supervision of a certified correctional officer" (ECF 43-4, p. 8).

6.      That Detention Specialist Howard Beasley's CVSA being taken on 8/30/2018 is an indicator of Mr. Beasley's "candor and truthfulness relative to the seriousness of his job assignment." (ECF 43-4, p. 8).

7.      That "Mr. Beasley was in fact hired prior to a background investigation." (ECF 43-4, p. 8).

8.   That Mr. Beasley was not "certified or properly trained on 6/13/2018." (ECF 43-4, p. 8).

9.   The reference to the hiring of Randy Olson. (ECF 43-4, p. 8).

10.   That "Dr. Hough's opinion that the immediate and ongoing efforts by members of the Detention Department staff after learning that Inmate Wells had been attacked were within acceptable standards is absurd." (ECF 43-4, p. 10).

11.   That the day after the incident Plaintiff was "moved to C-3 Cell 10 Top Bunk the following day at 1752.48," and that Mr. Wells was "not only denied protection but actually moved out of Protective Confinement" and that he was "punished by a top bunk assignment." (ECF 43-4, p. 10).

12.   That Officer Sean Burkett's investigation was flawed, "unlawful and unqualified investigation of PREA crime" and that it "hinder(ed) matters in terms of the real meaning of Protective Confinement." (ECF 43-4, p. 10).

13.   That Dr. Hough's opinions regarding "anyone's past action does not create a foreseeability of repeating the behavior at a specific future time and place" is an implication that "caution is to the wind." (ECF 43-4, p. 10).

14.   That, in his opinion, "Mr. Wells was in an obvious state of recovery." (ECF 43-4, p. 10).

15.    That the observation that Plaintiff was in a state of recovery combined with his non-violent charges "should have been recognized that (he was) vulnerable to predators or violence" and that the "Bay County Jail failed in this important observation resulting in the horrible and brutal rape of" Plaintiff. (ECF 43-4, pp. 10-11).

16.    That it is his "opinion that the Bay County Jail failed in its responsibility to maintain control and safety by allowing contraband to be in the hands of violent inmates such as McCoy and Bell" regarding the glove and that "inmates issued such gloves should be under the supervision of certified correctional officers and confiscated once work is complete. This was obviously not the case".  (ECF 43-4, p. 11).

17.    That the Bay County Jail should have appropriately classified Plaintiff "to protect the Plaintiff from predators such as Bell and McCoy.  Such appropriate classification would have prevented stated predators' access to the Plaintiff." (ECF 43-4, p. 11).

18.    That Plaintiff was housed with "Extremely violent inmates" resulting "in the stated horrible and brutal rape of the Plaintiff. One would compare this blunder with the placement of two wolves in a sheep corral." (ECF 43-4, p. 11).

McAndrew's deposition took place on March 28, 2022. During his deposition, McAndrew made statements that were conjecture, speculative, argumentative, beyond the scope of his alleged expertise, and/or contradicted by available and undisputable evidence. Additionally, these opinions were devoid of any foundational support, and are therefore inherently unreliable. Therefore, Defendants seek to challenge the following:

1.     That he was not provided with the jail's emergency plans prior to formulating opinions, but he was unable to give an example of what he would be looking for in relation to this case or that anything constituted an emergency without looking at the jail's emergency plans. (ECF 43-3, p. 12, l.23, p.13 ll. 11 to 22)

2.     That "[a]ny rape is horrible and brutal. Some more than others." (ECF 43-3, p. 33, ll. 20-21). That the rape "in this case, it was certainly more brutal than the average prison rape or jail rape." (ECF 43-3, p. 34, ll. 9-10).

3.     That two people restrained Plaintiff during the incident. (ECF 43-3, p. 34, ll. 15-17).

4.     That McCoy was restraining Plaintiff "[b]y his mere presence and being with Bell." (ECF 43-3, p. 35, ll. 9-11).

5.     That "mere presence, the threat of your presence can be" considered restraining someone, "if someone is standing in front of you and

not allowing you to pass they are restraining you" yet he cannot remember the positioning of either McCoy or Bell as it relates to this incident. McAndrew further goes on to explain the possibility that Mr. McCoy could have been behind Plaintiff "preventing him from leaving the shower" or "in front of him preventing him from going in another direction." (ECF 43-3, p. 35, ll. 22-25, p. 36, l. 1, ll. 7-11, p. 37, ll. 1-4).

6.    That it is McAndrew's testimony that McCoy was restraining Plaintiff he just does not remember how. (ECF 43-3, p. 38, ll. 3-8).

7.    McAndrew states that Plaintiff was injured; however, he cannot provide examples of injuries or of documents that he reviewed notating injuries, but McAndrew insists that "there's one that describes his injury." (ECF 43-3, p. 40, ll. 2-8).

8.    That this would still be "considered one of the more horrific and brutal rapes" he had seen even if Mr. Wells was never penetrated by the broom handle. (ECF 43-3, p. 40, ll. 23-25, p. 41, ll. 1).

9.    Regarding evidence of penetration, McAndrew stated that he would "have to go back and look" at the evidence to determine the "degree" of penetration by the broom handle used in this incident. (ECF 43-3, p. 41, ll. 10-11).

10.    McAndrew provided the opinion that the number of guards present in the dorm where the incident took place was inadequate, however, McAndrew could not give an example of what the guard to inmate ratio should be or what the ratio was at the time of the incident, and he could not explain when asked how the staffing should be determined and what qualified as inadequate. Further, McAndrew states that there were no "certified" staff but could not provide evidence of how many certified staff the Jail needed while deferring to the staffing chart. (ECF 43-3, p. 49, ll. 24-25, pp. 50-51, p. 52, ll. 5-11, 16-19).

11.    That the Bay County Jail found out about the rape because "the fact that the victim spoke out." (ECF 43-3, p. 53, ll. 19-21).

12.    McAndrew confirmed that it is his position that the "victim spoke out, and then they (Bay County Jail) located the video to confirm if it did or didn't happen" conceding that "[t]here's possibly another person that spoke up about this." (ECF 43-3, p. 54, ll. 4-9).

13.    When asked about his opinion of the investigation McAndrew replied that "[i]t was not adequate. It was unauthorized. I don't think it was done by a proper investigator." (ECF 43-3, p. 54, ll. 13-16).

14.    McAndrew stated he does not believe that witness statements were taken by Officer Burkett or anyone else. (ECF 43-3, p. 55, ll. 22-25).

15.   That Burkett did not meet the qualification requirements to investigate the incident per the requirements outlined by the Prison Rape Elimination Act of 2003. (ECF 43-3, p. 56, ll. 17-20).

16.   That Burkett was determined to be the investigator of the PREA incident due to him being the first person to investigate and file a paper." (ECF 43-3, p. 58, ll. 20-25).

17.   That Burkett's efforts to investigate this crime were "flawed" because "he was not qualified" and did not make a "notation of a location in protective confinement for the month of June 2018 in his investigation." (ECF 43-3, p. 59, ll. 8-10, 13-15).

18.   That the investigation of the case, completed by a certified law enforcement officer was "late" because the "evidence by this time could have been tampered with." (ECF 43-3, p. 60, ll. 5-14).

19.   McAndrew stated that there is evidence that Plaintiff, "who's been attacked going into the protective confinement shower by two inmates that were not in protective confinement, had no business being there, was then reassigned to another cell outside of protective confinement" where he was given a top bunk assignment as punishment for being assaulted. (ECF 43-3, p. 60, ll. 15-25).

20.     McAndrew confirmed that he thinks Plaintiff was assigned to general population or a "non-protective confinement area" however, cannot tell which dorm Plaintiff was assigned to or provide direction to a document that provides this information. When further questioned about the dorm classifications, McAndrews stated that C Dorm Pod 1 is protective confinement but could not identify C Dorm Pod 2 or C Dorm Pod 3. Further, McAndrew stated he know(s) Plaintiff was removed from protective confinement and acknowledged that he does not know off the top of his head to which pod Plaintiff was moved. (ECF 43-3, p. 61, ll. 15-25, p. 62, ll. 11-17).

21.     That the Bay County Jail did not have more than one protective confinement area at the time this incident occurred.  (ECF 43-3xhibit 2, p. 65, ll. 14-18).

22.     That prior criminal history is part of the classification process, "but has absolutely nothing to do with protective confinement if that's the necessity and the classification fits." (ECF 43-3, p. 66, ll. 16-21).

23.     That "details of any alleged past criminal history would not be a part of that" regarding the decision on where to house Plaintiff. (ECF 43-3, p. 66 to 67, ll. 22-25, 1-2).

24.     That the broom used in this incident should have been submitted for DNA testing for confirmation of penetration or to determine the guilty party. (ECF 43-3, p. 67, ll. 4-9).

25.     That a video of the broom making contact with Plaintiff does not mean there is no need for DNA testing because "[t]he details of the video are not that close.  It's too far away to make that exact determination." (ECF 43-3, p. 67, ll. 10-15).

26.     That instead of relying on the witness or Plaintiff's testimony (or the video), he would get DNA testing done to determine if there was penetration as a "supplement to support anything else. This is a serious crime that has been alleged, and as an investigator, I would certainly have gathered every piece of evidence possible. (ECF 43-3, p. 67 to 68, ll. 19-25).

27.     When asked how many brooms were in the pod, McAndrew stated "I don't know." (ECF 43-3, p. 68, ll. 5-6).

28.     When asked how he would identify the specific broom, McAndrew replied "I would have gotten all of the brooms if necessary." (ECF 43-3, p. 68, ll. 7-10).

29.     When asked what he would have done with all the brooms, McAndrew stated that "I would have taken swabs from the end of each broom. I would have gotten fingerprints off each broom. And for a crime as

serious – this is not somebody that stole a loaf of bread from a grocery store."
(ECF 43-3, p. 68, ll. 11-17).

30.     When asked if it was his position that he would need fingerprints
from the wooden broom even though there is video evidence of who handled
the broom McAndrew states "[t]o confirm who handled the broom." (ECF 43-
3, p. 68, ll. 18-22).

31.     When asked how fingerprints would further prove who handled
the broom over the video, McAndrew replied "[t]he Court makes those
decisions. The investigator doesn't have that opportunity. If he does, he's not
an investigator. If he does, he's not investigating a serious crime…" (ECF
43-3, pp. 68 to 69, ll. 23-25, 1-4).

32.     When asked if a wood broom handle is a surface where you
would be able to lift prints, McAndrew stated "[y]es of course, latent prints
would be on a broom handle wood or plastic." (ECF 43-3, p. 69, ll. 15-18).

33.     When asked how he would eliminate the many other prints that
would be picked up on the broom in addition to the individual involved in the
incident, McAndrew replied "[t]hrough process of elimination." (ECF 43-3, p.
69, ll. 19-25).

34.     When asked if he would have lifted all the prints off the broom,
that was possibly handled by all the inmates in the pod, and submitted all of

those prints to the FDLE, McAndrew replied "[a]bsolutely. And if they refused to do it, then it would be on the FDLE. It would not be on me as the investigator." (ECF 43-3, p. 70, ll. 8-14).

35.    When asked how many crimes he investigated in the 1980's that had DNA evidence McAndrew replied "[n]one, because it wasn't available then" (ECF 43-3, p. 70, ll. 21-24).

36.    When asked if he knew if Plaintiff was originally cooperative when asked about what happened, McAndrew replied "I believe his cooperation was not open in the very beginning.  He was surrounded by two men accused of extremely violent crimes, murder and rape, and he had his own protection to worry about at that time." (ECF 43-3, p. 72, ll. 11-19).

37.    When asked if he knew the location where Plaintiff was asked about the incident and if it was in a place such as he would have been concerned about the other individuals, McAndrew replied "[n]o, I'd have to go back and look at the exact location." (ECF 43-3, p. 72, ll. 20-24).

38.    When asked if Plaintiff not being forthcoming about what took place would have delayed the investigation, McAndrew replied "[p]ossibly. It could have delayed that part of the investigation, but it certainly should not have delayed the investigation in any way, shape, or form." (ECF 43-3, p. 72 to 73, ll. 25, 1-6).

39.    When asked if Plaintiff's inability to give an accurate time in which the incident occurred would have delayed the investigation, McAndrew responded "[t]he video would correct that and give an exact time." (ECF 43-3, p. 72, ll. 6-9).

40.    When asked if the investigators would be able to obtain the video of the incident without being told that the incident occurred or when it occurred, McAndrew stated "[a]ny time there's an allegation of criminal activity, the first thing you do, as I mentioned earlier, is go to see if there's video that will give you a picture of what may or may not have happened." (ECF 43-3, p. 72, ll. 10-16).

41.    When asked if the time of the incident would need to be known to locate the video, McAndrew stated "…[y]ou take the whole video, and you scroll down through it until you come to whatever you're looking for." (ECF 43-3, p. 72, ll. 20-25).

42.    When asked if a time is not provided could there be a lot of videos to review, McAndrew stated "[w]ell there's only one video for that particular crime. So, if an investigator, if he's doing his job properly, can usually narrow down the time by interviewing other people in the pod separately. Going through the video itself, if you don't have the information, you sit there in front

of a monitor and you scroll through that video until you find what you are looking for." (ECF 43-3, p. 74, ll. 7-17).

43.    When asked about the length of time from when the broom was picked up to when it was returned, McAndrew stated "[n]o, I don't know that time, no." (ECF 43-3, p. 75, ll. 4-7)

44.    That there was "a day" between when Plaintiff reported the incident and when the qualified investigator took over. (ECF 43-3, p. 76, ll. 21-24).

45.    That moving Plaintiff from C1 to C3 was punishment rather than for his protection "because they took him from protection to non-protection." (ECF 43-3, p. 77, ll. 7-11).

46.    That "[o]nce you are having an issue with a predator or predators, you have to assume that they are gang members, that they have other contacts, that they know a multitude of people in the jail that have been arrested.  They can get word passed around if they want. It's the – those that are accused of this crime, in my opinion, they should have been moved to single cells and locked up." (ECF 43-3, p. 78, ll. 9-13).

47.    That the Bay County Jail "for a full day, left the situation untouched" contradicting his previous statement that he thought it was "a

day" before Plaintiff reported the incident. (ECF 43-3, p. 79, ll. 6-7, p. 76, l.25- p. 77, l.3)

48.    When asked if he knows whether the inmates had been moved, McAndrew states "[p]ossibly.  I –I'm not sure." (ECF 43-3, p. 78, ll. 18-21).

49.    That "[w]e're dealing with guys that just killed somebody and the other one raped somebody." (ECF 43-3, p. 79, ll. 19-20).

50.    McAndrew repeatedly alludes to Plaintiff being incarcerated at the Jail on misdemeanor charges, but when asked states "[n]o he was there on a drug charge." (ECF 43-3, p. 79, ll. 23-24, p. 80, ll.5-7).

51.    That the Bay County Jail was supposed to "[a]utomatically know about video of the incident before the incident was reported. (ECF 43-3, p. 8, ll. 1-3).

52.    That McAndrew believes that Plaintiff was in the "top bunk at one time, probably for self-protection" and that it would be an "investigative assumption that if he went to ta top bunk, it would be to get as far away as possible from someone that could hurt" him. He further stated that he does not know that this applies to other times Plaintiff slept on the top bunk, "I do know about this time." (ECF 43-3, p. 82, ll. 7-12, 16-17).

53.    When asked about the process for assigning bunks at the Bay County Jail, McAndrew continuously refers to the Florida Model Jail

Standards describing the classification process, and when pressed, he states he "can't remember if there's something in the standards for – that addresses a particular bunk." (ECF 43-3, p. 83, ll. 7-24).

54.   McAndrew states that he has "to make a professional assumption that some inmates are going to be more dangerous than others simply based on the pending charges" regarding determining if someone is a dangerous felon. (ECF 43-3, p. 84, ll. 11-15).

55.   When asked about the classification process for individuals charged with sensitive and or high-profile crimes, as was the case with McCoy and Bell, being placed in protective custody, McAndrew admits that he has not reviewed documents that would confirm their needing extra protection and that he is "sure that the jail in their own defense would have provided such documentation." (ECF 43-3, p. 87, ll. 13-25).

56.   That he would pick and choose which inmates be placed in protective custody: "I would pick and choose simply based on the charge itself because that's all the jail has to go with initially. They get a very small narrative on an arrest report that gives them a little bit of information about the charge, and they have to make a decision accordingly." (ECF 43-3, p. 88, ll. 6-11).

57.    When asked if some inmates should be protected more than others simply based on what they've been arrested for, McAndrew replied "[y]es and no. There's a level of custody that's assigned to every inmate, and it could be minimum custody, or it could be closed custody or medium custody. And custody itself will tell you a lot. That's part of the classification process." (ECF 43-3, p. 88, ll. 18-25).

58.    When asked if he reviewed anything that suggested Plaintiff was being targeted, he does not answer the question, rather states "[a]s a past investigator and in reviewing this case, I would certainly have considered it as an investigator that because this man was a cripple, handicapped kind of guy, small and invisible, that he would be subject as prey." (ECF 43-3, p.89, ll.7-13)

59.    When asked about Plaintiff's "horrific" injuries he described Plaintiff receiving, McAndrew states that "McCoy gave Bell the plastic glove that fit over the end of the broom.  And when the broom was retrieved in the video the glove was no longer on the end of the broom. That's something that I remembered as well, indicating that --- strongly indicating or suspecting penetration." (ECF 43-3, p. 91, ll. 5-12).

60.    After reading the statement of a witness, McAndrew was again asked if witness statements were taken to which he replied "yes"

contradicting his earlier answer of "I don't believe so." (ECF 43-3, p. 55, ll. 22-25 and p. 92, ll. 18-20).

61.     When asked again about the "horrific" injuries he described Plaintiff having suffered, McAndrew replied, "I'm not able to find the exact wording in my report for the investigation." (ECF43-3, p. 93, ll. 20-25 and p. 94, ll. 1-5).

62.     When asked what document he reviewed regarding Plaintiff's injuries, McAndrew responded "[i]t was a medical document that I cannot put my hands on that indicated his injuries." (ECF43-3, p. 94, ll. 1-10).

63.     When asked what the injuries were, McAndrew replied, "I don't remember the exact – and I can't put my finger on that right now." (ECF 43-3, p. 94, ll. 11-13).

64.     When asked who the doctor was that examined Plaintiff McAndrew responded, "I can't remember." (ECF 43-3, p. 94, ll. 14-15).

65.     When asked where Plaintiff was examined, McAndrews stated "I believe it was at a medical center or another facility." (ECF 43-3, p. 94, ll. 18-20).

66.     When asked what facility examined Plaintiff, McAndrew replied, "I don't remember." (ECF 43-3, p. 94, ll. 21-23).

67.    In response to being asked what sexual position Plaintiff was forced into, McAndrew describes the incident stating that McCoy "attempts to push the broomstick up inmate Wells' rectum. He pushes the broomstick hard enough, and the glove comes off the broomstick." (ECF 43-3, p. 95, ll. 14-16).

68.    McAndrew states that "[a] statement was also obtained from the victim who stated that this was done against his will and without his permission." (ECF 43-3, p. 96, ll. 3-5).

69.    When asked how this rape qualifies as one of the most brutal rapes he's ever seen, McAndrew does not answer the question and states "Normal cases involving rape in jails and prison result from a predator who is so feared that the victim will allow themselves to be sexually abused, raped and will oftentimes not report it just as it happens in public. In PREA classes, officers are taught that rape is not often reported because of the humiliation or the fear of the predator or both." (ECF 43-3, p. 96, ll. 25 and p. 97, ll. 2-9).

70.    When asked if being aware of the outcome of the investigation as it pertains to charges against McCoy and Bell would matter to his opinion regarding the investigation being flawed, McAndrew states "[i]t would not matter at all because it would not be related to my work and would be outside my area of expertise." (ECF 43-3, p. 98, ll. 2-8).

71.     When asked why he did not review Plaintiff's criminal history, to determine if Plaintiff had any prior convictions for violent felonies in the past, to support McAndrew's opinion that Plaintiff was a nonviolent felon housed with violent felons, McAndrew replied "[t]hey were not identified in the classification process as having a violent history." (ECF 43-3, p. 102, ll. 7-13).

72.     McAndrew confirms that he saw in the jail records that Wells had a prior dangerous felony robbery charge, however "[h]e was still classified as nonviolent. McAndrews stated that he too would have classified Wells as nonviolent, considering the time element, the nature of the offense and whether he had served any serious time or any time all" (ECF 43-3, p. 101, l. 18 through p. 103. l.8).

73.     When asked if a person with a violent felony history, has a pending misdemeanor, he should be housed with only misdemeanors, McAndrew does not answer the question and states "[i]f an inmate is charged with a misdemeanor and has been previously charged with a very serious violent crime, it would mean that he has done time in state prison, that he has served his time for that particular crime and hopefully realized through his own redemption that crime doesn't pay." (ECF43-3, p. 103, ll. 14-24).

74.    When asked about statements made in his expert report regarding Mr. Olson and his relation to this case, McAndrew replied that his hiring had "nothing really to do with this case" then moments later says that his hiring "does have bearing on this case." (ECF 43-3 2, p. 109, ll. 2-4, 20-22).

75.    That Mr. Olson "should never have been on watch period." (ECF 43-3, p. 110, ll. 6-7).

76.    When McAndrew is asked why he did not mention PREA in his original report he states "I don't know that I did not mention in my original report. I'd have to go back and take a look at that. Because PREA certainly is the guiding light, one might say, for any kind of sexual abuse inside a place of incarceration in the United States of America according to the Department of Justice." (ECF 43-3, p. 113, ll. 8-16).

77.    When again asked why PREA was omitted from his first report, McAndrew does not answer the question but responds, "[b]ecause there's the evidence of sexual battery. It certainly falls under PREA." (ECF 43-3, p. 113, ll. 19-22).

78.    In regard to PREA being put on a criminal affidavit, McAndrew states "I believe that PREA should be listed on the document as having been

used as a guide in terms of formulating the charge (ECF 43-3, p. 118, ll. 23-25).

79.    Regarding his description of Plaintiff potentially being scared and terrified of Bell and McCoy, thus not coming forward to report the incident, McAndrew states that his description "is factual in terms of how things work with prisoners that are being raped." (ECF 43-3, p. 120, ll. 10-17).

80.    That "you never know what's going to happen in a day or two. On the 15th, 16th and 17th, there may have been a dozen reports sent in." (ECF 43-3, p. 121, ll. 13-16).

81.    When asked if Plaintiff's statement to Investigator Bailey where he says "…if he wants to do it again, I'll beat his ass" is representative of a person in fear, McAndrew stated "[m]ore so, so yes."(ECF 43-3, p. 124, ll. 5-13).

82.    That the evidence of penetration of which McAndrew formulated his opinion is based on "the video showing him going with the glove, and when he pulled the handle back from Mr. Well's anus, the glove was no longer on the end of the stick." (ECF 43-3, pp. 124-125, ll. 24-25, 1-2).

83.    That "[y]ou don't see it falling to the ground" regarding the glove. (ECF 43-3, p. 125, ll. 3-5).

84.    That the glove being stuck "[b]etween his butt cheeks would have been penetration." (ECF 43-3, p. 125, ll. 6-10).

85.    When asked if the Defendants had a duty to monitor the inmate population in real time, McAndrew responded "[w]ithout question." (ECF 43-3, p. 127, ll. 8-10).

86.    When asked if the Defendants should have noticed the incident occurring at the time it occurred, McAndrew stated, "[w]ithout question." (ECF 43-3, p. 127, ll. 13-16).

87.    When asked if the Defendants should have noticed the incident regardless of any video or reports, McAndrew replied, "[a]gain without question." (ECF 43-3, p. 127, ll. 13-16).

88.    When asked if Plaintiff should have had to report the incident "at all for them to be aware of it" McAndrew replied "[a]bsolutely". (ECF 43-3, p. 127, ll. 22-25).

89.    When asked if the Defendants "were negligent in not being aware of that pretty obvious act at the time that it happened," McAndrew said "[t]hey were indeed." (ECF 43-3, p. 128, ll. 3-7).

90.    When asked if "grabbing a glove from under a mattress and putting that glove on the end of a broomstick before the attack is an indication

of preplanning," McAndrew stated "[y]es, indeed." (ECF 43-3, p. 128, ll. 9-13).

91.    When asked if he had any documents to support that no one was monitoring the control room security computers, McAndrew replied "[y]es, it shows that there is an uncertified person who has no training in being a correctional officer, has no certification whatsoever has never been to the academy, somebody off the street sitting there that either knows what to do to doesn't know what to do because they are left without supervision. They're left alone." (ECF 43-3, pp. 131-132, ll. 25, 1-8).

92.    When reminded that he was not being asked about certifications rather he was being asked to provide evidence that no one was monitoring the video for the different pods, McAndrew again replied regarding certification "even if he was monitoring, he didn't have the training and the certification to know how to handle a situation, a serious crime being committed in front of his eyes." (ECF 43-3, p. 132, ll. 9-15).

93.    When asked if it takes special training to know that this type of incident was a bad thing, McAndrew replied "[i]n order to be legal, it certainly does require someone who's certified." (ECF 43-3, p. 132, ll. 16-21).

94.    When asked if due to this incident occurring in such a small time frame, under two seconds, that a person monitoring in the control room could

have sneezed and missed the entire thing, McAndrew stated "…I would say that if a certified trained, experienced officer was sitting there doing his job as required, would have noticed something like this going on, and he would have the evidence on the camera and he would have notified the proper security staff to come and handle the situation." (ECF 43-3, p. 133 to 134, ll. 16-25, 1-2).

95.    When asked if it is his position that uncertified law enforcement officers ever must blow their nose, or sneeze or do something that may cause them to turn away or look at one of the other monitors, McAndrew replied "[i]t is my professional opinion that uncertified people are not correctional officers, don't know what to do as a correctional officer. But if they had a correctional officer certified sitting there supervising telling them what to do and helping them as they are required to do, then the process I just mentioned could have happened." (ECF 43-3, p. 134, ll. 9-16)

96.    When asked how many monitors there are in the control room, McAndrew replied "[t]here's at least one that showed exactly what happed in this case." (ECF 43-3, p. 134, ll. 17-20).

97.    When asked if that control room was for all of C pod, McAndrew replied, "I don't know." (ECF 43-3, p. 134, ll. 21-23).

98.   When asked if it was possible that the person monitoring the monitors was looking at one of the other monitors for a few seconds when this incident occurred and missed the incident that took place, McAndrew replied "[n]o because the monitors always are in a cluster where you're looking at all of them at the same time." (ECF 43-3, p. 135 to 136, ll. 24-25, 1-6).

## CONCLUSION

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education to form a reliable opinion about an issue that is before the court." *Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010)(citing Fed. R. Evid. 702).   It is clear from a review of his deposition testimony that McAndrew is unaware of the underlying facts of the case and cannot substantiate his opinions.   Not only are his opinions unreliable based on his inability to explain the basis for his opinions, but most of his opinions offer no more insight "beyond the understanding and experience of the average citizen," as required by *United States v. Rouco,* 765 F.2d 983, 995 (11th Cir. 1985). McAndrew's opinions are due to be excluded because he improperly assigns credibility, his opinions are based on conjecture, speculation, and not based on any training, experience, or methodology of a Prison and Jail Operations

expert, his opinions are argumentative, do not provide assistance to the factfinder in understanding issues, his opinions lack foundation, offer legal conclusions, and some of his opinions, such as on medical conditions, and investigations, are in areas in which he is not trained, certified, or experienced. McAndrew also incorrectly references Constitutional requirements, e.g. the Constitution does not require that every inmate in Jail be observed by a guard every 20 minutes. See *Purcell*, 400 F.3d 1313, 1323, n.23 (11th Cir. 2005).

WHEREFORE, Defendants, Sheriff and Anglin, request this Court to enter an order excluding Plaintiff's expert witness, Ron McAndrew, in his entirety along with the opinions expressed by him in his reports and deposition.

Dated this 12th day of May, 2022.

WARNER LAW FIRM, P. A.
*/s/ Jennifer Hawkins*
JENNIFER HAWKINS
Florida Bar No. 17694
TIMOTHY M. WARNER
Florida Bar No. 0642363
501 W. 11th St. Suite A
Panama City, FL  32401
Phone No. (850) 784-7772
pleadings@warnerlaw.us
*Counsel for Defendants: Sheriff and Rick Anglin*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

The undersigned hereby certifies that he complied with the attorney-conference requirement of Local Rule 7.1(B). Counsel for the Defendant Sheriff conferred with Plaintiff's Counsel, and Plaintiff's Counsel objects to the relief sought herein.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F), I hereby certify that the foregoing motion and memorandum is 7,031 words in length.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was filed via CM/ECF this 12th day of May 2022, which will send notice to all counsel of record.

*/s/ Jennifer Hawkins*
JENNIFER HAWKINS
Florida Bar No. 17694