UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ROBERT GENE WELLS,
        Plaintiff,

v.                                        CASE NO.:  5:21-cv-00019-TKW-MJF

TOMMY FORD, in his official capacity as
SHERIFF of BAY COUNTY, and RICK ANGLIN,
In his supervisor capacity

        Defendants.

---

### DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Tommy Ford, in his official capacity as Sheriff of Bay County, Florida and Rick Anglin, in his supervisory capacity, hereby file their Joint Reply to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [ECF 60], and state:

### I.     Alleged Material and Disputed Facts

Plaintiff alleges that "[d]isputed issues of material fact remain," which would justify denying Defendants' Motion for Summary Judgment. However, Plaintiff's position is not supported by the undisputed, record evidence. Plaintiff's alleged disputed issues of fact are nothing more than conclusory statements, unsubstantiated opinions, and misrepresentations of the record evidence. It is insufficient for the facts to simply be disputed; the dispute must

be "genuine." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### a.   Sheriff is the Final Policymaker

Plaintiff attempts to rely on *Carnley v. Sheriff of Bay County, Florida*, 5:17-cv-00085-RH-GRJ, 2018 WL 1903126, at *2 (N.D. Fla. Apr. 20, 2018), and a 2009 memorandum from former Sheriff Frank McKeithen to establish that Anglin is the final policymaker at the Jail. That reliance is misplaced.

As to the 2009 memorandum, Sheriff McKeithen was not the Sheriff on June 13, 2018, and that memorandum was rescinded by Sheriff Tommy Ford when he took office.[1] [ECF 48-3]. Additionally, Sheriff changed the designations that were enacted by Sheriff McKeithen by implementing organizational charts and a chain of command. [ECF 48-4, 48-6, 48-7, and 48-8]. Under Sheriff, Anglin is no longer designated as a chief deputy or warden. [ECF 61-54: 6:1-25, 7:1-6, and 9-12]. Heape testified, and it is undisputed, that the Sheriff "may delegate authority but retains control of all tasks and duties." [ECF 61-54: 29:5-23, and ECF 48-4, p. 3]. Furthermore, Heape testified, and the policy reflects, that Anglin was merely "appointed" by Sheriff to oversee the Jail on Sheriff's behalf and the duties of Chief Correctional Officer were "delegated" to Anglin, but the Sheriff maintained

---

[1] The memorandum referenced by Plaintiff also indicated the authority was "delegated" to Anglin, which under Florida law, a Sheriff may delegate authority and not surrender his role as final policymaker, nor does such delegation make someone a final policymaker.

control of all tasks and duties. [ECF 61-54:  31:2-23].

Furthermore, in *Carnley*, there was never a court order which found that Anglin was the final policymaker. Rather, trial counsel in *Carnley* stipulated Anglin was the final policymaker; therefore, the issue was not litigated.[2] Trial counsel in the instant case has made no such concession regarding Anglin's role.

Specifically, "[a]n official does not have final policymaking authority over a particular subject matter when that official's decisions are 'subject to meaningful administrative review.'" *Dixon v. Hansell*, 844 Fed.Appx. 198, 201 (2021) citing *Scala*, 116 F.3d at 1401. If the official's actions are reviewable or someone possesses the power to reverse or amend the official's decision, then that official is not a final policymaker." *Dixon*, 844 Fed.Appx. at 201. See *Scala*, 116 F.3d at 1402-03; *Morrow v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997). In this case, it is undisputed that Anglin reported to Sheriff, and Anglin's decisions concerning the Jail were reviewed and reviewable by the Sheriff.  [ECF 48-4, 48-6, 48-7, and 48-8].

---

[2] Anglin was not a named party in *Carnley* and did not have a full and fair opportunity to litigate the issue. See *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000) and *Greenblatt v. Drexel*, 763 F.2d 1352 (11th Cir. 1985).

Plaintiff can "refute an assertion that an official is not a final policymaker by demonstrating that the reviewing body's (in this case the Sheriff) administrative review is not meaningful. *Dixon*, 844 Fed.Appx. at 201-02 citing *Scala*, 116 F.3d at 1401. However, simply stating Sheriff "might review [the jail procedures] first," without any supporting evidence is insufficient. The undisputed, record evidence verifies Sheriff was and is the final policymaker, made meaningful reviews of Anglin's actions and the Jail's policies and procedures, and was the one ultimately responsible for the Jail. See *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003).

### b.    The Breakdown of the C-Dorm

Plaintiff claims that C-4 is for behavioral observation and those inmates **with mental disabilities**; however, the record evidence establishes C-4 is behavioral observation and overflow of administrative confinement. [ECF 48-29]. Behavioral observation is defined as the close observation of an inmate exhibiting behavior indicative of a mental condition that poses a threat to the safety and security of the inmate, inmate population and/or daily operation of the facility. [ECF 61-6]. The Jail's procedure 606.00 specifically states that behavioral observation is **not** to be utilized for inmates who are "special needs inmates" as defined by the Florida Model Jail Standards. [Id. (emphasis added)]. C-4 is considered a "behind the door" pod, where

inmates are kept in a two-man cell, with the cell door closed for a vast majority of the time. [ECF 61-45: 95:13-25 and 96:1-6]. An inmate who is in C-4 does not have the same freedoms or privileges as those inmates who are not "behind the door." [ECF 61-53: 96:7-25 and 97:1-19].

There is no record evidence that Plaintiff committed any offenses or was exhibiting behaviors that would require observation, which would merit the loss of his privileges by being placed in C-4 and "behind the door" at the time of the incident. [ECF 61-53: 18:23-25 and 19:1-3]. Housing an inmate in C-4 without justification would be tantamount to an "unfounded punishment," and would be inappropriate housing placement. [ECF 61-52: 26:8-25 and 27:1-21].

C-1 is a protective custody dorm, designed for inmates that need additional protection from general population but have no basis to be "disciplined" and lose their privileges. [ECF 61-52: 27:16-20]. It is a unit that is known to have very few issues with inmates being violent. [ECF 61-45: 22:5-24 and 128:13-15]. This record evidence is supported by the statement of inmate Anderson in his sworn deposition testimony when he stated there may be some violent inmates in C-1, but most of the violent inmates were not in C-1. [ECF 61-50, 29:11-17].

### c.   The Jail was Compliant with PREA

The undisputed record evidence established the Jail was complying with PREA reporting requirements. [ECF 48-28]. Thus, failure to comply with PREA is not relevant to his case, and Plaintiff's reference to training coordinator Olson is a red herring. There is no record evidence that Olson was involved or had any knowledge of the incident involving Plaintiff, or that there was some deficiency in training caused by Olson.

### d.   Facts related to Bell and McCoy

There is no record evidence that Bell was involved in an incident in which "he was accused of sexual assault by another inmate."  ECF 61-26, pp. 47-48, involves an accusation **by** Bell that another inmate inappropriately touched him, and the other inmate in turn accused Bell of "verbally approaching him about a possible sexual liaison," making Bell an alleged victim not a perpetrator. Additionally, the case was closed as unsubstantiated. [ECF 61-26, p. 47].

Plaintiff's allegation that "Bell was known to engage in physical altercations with other inmates" is not supported by the record evidence. The record evidence establishes that Bell, according to Anderson, got into one physical altercation with Anderson at some point prior to the incident involving Wells, which Anderson did not report, and that Bell "did get into

arguments with other inmates as well." [ECF 61-50: 16:3-15]. Thus, the undisputed, record evidence establishes, at most, that Bell was involved in one physical altercation with Anderson, which the Jail would not have been aware of because Anderson did not report it.

Plaintiff alleges McCoy's prior criminal history includes sexual battery, referencing ECF 61-33, pp. 6-7, which includes the charges McCoy was in jail on at the time of the incident, and the added charge, principal to sexual battery, arrest date of 6/19/2018. Thus, the undisputed, record evidence establishes McCoy's history prior to the incident with Plaintiff did not include sexual battery.

### e.   Plaintiff neither received nor reported threats

Plaintiff notes that Anderson informed Bailey in his sworn statement that Bell would "pick on" Plaintiff and "call him names." [ECF 61-50: 24:6-12]. However, there is no record evidence that there were specific threats made to Plaintiff by Bell, or anyone else. Nor is there any record evidence that this information was known to anyone at the Jail prior to the incident on June 13, 2018.

### f.   Plaintiff's transfer to FSH is not disputed, nor material

As with Olson, Plaintiff's transport to FSH is a red herring. The facts are not in dispute, there are court minutes from May 17, 2018, that note the

Plaintiff was to be involuntarily committed, directing his defense attorney to prepare an order. That, however, has no bearing on the Jail's ability to transport Plaintiff to the FSH, as only an order confers authority, not a "minutes sheet." [ECF 61-49: 25:24-25 and 26:1-16] Thus, the BCJ had no ability to transport Plaintiff until after the order was signed and certified, which took place on June 13, 2018. In addition to needing a signed certified order, the Jail was reliant upon the FSH to notify them they had space for Plaintiff. [Id. at 22:6-15]

## II.    Deliberate Indifference

Plaintiff alleges the constitutional violation was failure to protect, which requires Plaintiff to demonstrate a genuine issue for trial with more than unsupported and conclusory allegations that there was a substantial risk of harm, the defendants' deliberate indifference to that risk, and causation. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102 (11th Cir. 2014). A failure to protect claim can be based on (1) the inmate being a target of a specific threat or (2) dangerous conditions at the jail. *See Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016).

Plaintiff alleges, without any supporting record evidence, the conditions at the Jail were "extreme and posed an unreasonable risk of serious injury" to him. However, the undisputed, record evidence establishes that the Jail,

like other facilities, has limited housing locations, and through the classification process, the employees of the Jail make the best decisions possible to keep inmates safe from other inmates. C-1, protective custody, was used to protect inmates from the general population inmates, while not restricting their privileges. [ECF 61-46: 19:15-23, 20:2-17; and 61-53: 9:10-20, 18:8-22]

There is no record evidence to suggest that inmates with Plaintiff's mental or physical limitations were routinely attacked in C-1. The undisputed, record evidence is that C-1 is the location in the Jail where the mentally or physically infirmed inmates are placed for their own protection, [ECF 61-52: 27:24-25 and 28:1-2], and that it was a unit in the Jail with the fewest issues. [ECF 61-45: 22:5-24 and 128:13-15]. There is no record evidence to substantiate an "extreme and unreasonable risk" of serious injury to anyone, much less Plaintiff, and there is no record evidence of prior acts of violence taking place in C-1 to substantiate Plaintiff's claim.

Plaintiff argues the extreme condition was Plaintiff's physical and mental condition rather than the Jail itself because there are no prior acts of violence in C-1, nor are there any prior acts of violence by Bell or McCoy against Plaintiff that would make the Sheriff or Anglin liable. Defendants do not dispute that Plaintiff was deemed incompetent and had physical

limitations; however, there is no record evidence to support Plaintiff's opinion that he could not function in C-1, and that because of his mental or physical condition, C-1 was improper classification.

The record evidence supports that Plaintiff, who is successfully residing in a group-home, not a locked down institution, was able to follow the procedures of the Jail, such as completing sick call requests, requesting medicine for things such as a tooth ache or glasses. [ECF 61-38, pp. 17, 20, 22, and 25]. He requested crutches, as he wanted to build up his leg strength and not be as reliant on his wheelchair. Plaintiff even requested the Jail give him a job so he could earn money for his canteen. [Id.] The undisputed, record evidence is that Plaintiff was aware of his surroundings and operated within the Jail. [ECF 61-51: 15:23-25 – 16:1-5].

Contrary to Plaintiff's argument that *Malone v. Butler*[3] does not apply, in *Malone*, the plaintiff, a disabled individual, claimed that the defendants subjected him to cruel and unusual punishment when they placed him in the cell with two able-bodied prisoners and failed to protect him from assault by them. While Plaintiff argues that *Malone* is distinguishable because the prison was for the aged and infirm, it is clear that the court addressed the

---

[3] *Malone v. Butler*, 6:11-CV-00453-RDP, 2012 WL 4009345, at *5 (N.D. Ala. Aug. 20, 2012), report and recommendation adopted, 6:11-CV-453-RDP-HGD, 2012 WL 4009341 (N.D. Ala. Sept. 7, 2012)

issue of placing handicapped inmates with non-handicapped inmates, which aligns with Plaintiff's allegations against the Sheriff and Anglin. Additionally, like in *Malone*, Plaintiff points to no cases that hold that disabled and non-disabled inmates should not be housed in the same cell or unit together, and as such, there is not a clearly established right that Plaintiff would have to be housed in C-3 or C-4 due to his mental or physical limitations.

Additionally, Plaintiff fails to acknowledge his lengthy incarceration history. While Plaintiff refers to himself as a "non-violent offender," in looking at Plaintiff's criminal history, during the classification process, Plaintiff has a history of controlled substances, driving charges, a robbery, a robbery with firearm, child abuse, and battery charges. [ECF 63-1]. Thus, while Plaintiff's present charges were for non-violent offenses, he would not necessarily be classified as a "non-violent offender" as the classification process takes into account prior criminal history.

The undisputed, record evidence establishes Plaintiff had several periods of incarceration at the Jail after his accident in November 2016, wherein he suffered head trauma. The record evidence demonstrates that Plaintiff was incarcerated in 2017 for some period of time in both the A-Dorm and the G-Dorm, or general population dorms, with no issues and it was not until 2018 that Plaintiff was placed in the C dorm. Thus, there is nothing in

the record evidence to suggest that Plaintiff's physical or mental condition itself presented this "extreme risk" that was known to Defendants.

Even assuming *arguendo* that Plaintiff's mental and physical infirmities satisfy the first element, that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm, Plaintiff fails to prove the second element, that the Defendants had a sufficiently culpable state of mind, amounting to deliberate difference. *Caldwell*, 748 F. 3d at 1099. The record evidence is upon his initial entry into the Jail, Plaintiff was placed in behavioral observation, having come from FSH, and that at some point he was moved to C-2, and then to C-1.  There is no record evidence that he was placed in C-4 for his own protection from a perceived threat to him, rather it was the behavioral observation unit, and deemed appropriate placement based upon his return from FSH. There is no record evidence that C-1 was any less safe for Plaintiff. There is no record evidence of inmates attacking disabled inmates in C-1, and there were no specific threats from any of the inmates housed in C-1 towards Plaintiff.

The undisputed, record evidence is that C-1 houses individuals who need extra protection from general population, is a unit with the fewest disciplinary issues in the Jail and is a unit that would be completely appropriate to house someone like Plaintiff. Thus, there is no undisputed,

record evidence to suggest otherwise, and Plaintiff clearly fails to establish the second component. Record evidence supports that placing Plaintiff in C-1 was objectively reasonable because Plaintiff never experienced issues in general population during prior periods of incarceration after his head injury, there were no known incidents in C-1 of violence on handicapped inmates, nor were there any specific threats by any of the inmates towards Plaintiff.

Additionally, Plaintiff has brought this claim against the Sheriff in his official capacity and Anglin in his supervisory capacity, as there is no record evidence of either the Sheriff or Anglin having knowledge that Plaintiff was in the Jail in June 2018, that he was suffering from any mental or physical disabilities in June 2018, or that either participated in the classification process for Plaintiff, Plaintiff's claim must overcome the additional required elements for supervisory liability and/or *Monell* liability, which Plaintiff cannot do, and the Sheriff and Anglin are entitled to summary judgment.

## III. <u>Supervisory Liability & *Monell*</u>

To establish *Monell* or supervisory liability, Plaintiff must establish that the Sheriff's policy, and Anglin's enforcement of said policy, was the moving force behind the alleged constitutional violation, which Plaintiff cannot do. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (2985).

In *Sandlin v. Conner*, 515 U.S. 472, 481-82 (1995), the Supreme Court held that prison regulations are not intended to confer Constitutional rights or benefits on inmates but are designed to guide correctional officers in the administration of prisons. Mere violations of agency regulations do not raise Constitutional questions. See *United States v. Caceres*, 440 U.S. 741, 751-51 (1979). In this case, Plaintiff cannot establish that any policy of the Sheriff was violated by placing Plaintiff in the C-1 dorm or that the policy itself created a constitutional violation.

The record evidence is that there was a policy in place at the Jail that directed "all efforts will be made to assist incoming inmates who have special needs," [ECF 61-4, p.4(11)] along with a policy pertaining to classification, 503.00 [ECF 61-5]. Policy 503.00 details the classification process. It provides in section 5(d) how inmates should be housed whenever possible, *i.e.*: adult male felons housed together. The undisputed, record evidence establishes Plaintiff was charged with possession of methamphetamine, a felony of the third degree, and had prior violent charges, including, but not limited to, child abuse and robbery. Thus, he was due to be housed, and was housed with, other males charged with felony crimes.

Furthermore, the Sheriff has a policy related to "Special Housing of Inmates," and there is no evidence that it was the policy, practice, or custom

of the Sheriff "to house violent and high-profile felons in C-1's protective custody dormitory for their own safety, because their crimes were so public or egregious that they could not be safely housed in general population" as Plaintiff speculates. Rather, Policy 503.00 6. states it applies to "those who present a threat to the staff, other inmates, medical reasons, or threat to themselves." [ECF 61-5]. Specifically, 503.00 6.d. provides guidance on protective custody and states: "Inmates may be kept separate from the general population for [their] own protection." [ECF 61-5]. The policy even gives inmates the ability to object to their placement in Protective Custody, C-1, which the record evidence establishes Plaintiff, while capable of submitting requests as evidenced above, did not submit an objection to his placement in C-1.

There is no record evidence to suggest the policy on its face is unconstitutional, thus, the Court must look to any record evidence that Sheriff or Anglin were on notice that the policy was deficient in a manner that led to constitutional violations, of which there is none.[4] As there is no record

---

[4] *See Estate of Owens*, 660 Fed. Appx. at 773, finding that it could not be said that the security procedures utilized by GEO employees were generally known to subject inmates to a strong likelihood of an excessive risk of violence, therefore granting summary judgment was proper. *See also Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014), where the Court held that absent a showing of regular or constant violence, procedures used by a prison, even if deficient, do not amount to deliberate indifference of violate the Eighth Amendment's cruel and unusual punishment clause.

evidence of any prior "attacks" or incidents involving mentally or physically disabled individuals by able-bodied individuals in C-1, the policy itself is not such that it can be said to be the moving force behind Plaintiff's alleged constitutional violation such that Sheriff can be held liable under *Monell*, or Anglin under a theory of supervisory liability. Additionally, as to the Jail's classification policy, Courts have held that "the constitution does not require elaborate prisoner classification at the jail level… even at the penitentiary level prisoner classification is confined to the sound discretion of prison officials, under state law. It is only when the officials fail to protect prisoners from homosexual attacks, personal violence, or unnecessary contact with the contagiously ill that the federal courts are warranted in entering the classification picture." *Jones v. Diamond*, 594 F.2d 997, 1016 (5th Cir. 1979), on reh'g, 636 F.2d 1364 (5th Cir. 1981), *see also Estate of Owens*, 660 Fed. Appx. at 773.

Plaintiff's theory that simply leaving a broom out, without anything more, somehow creates a custom that is the moving force behind an alleged constitutional violation is not supported by any record evidence. The undisputed facts establish, prior to the broom being used against Plaintiff, the broom had not been used to harm anyone. *King v. Anderson*, 2014 WL 2504549, at *8 (M.D. Ala. June 2, 2014) (a broom is not ordinarily used as a

weapon, and the broom's form was not altered to create something more dangerous, and the inmates involved in the altercation did not have a history of violence toward one another, thus no way to know a broom handle would be used as a weapon against an inmate). Based on *King*, a practice or custom of allowing a broom to remain in a dorm with inmates, without prior knowledge that the broom was used to harm anyone, is not sufficient to establish *Monell* or supervisory liability, and the Sheriff and Anglin are entitled to summary judgment.

## IV.   ADA Compliance

Plaintiff's argument that because of his disability he should have been housed in C-3 or C-4 (the administrative segregation units for disciplinary segregation and behavioral observation) fails without any record evidence that Plaintiff's disability necessitated it, it was requested, or that it would have been safer, as "violent" inmates are also housed in those units. [ECF 61-5, p. 4 (6.b.)]. According to the Jail, the behavioral observation unit is not a designated unit to house inmates who are "special needs inmates" as defined by the Florida Model Jail Standards. [ECF 61-6, p. 3 (D.5.)]. The administrative segregation and disciplinary segregation units are for inmates who exhibit, or have a history of, aggressiveness towards other inmates, present a threat, disrupt security, and/or are subject to disciplinary actions.

[ECF 61-5, p. 5-6 (6.e.-f.)]. The record evidence is that inmates housed in C-3 and C-4 are considered "behind the door" and have many of their privileges restricted. [ECF 61-52: 26:18-25 – 27:1-15].

By contrast, C-1 is the unit in the Jail where inmates, including those with mental and physical disabilities, were kept separate from the general population for their own safety, without punishment or loss of privileges. [ECF 61-5, p. 4 (6.d.); 61-52: p.27:16-25, and 28:1-3]. There is no record evidence that Defendants discriminated against Plaintiff by placing him in C-1. Rather, the undisputed, record evidence establishes by placing Plaintiff in C-1, he was not discriminated against, he was still entitled to privileges, and his physical and mental needs were being met. Plaintiff's suggestion is exactly what the ADA is designed to prevent, i.e.: individuals with disabilities being subjected to what are effectively the "punishment dorms" because of their disabilities. Additionally, there is no record evidence to support a finding that the Sheriff knew placing Plaintiff in C-1 would pose any risk, as previously stated, and the Sheriff is entitled to summary judgment because the Jail complied with the ADA and Plaintiff was not discriminated against because of his physical and mental disabilities.[5]

---

[5] It is clear from the record evidence Defendants accommodated Plaintiff by providing him a walker as he desired to "build up his leg strength."

## V.  <u>Negligence</u>

Sheriff is not liable for the harm caused to Plaintiff because Sheriff was not negligent, nor did Plaintiff establish Sheriff negligently supervised or trained his employees.

According to *DeShaney v. Winnebago Cty Dep't of Soc. Servs.*, 489 U.S. 189, 198-99 (1989) a duty of care exists when "(1) the state takes a person into custody, confining him against his will and leaving him unable to care for himself; and (2) the state creates the danger or renders a person more vulnerable to an existing danger." The duty of care is a requirement that "poses a question of law that the court must answer before permitting a negligence claim to proceed before the trier of fact." *Id.* at 1046.

The undertaker doctrine provides that "one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care." *Union Park Memorial Chapel v. Hutt*, 670 So. 2d 64, 66-67 (Fla. 1996); See also *Wallace v. Dean*, 3 So. 3d 1035, 1040 (Fla. 2009). According to *Wallace*, the undertaker doctrine applies to both governmental and non-governmental entities. *Wallace*, 3 So. 3d at 1051. The undisputed, record evidence in this case establishes that Sheriff acted with reasonable care in the classification and confinement of Plaintiff.[6]

---

[6] Inmate Anderson stated that correctional officer Burkett "took immediate action to

A person is liable to another for physical harm that results "from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care *increases the risk of such harm, or* (b) the *harm is suffered* because of the *other's relied upon the undertaking*." *Id.* (Emphasis supplied).

The facts and circumstances in *Wallace* are different from the case here; in *Wallace*, the deputies "responded to the scene, entered a home, engaged the unconscious resident, provided an assessment of her safety, and further, assured concerned third parties that she was simply asleep and did not need medical attention." *Id.* at 1052. The Supreme Court of Florida found the deputies' behavior satisfied "the requirements of the undertaker's doctrine because the deputies, in a position of authority, increased the risk of harm that the decedent faced by inducing third parties – who would have otherwise rendered further aid (and actually requested that the deputies provide additional assistance, but were rebuffed) – to forebear from doing so. *Id.*

In this case, it is undisputed that Plaintiff never filed a complaint with the Sheriff or anyone else associated with the Sheriff regarding his

---

ensure the safety of Mr. Wells" as soon as he was made aware of the allegation on June the 14, 2018. [61-50:11:10-20].

confinement in C-1 or his treatment by other inmates. It was only after the incident by Bell and McCoy, that another inmate, later identified as Anderson, anonymously reported the incident and Plaintiff initially denied it until later investigation by the correctional staff located the video of the incident.

Sovereign immunity is waived "'under circumstances in which the . . . agency, if a private person, would be liable to the claimant, in accordance with the general laws of this state.'" *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005) *citing* Fla. Stat. § 768.28(1). An exception to the waiver exists "if the challenged acts of the state agent were 'discretionary' governmental acts rather than merely 'operational' ones." *Id. citing Lewis v. City of St. Petersburg*, 260 F. 3d 1260, 1266 (11th Cir. 2001) (citing *Dep't of Health & Rehab. Servs. v. Yamuni,* 529 So. 2d 258, 260 (Fla. 1988)). "Florida's discretionary function exception to the waiver of sovereign immunity applies when 'the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning.'" *Id. citing Henderson v. Bowden*, 737 So. 2d 532, 538 (Fla. 1999).

A discretionary function is one that includes "development and planning of governmental goals and policies." *Lewis*, 260 F. 3d at 1266. An

operational function is one "'not necessary to or inherent in policy or planning that merely reflects a secondary decision as to how those policies or plans will be implemented.'" *Id.* (citation omitted). For the negligence claim, Plaintiff is challenging "the reasonableness of basic policy decisions made by the Sheriff, and the constitutionality of the classification policy;" thus, "the 'discretionary' function exception to the waiver of sovereign immunity applies and [the] claim is barred." *Id.*, see also, *McCreary v. Brevard Cnty., Fla.,* 609-CV-1394-ORL-19DA, 2010 WL 2509617, at *10 (M.D. Fla. June 18, 2010), *on reconsideration,* 6:09-CV-1394-ORL, 2010 WL 2836709 (M.D. Fla. July 19, 2010), and *aff'd sub nom. McCreary v. Parker*, 456 Fed. Appx. 790 (11th Cir. 2012). There is no record evidence that establishes the implementation of the classification policy was performed incorrectly; thus, Plaintiff's argument fails, and Sheriff is entitled to summary judgment.

Plaintiff generically alleges that Sheriff's decision to train and/or supervise his deputies was insufficient and therefore somehow negligent. However, as established in *Lewis*, Sheriff's employee training is "clearly an exercise of government discretion regarding fundamental questions of policy and planning. *Id.* at 1281. Furthermore, it is well established in Florida that supervision and/or training are discretionary acts, which are an exception to

the waiver of sovereign immunity.  *Ermini v. Scott*, 249 F. Supp. 3d 1253, 1280 (M.D. Fla. 2017).

"There is no duty on the part of an entity to train or supervise officers regarding a particular issue unless and until it is shown that the entity was on notice that there was a problem of constitutional magnitude, and even then, that the entity was deliberately indifferent to that knowledge and the need to train or supervise." See *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998).  The Plaintiff cannot point to any evidence that there was an issue with his employees' training and/or supervision that is sufficient to put Sheriff on notice that such training was needed. Furthermore, there is no evidence that the employees violated Sheriff's policies by placing the inmate in C-1.

A governmental entity is immune from tort liability arising from the performance of its discretionary governmental functions. *Trianon Park Condo. Assoc. v. City of Hialeah*, 462 So.2d 912 (Fla. 1985). Governmental activity which involves planning and policy judgments do not give rise to the limited wavier of sovereign immunity under section 768.28, Florida Statutes. The separation-of-powers doctrine necessitates that certain policymaking, planning or judgmental governmental functions cannot be the subject of traditional tort liability. *Labance v. Dawsy*, 14 So. 3d 1256, 1260 (Fla. 5th DCA 2009). Municipalities are immune from suit for "planning level activities

such as creating policies and procedures…"  See *Trianon* at 917.

There is no evidence that Sheriff's employees did anything contrary to policy, nor is there any record evidence that Sheriff's employees did anything contrary to clearly established and existing law by placing the Plaintiff in C-1. Therefore, Sheriff is entitled to sovereign immunity and summary judgment.

## VI.   Conclusion

Those who oversee and control jails are tasked with accommodating human beings, not just inmates that fit squarely into a male/female, felon/non-felon box.  The undisputed, record evidence establishes the Jail houses female inmates separate from male inmates, the Jail has multiple general population dorms for males, and segregates the male inmates based on their offense classification, as well as a separate area for juveniles.  The Jail also has the C dorm, which is designated as special housing, behavioral observation, suicide precaution, administrative segregation, and protective custody. Thus, the Defendants have taken all possible steps to accommodate for the infinite possibilities faced when housing inmates of all conditions within the confines of reality.

There is no record evidence that the Defendants are liable for deliberate indifference for failing to protect Plaintiff, violating the ADA, or that

Sheriff was negligent in his training or supervising of his staff. Furthermore, Anglin is entitled to Qualified Immunity. Thus, Defendants are entitled to summary judgment as a matter of law.

WHEREFORE, Defendants respectfully request that this Court grant their Motion for Summary Judgment as to all claims brought against them.

Dated this 17th day of June 2022.

*/s/ Jennifer A. Hawkins*
JENNIFER A. HAWKINS
Florida Bar No. 0017694
TIMOTHY M. WARNER
Florida Bar No. 0642363
501 West 11th Street, Suite A
Post Office Box 1820 (32402)
Panama City, Florida 32401
Phone No. (850) 784-7772
pleadings@warnerlaw.us
*Counsel for Defendants*

## WORD LIMIT CERTIFICATION

Pursuant to Local Rule 7.1(F), I hereby certify that, according to the word-processing system used to compile this motion, the combined motion and memorandum in support is 5,334 words in length.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed via CM/ECF this 17th day of June 2022, which will send notice to all counsel of record.

<u>*/s/ Jennifer A. Hawkins*</u>
JENNIFER A. HAWKINS
Florida Bar No. 0017694