## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**CINDY HARRISON**, as legal
guardian of Robert Gene Wells,

     **Plaintiff,**

v.                              **Case No. 5:21cv19-TKW-MJF**

**TOMMY FORD**, in his official capacity
as Sheriff of Bay County, Florida, and
**RICK ANGLIN**, in his supervisory capacity,

     **Defendants.**
_____/

## ORDER GRANTING SUMMARY JUDGMENT ON FEDERAL CLAIMS AND REMANDING STATE LAW CLAIMS TO STATE COURT

     This case is before the Court based on Defendants' motion for summary judgment (Doc. 52). Upon due consideration of the motion, Plaintiff's response in opposition (Docs. 60), Defendants' reply (Doc. 64), Plaintiff's sur-reply (Doc. 71), and the evidence submitted by the parties,[1] the Court finds for the reasons that follow that Defendants are entitled to summary judgment on the federal claims and that the state law claims should be remanded to state court.

### Parties

     Plaintiff is the sister and legal guardian of Robert Gene Wells.

_____

[1] Collectively, the parties submitted over 2,000 pages of evidence. *See* Docs. 48-1 through 48-75, 49, 50, 54, 61-1 through 61-55, and 63-1.

Mr. Wells is cognitively and physically disabled as the result of a car accidents in 2015 and 2016. He has low intellectual functioning, impaired speech patterns, and memory difficulties. He also has difficulty walking and uses a walker to get around.

Defendant Tommy Ford (Sheriff Ford) was, at all times pertinent to this case, the Sheriff of Bay County. He was ultimately responsible for the operation of the Bay County Jail (the Jail) as the "chief correctional officer" (CCO) of the Bay County Correctional System, although he had the authority to—and did—delegate those duties.

Defendant Rick Anglin (Warden Anglin) was, at all times pertinent to this case, the highest ranking official at the Jail, and in his capacity as Major of Judicial Services, he was delegated the duties of the CCO. Warden Anglin "command[ed] the Jail" and was responsible for establishing the Jail's policies and procedures at the Jail, but his decisions were subject to review by Sheriff Ford.

## Undisputed Material Facts

In October 2016, Mr. Wells was booked in the Jail after being arrested for possession of methamphetamine with the intent to sell (a second-degree felony)[2] and several misdemeanors. He was released on bond, but he was re-arrested after he failed to appear in court.

---

[2] *See* §893.13(1)(a)1., Fla. Stat.

When Mr. Wells was re-booked into the Jail in August 2017, he was given a "medium" custody classification based on his charges and his prior criminal convictions.[3]  That classification authorized Mr. Wells to be placed in an open bay dorm.

Mr. Wells was housed in general population dorms without any incident until October 2017 when he was transferred to the Florida State Hospital after the state court found him incompetent to proceed.

Mr. Wells was returned to the Jail on April 27, 2018.  Upon his return, Mr. Wells was placed in the segregation dorm—the C Dorm—which houses inmates who need to be separated from the general population for their own safety or the safety of other inmates or jail staff.

The C Dorm was comprised of four pods:  C-1, which was for protective custody; C-2, which was suicide precaution, C-3, which was administrative and disciplinary segregation; and C-4, which was behavioral observation.

Mr. Wells was initially housed in the C-4 pod, but he was moved to the C-2 pod on May 22, 2018, and three days later, he was moved to the C-1 pod.

There is no evidence that Mr. Wells exhibited behaviors that required the type of close observation (and the resulting loss of privileges) that was provided in the

---

[3] Mr. Wells' prior convictions include drug offenses, robbery, child abuse, and battery, but those offenses predated his injuries.

other pods in the C Dorm, and it is undisputed that he was placed in the C-1 pod for his own protection (because of his disabilities) and because he needed a low bunk.

Inmates Diontez McCoy and Travis Bell were also housed in the C-1 pod when Mr. Wells was moved into that pod.

McCoy was being held on charges of possession of a firearm by a convicted felon and second-degree murder, and he was housed in the C-1 pod because he was "tied to a recent high-profile murder." McCoy was initially given a "medium" security classification, but his classification was increased to "high" after the murder charges were added.

Bell was being held on charges of child molestation and he was being housed in the C-1 pod because the nature of his charges put him at risk of harm if he was housed in the general population. Bell was given a "high" security classification because of the nature of his charges.

On June 13, 2018, Mr. Wells was using his walker to go to the shower in the C-1 pod. He was not wearing pants because he had soiled himself.

As Mr. Wells was walking to the shower, Bell placed a rubber glove that he got from McCoy on the end of a broom that was leaning up against the wall in the common area of the pod. Bell then ran up behind Mr. Wells, shoved the broom into his buttocks. Bell then ran off and replaced the broom against the wall. Mr. Wells did not react to the assault and he kept walking towards the shower.

4

The entire incident was captured on video and only lasted about 30 seconds, from the time that Bell directed McCoy to get the glove to when Bell replaced the broom against the wall.  The actual assault lasted less than five seconds.  The video shows that the assault was fairly unremarkable and not particularly violent, but it was criminal and should not have happened.

Mr. Wells did not report the incident to Jail staff, but after another inmate reported the assault, an investigation was conducted.  Mr. Wells initially told the investigator that the incident did not occur, but after the investigator reviewed the video and saw the incident, Mr. Wells provided a sworn statement that Bell "poked [him] in the butt" and that he "tried to" insert the broom into his anus.

After the incident, Mr. Wells was moved to the C-3 pod for his protection. Shortly thereafter, pursuant to a state court order, Mr. Wells was transferred to the Florida State Hospital for an evaluation regarding involuntary civil commitment.[4]

A week after the incident, Mr. Wells told staff at the Florida State Hospital that another inmate had placed a broom handle between his legs but that there had been no penetration.  A medical examination was conducted and no injury was observed.

---

[4]  The state court's order was signed on the day of the incident and received by the Jail the day after the incident, but there is no evidence that the timing of the order had anything to do with the incident at issue in this case.

Bell and McCoy were both criminally charged based on the incident.  Bell was charged with sexual battery and McCoy was charged with principal to sexual battery.  They both ultimately pled no contest to reduced charges.

The Jail has procedures to prevent, detect, report, and investigate incidents involving inmate sexual abuse and sexual harassment, as required by the Prison Rape Elimination Act (PREA).[5]

From 2016 to the date of the incident at issue in this case, there were only three substantiated PREA incidents at the Jail and none of those incidents occurred in the C-1 pod and none involved Bell or McCoy.  Bell was identified in a PREA report—as the victim, not the aggressor—but that report was unsubstantiated.

There is no evidence that Bell or McCoy made any specific threats against Mr. Wells before the incident at issue in this case.[6]

There is no evidence that incidents like the incident in this case ever occurred in the C-1 pod, much less that such incidents were common.  Indeed, the evidence is undisputed that the C-1 pod has very few issues with inmate violence.

---

[5]  Pub. L. No. 108-79, 117 Stat. 972 (2003) (codified as amended in 34 U.S.C. §30301, et seq.).

[6]  The Court did not overlook that the inmate who reported the incident told the investigator that Bell constantly picked on Mr. Wells by "joking around calling his name and getting him riled up," but there is no evidence that this conduct involved physical threats or that Jail staff was aware of this conduct.

Neither Sheriff Ford nor Warden Anglin was personally involved in any of the classification or housing decisions related to Mr. Wells, Bell, or McCoy.

Classification decision are made by a "classification counselor" pursuant to a standard procedure.  Among other things, the procedure provides that "dangerous felons shall be housed separately from misdemeanants."  The procedure also includes criteria for housing of "special needs inmates"—i.e., those who present a threat to the staff, other inmates, medical reasons or threat to themselves—and it provides that housing for inmates with medical needs "will be based on a combination of needs and his/her security designation."

### Procedural History

In September 2020, Mr. Wells filed a complaint against Sheriff Ford and Warden Anglin in state court asserting claims under 42 U.S.C. §1983, Florida common law, and Title II of the Americans with Disabilities Act (ADA).[7] Defendants removed the case to this Court in January 2021 based on federal question and supplemental jurisdiction and thereafter filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  The motion was denied as moot after Mr. Wells filed an amended complaint.  *See* Doc. 14.

The amended complaint (Doc. 13) asserts seven claims:  a §1983 "failure to protect" claim against Sheriff Ford in his official capacity (Count I); a §1983 "failure

---

[7] 42 U.S.C. §12181, et seq.

to protect" claim against Major Anglin in his supervisory capacity (Count II); a §1983 deliberate indifference to serious medical needs claim against Sheriff Ford in his official capacity (Count III); a §1983 deliberate indifference to serious medical needs claim against Major Anglin in his individual capacity (Count IV); common law negligent training (Count V) and negligence (Count VI) claims against Sheriff Ford in his official capacity; and an ADA claim against Sheriff Ford in his official capacity (Count VII).  Sheriff Ford answered the amended complaint and Warden Anglin responded to the amended complaint with a motion to dismiss the claims against him under Rule 12(b)(6).  The Court granted Warden Anglin's motion in part and dismissed Count IV.  *See* Doc. 22.  Warden Anglin thereafter answered the amended complaint and the parties engaged in an extended period of discovery.

In July 2021, the case was stayed at the parties' request due to Mr. Wells' incompetency until an appropriate representative could be appointed to prosecute the case on his behalf.  *See* Doc. 31.  The stay was lifted in October 2021 after Plaintiff was appointed as Mr. Wells' legal guardian.  *See* Doc. 35.  Plaintiff was thereafter substituted for Mr. Wells as the named plaintiff pursuant to Fed. R. Civ. P. 25(b).  *See* Doc. 73.

After discovery closed, Defendants jointly filed a motion for summary judgment on all the remaining claims in the amended complaint.  The motion was fully briefed and is ripe for ruling.  No hearing is necessary.

8

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is "material" if it would change the outcome of the litigation, and a dispute about a material fact is genuine" if the record evidence could lead a reasonable jury to find in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), and where (as here) the nonmoving party bears the burden of proof on an issue at trial, the moving party may meet its initial burden by simply "showing … that there is an absence of evidence to support the nonmoving party's case," *id.* at 325 (internal quotation omitted).  Once the moving party meets its burden, the non-movant must go beyond the pleadings and identify evidence of record showing a genuine factual dispute for trial.  *Id.* at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted).

When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *Pennington v. City of*

*Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).  The Court's role at the summary

judgment stage is not to weigh the evidence, but rather to "conclude whether [the

evidence] is so one-sided that the result of any trial is inevitable." *Turner v. Phillips*,

2022 WL 458238, at *4 (11th Cir. Feb. 15, 2022).

### Analysis

Defendants argue that they are entitled to summary judgment on the remaining

claims because (1) as to the §1983 claims, there is no evidence from which a

reasonable jury could find that they or their policies were deliberately indifferent to

Mr. Wells' safety or his medical needs; (2) as to the ADA claim, there is no evidence

that Mr. Wells was denied any benefit or otherwise discriminated against based on

his disability; and (3) the state law claims are barred by sovereign immunity.  The

Court agrees with Defendants with respect to the federal claims, and based on the

disposition of those claims, the Court declines to exercise supplemental jurisdiction

over the state law claims.

### §1983 Claims

Plaintiff alleges that Sheriff Ford (Count I) and Warden Anglin (Count III)

were deliberately indifferent to his safety and that Sheriff Ford was deliberately

indifferent to his serious medical needs (Count II).  Each claim will be discussed in turn, starting with the "failure to protect"[8] claim against Sheriff Ford.

### *Failure to Protect – Sheriff Ford (Count I)*

The failure to protect claim against Sheriff Ford is against him in his <u>official</u> capacity, which means that it is a *Monell*[9] claim against the Sheriff's Office.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

To overcome Defendants' motion for summary judgment on this claim, Plaintiff must show that there are facts from which a jury could find "(1) that [Mr. Wells'] constitutional rights were violated; (2) that the [Sheriff's Office] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  Here, the Court need not address the third element because, as discussed below, there is no evidence from which a jury could find either of the first two elements.

---

[8]   A claim that prison officials inflicted cruel and unusual punishment by acting with deliberate indifference to an inmate's safety is commonly referred to as a "failure to protect" claim. *See Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021).

[9]   *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

*Constitutional Violation*

With respect to the first element, it is well established that prison officials have a constitutional duty[10] to protect prisoners from violence at the hands of other prisoners.  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  However, merely negligent failure to protect an inmate from being attacked by another inmate is not enough to establish a constitutional violation and impose liability under §1983.  *See Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).  Instead, to establish a constitutional violation, the inmate must establish that prison officials were "deliberately indifferent" to a substantial risk of harm—which requires the officials' knowledge of a "strong likelihood" of injury, not just a "mere possibility" of injury. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).

In the context of a failure to protect claim, the inmate must establish that prison officials were subjectively aware that there was strong likelihood that (1) the inmate was the target of a specific threat or (2) inmates were under a regular and constant threat of violence due to the dangerous conditions of the prison.  *See Estate of Owens v. GEO Group, Inc.*, 660 F. App'x 763, 769-771 (11th Cir. 2016).

---

[10] This duty arises under the Eighth Amendment with respect to convicted inmates and the Fourteenth Amendment with respect to pretrial detainees like Mr. Wells—but the applicable standards are the same. *See Balbin v. Latin*, 2022 WL 426508, at *3 (S.D. Fla. Feb. 11, 2022) (citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996)).

Here, there is no evidence that Bell or McCoy threatened Mr. Wells prior to the incident giving rise to this case and, as a result, there is no evidence that Jail officials were aware that Bell or McCoy posed a particularized risk to Mr. Wells' safety.  Merely because Bell and McCoy were classified as "high" security inmates is not enough to establish that they posed a particularized threat to Mr. Wells.  *See Gross v. White*, 340 F. App'x 527, 531 (11th Cir. 2009) (citing *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003), for the proposition that "jail officials' generalized awareness that an inmate was a violence-prone troublemaker was not enough to show that they were subjectively aware that he posed a substantial risk of serious harm to the plaintiff").

Likewise, because there is no evidence that there had been any similar prior incidents in the C-1 pod, there is no evidence from which the jury could find that the conditions that Mr. Wells was subjected to in that pod were so extreme that "serious inmate-on-inmate violence was the norm or something close to it."  *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019); *see also Johnson v. Lang*, 2022 WL 2734421, at *3 (11th Cir. July 14, 2022) (citing *Purcell ex rel. Est. of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005), for the proposition that "[e]xtreme levels of prisoner-on-prisoner violence may create a substantial risk of harm" but "'occasional, isolated attacks by one prisoner on another' are insufficient to establish this element"); *Estate of Owens*, 660 F. App'x at 771 (explaining that

13

"in order to succeed on a 'prison conditions' theory, a plaintiff cannot rely simply on 'occasional [or] isolated attacks by one prisoner on another' but rather must prove 'confinement in a prison where violence and terror reign'" (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (alterations in original))).

The Court did not overlook Plaintiff's argument that Jail staff was deliberately indifferent to Mr. Wells' safety by leaving a broom unattended in the common room of the C-1 pod.  However, there is no evidence that the broom had ever been used by an inmate to attack another inmate and there is no evidence that Jail staff were subjectively aware that there was a strong likelihood that the unattended broom posed a substantial risk of harm to Mr. Wells.  *See King v. Anderson*, 2014 WL 2504549, at *8-9 (M.D. Ala. June 2, 2014) (grating summary judgment against inmate who was attacked by another inmate with a broom because there was no evidence that the broom had previously been used as a weapon and, thus, the defendant officers had no reason to believe that there was strong likelihood that the broom posed a substantial risk of danger).

Accordingly, Plaintiff failed to establish that Mr. Wells' constitutional rights were violated by the Jail officials' alleged failure to protect him from being attacked by Bell and McCoy.

*Policy or Custom*

With respect to the second element, Plaintiff claims that Sheriff Ford has a policy of ignoring the needs of mentally and physically disabled inmates by housing them with violent felons. The problem with this argument is that the evidence fails to establish the existence of such a policy. In fact, the evidence establishes that the Sheriff's Office has a classification policy requiring "dangerous felons [to] be housed separately from misdemeanants" and the policy also provides that the housing determination for inmates with medical needs "will be based on a combination of needs and his/her security designation." Plaintiff does not argue that this policy, as written, is facially unconstitutional.

Notwithstanding the existence of a facially constitutional officially promulgated policy, municipal liability can be established if the municipality has a widespread "custom or practice" that contravenes the official policy and authorizes the unconstitutional practice at issue. *See Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 819 (11th Cir. 2017). Additionally, even in the absence of a widespread custom or practice, municipal liability can be established based on a single unconstitutional decision made or ratified by the municipality's final policymaker. *See Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989). However, neither of these circumstances are present here.

First, Plaintiff has not identified any other instances in which a disabled inmate has been attacked by another inmate in the C-1 pod or that it is a widespread practice to house disabled inmates in that pod.  Second, irrespective of whether Sheriff Ford or Warden Anglin is the final policymaker with respect to classification decisions at the Jail,[11] their ratification of the decision to house Mr. Wells in the C-1 pod would not impose municipal policy because that decision was not unconstitutional for the reasons stated above.  *Cf. Malone v. Butler*, 2012 WL 4009345, at *8 (N.D. Ala. Aug. 20, 2012) (finding that prison officials were entitled to qualified immunity from a failure to protect suit by a disabled inmate who was sexually assaulted by his cellmate because case law did not establish that housing disabled and non-disabled inmates together violated a clearly established constitutional right), *report and recommendation adopted*, 2012 WL 4009341 (N.D. Ala. Sept. 7, 2012).

\*   \*   \*

In sum, for the reasons stated above, there is simply no evidence from which a jury could find that Mr. Wells' constitutional rights were violated or that the Sheriff's Office has a policy, custom, or practice of failing to protect disabled

---

[11] Plaintiff argues that Warden Anglin is the final policymaker for all Jail policies because he has been delegated that authority by Sheriff Ford.  *See* Doc. 60 at 3, 24.  Defendants argue that Sheriff Ford is the final policymaker because he is the head of the Sheriff's Office and, notwithstanding his delegation of certain duties to Warden Anglin, he maintains control of the Jail and has the authority to (and does) meaningfully review Warden Anglin's decisions.  *See* Doc. 52 at 22-24; Doc. 64 at 2-4.  Resolution of that dispute is immaterial to the outcome of this case.

inmates from being attacked by other inmates.  Accordingly, Sheriff Ford is entitled to summary judgment on the failure to protect claim in Count I of the amended complaint.

*Failure to Protect – Warden Anglin (Count II)*

The failure to protect claim against Warden Anglin is against him in his <u>supervisory</u> capacity, and it is well established that "a plaintiff seeking to hold a supervisor liable for constitutional violations must show [1] that the supervisor either participated directly in the unconstitutional conduct or [2] that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Harrison*, 746 F.3d at 1298.  Here, there is no evidence that Warden Anglin participated in the decision to house Mr. Wells in the C-1 pod, so Plaintiff must show a causal connection between his actions and the alleged constitutional violation.

A casual connection can be established in three ways:

1) 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so'; 2) 'when a supervisor's custom or policy results in deliberate indifference to constitutional rights'; or 3) 'when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'

*Dickinson v. Cochran*, 833 F. App'x 268, 272 (11th Cir. 2020) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  The standard for establishing supervisory liability is "extremely rigorous," *id.* (quoting *Keith v. DeKalb Cnty.*,

*Ga.*, 749 F.3d 1034, 1048 (11th Cir. 2014)), and "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official [of the need to take action] must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences," *id.* (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Here, there is no evidence of any prior incidents involving disabled inmates being sexually assaulted (or otherwise attacked) by other inmates in the C-1 pod that would have put Warden Anglin on notice that the Jail's classification policy or the decisions of the classification counselors were causing widespread constitutional violations for disabled inmates. *See Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013) (rejecting inmate's argument that the general nature of the warden's job made it plausible that the warden was aware that the inmate's misclassification put him at substantial risk of harm). Moreover, as discussed above, there is no evidence from which a jury could find that the Jail had a custom or policy of violating disabled inmates' constitutional rights by housing them in the C-1 pod with dangerous inmates. Finally, there is no evidence that would support an inference that Warden Anglin directed the classification counselors (or other subordinates) to act unconstitutionally or that he knew that they were acting unconstitutionally and failed to stop them from doing so.

Under these circumstances, there is no basis to hold Warden Anglin liable in his supervisory capacity for the incident in which Mr. Wells was assaulted by Bell and McCoy.[12]  *See* Doc. 22 at 8 (denying Warden Anglin's motion to dismiss the failure to protect claim in Count II of the amended complaint but noting that this claim may not withstand summary judgment "if it turns out that Warden Anglin was not subjectively aware that [Mr. Wells] was vulnerable to attack due to his disabilities or that Bell and McCoy had an 'agenda' to harm [Mr. Wells]"). Accordingly, Warden Anglin is entitled to summary judgment on the failure to protect claim in Count II of the amended complaint.

*Deliberate Indifference to Serious Medical Needs – Sheriff Ford (Count III)*

Prison officials can be liable under §1983 for deliberate indifference to an inmate's serious medical needs.  Here, it is undisputed that Mr. Wells has serious medical needs since he has mental deficiencies and difficulty ambulating, but Plaintiff does not argue that Mr. Wells was not provided appropriate medical care or treatment for those needs.  Instead, Plaintiff claims that Sheriff Ford was deliberately indifferent to Mr. Wells' medical needs because "he should have been housed in the medical unit or the behavioral observation unit of the [Jail] rather than in protective custody."  Doc. 13 at ¶59.

---

[12]  Based on this disposition, the Court need not assess whether Warden Anglin was entitled to qualified immunity because the constitutional right he was alleged to have violated was not clearly established.

This is essentially a claim of misclassification and, thus, is effectively the same as the "failure to protect" claim asserted in Count I. *See* Doc. 22 at 4-5 (dismissing the identical deliberate indifference to serious medical need claim against Warden Anglin because "Plaintiff did not cite—nor could the Court find—any case law for the proposition that a deliberate indifference to a serious medical need claim can be based on the misclassification or failure to protect the inmate rather than the failure to provide necessary medical care or treatment"). Indeed, it is noteworthy that in her response in opposition to Defendants' motion for summary judgment, Plaintiff did not respond to Defendants' argument that Sheriff Ford was entitled to summary judgment on the deliberate indifference to medical needs claim in Count III of the amended complaint because that claim "is the same claim asserted against Sheriff in Count I, a claim for deliberate indifference based on misclassification, or a failure to protect." Doc. 52 at 37. Thus, it appears that Plaintiff has abandoned this claim. *See Est. of Miller v. Thrifty Rent-A-Car Sys., Inc.*, 637 F. Supp. 2d 1029, 1035 (M.D. Fla. 2009) ("[A]rguments not raised in response to a summary judgment motion are considered abandoned.") (citing *Crenshaw v. Lister,* 556 F.3d 1283, 1291 n. 3 (11th Cir.2009)).

Accordingly, for the reasons stated above with respect to Count I, Sheriff Ford is entitled to summary judgment on the deliberate indifference to medical need claim in Count III of the amended complaint.

ADA Claim

"[A] disabled prisoner can state a Title II-ADA claim if he is denied participation in an activity provided in state prison by reason of his disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998)).  To establish such a claim, Plaintiff must show that Mr. Wells is (1) a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) the exclusion, denial of benefit, or discrimination was by reason of [his] disability." *Id.* at 1083.

Prison officials must accommodate an inmate's disability, but the accommodation "need not be ideal; instead, it need only be reasonable and effective." *Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016) (citing *Wells v. Thaler*, 460 Fed. App'x. 303, 313 (5th Cir. 2012)).  Moreover, "a correctional facility is afforded deference in its determination of an appropriate accommodation." *Id.*

Here, it is undisputed that Mr. Wells a qualified individual and that the Jail is a public entity, but Sheriff Ford argues that there is no evidence from which a jury could find that Mr. Wells was denied any "program, service, or activity" or otherwise discriminated against because of his disability.  The Court agrees.

21

Plaintiff does not clearly articulate what program, service, or activity Mr. Wells was allegedly denied by his placement in the C-1 pod, and even if placement within a particular area of a jail is a "program, service or activity" (and it is not clear that it is), the undisputed evidence establishes that the reason Mr. Wells was placed in the C-1 pod was to accommodate his disability-based need to be segregated from the general population and to have a low bunk.  The fact that Mr. Wells' need for a low bunk could possibly have also been accommodated in another pod in the C Dorm does not mean that his placement in the C-1 pod was an unreasonable accommodation for Mr. Wells' disabilities because it is undisputed that his privileges and movement would have been more restricted than they otherwise needed to be if he been housed in another pod in the C Dorm.  *Cf. Olmstead. V. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation [of disabled individuals in custody] is properly regarded as discrimination based on disability.") Moreover, as discussed above with respect to the §1983 claims, there is no evidence from which a jury could find that Mr. Wells' housing assignment was made with deliberate indifference to his disabilities—which is a prerequisite for recovering compensatory damages under Title II of the ADA.  *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019).

In sum, there is no evidence from which a jury could find that Sheriff Ford violated Mr. Wells' rights under Title II of the ADA.  Accordingly, Sheriff Ford is entitled to summary judgment on Count VII of the amended complaint.

<u>State Law Claims</u>

The Court has supplemental jurisdiction over the state law claims in Counts V and VI of the amended complaint pursuant to 28 U.S.C. §1367(a).  However, based on the disposition of the federal claims, the Court is not required to retain jurisdiction over those claims.  *See* 28 U.S.C. §1367(c)(3) ("The district court[] may decline to exercise supplemental jurisdiction over [a state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction …. ").  Indeed, the Eleventh Circuit has "encouraged" district courts to dismiss any remaining state claims when the federal claims have been disposed of prior to trial.  *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004).

When deciding whether to retain or decline supplemental jurisdiction under §1367(c), the district court is to consider the *Gibbs*[13] factors:  judicial economy, convenience, fairness, and comity.  *See West v. City of Albany, Ga.*, 830 F. App'x 588, 597 (11th Cir. 2020) (citing *Ameritox, Ltd. v. Millenium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015)).  Here, although interests of judicial economy weigh in favor of retaining jurisdiction because the summary judgment arguments on the state

---

[13]  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

law claims have been fully briefed, interests of comity weigh strongly against retaining jurisdiction because the resolution of the state law claims involve nuanced issues of state sovereign immunity and the potential application of the "undertaker doctrine" that the state courts are better suited to address. The other *Gibbs* factors—convenience and fairness—are neutral because both parties are citizens of Florida and the state court in which this case was originally filed is an equally convenient and fair forum for the parties.

The Court recognizes that this case has been pending for nearly two years at this point and that remanding the state law claims to state court will further delay the final disposition of the case. However, the delay should be minimal because the summary judgment motions on the state law claims are fully briefed and ripe for resolution by the state court upon remand. *See Parcesepe v. Geo Grp., Inc.*, 2021 WL 5033986, at *7 (N.D. Fla. Mar. 22, 2021) ("Although the Court recognizes that remanding the state law claims back to state court may delay the final disposition of this case, it should not require much if any additional work on behalf of the parties (and no duplication of work by the state court) because discovery is complete and the motion for summary judgment is fully briefed and ready to be decided.").

Accordingly, because the *Gibbs* factors weigh against retaining jurisdiction over the state law claims, the Court will remand those claims to the court from whence they came.

**Conclusion**

In sum, for the reasons stated above, it is **ORDERED** that:

1.    Defendants' motion for summary judgment (Doc. 52) is **GRANTED** with respect to the federal claims in Counts I, II, III, and VII of the amended complaint.  Count IV was previously dismissed.  *See* Doc. 22.

2.    The Court declines to exercise supplemental jurisdiction over the state law claims in Counts V and VI and those claims are **REMANDED** to the Circuit Court for the Fourteenth Judicial Circuit in and for Bay County, Florida.

3.    The Clerk shall enter partial final judgment in favor of Defendants on Counts I, II, III, IV, and VII and then close the case file.

**DONE and ORDERED** this 22nd day of August, 2022.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**